```
            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO


JOHN TRUJILLO,
         Plaintiff,

vs.                       Cause No. 15-CV-00901 JB-WPL

RIO ARRIBA COUNTY ex rel.,
RIO ARRIBA COUNTY SHERIFF'S
DEPARTMENT, DEPUTY GILBERT ATENCIO,
in his individual capacity, and
LIEUTENANT MARVIN ARMIJO,
in his individual capacity,
         Defendants.



              ORAL DEPOSITION OF JOHN TRUJILLO
                       May 5, 2016
                       10:02 a.m.
              Offices of Brennan & Sullivan, P.A.
                     128 East De Vargas
                    Santa Fe, New Mexico


              PURSUANT TO THE NEW MEXICO RULES OF
     CIVIL PROCEDURE this deposition was:


     TAKEN BY:    MR. JAMES P. SULLIVAN, ESQUIRE
                  ATTORNEY FOR THE DEFENDANTS




     REPORTED BY: DIANNA M. ALVAREZ, NM CCR #141
                  Court Reporters de Santa Fe
                  Post Office Box 9603
                  Santa Fe, New Mexico 87504
                                                          1
```

```
                    A P P E A R A N C E S

For the Plaintiff:

     KENNEDY KENNEDY & IVES, LLC
     Attorneys at Law
     1000 Second Street, Northwest
     Albuquerque, New Mexico 87102
     BY: MS. THERESA V. HACSI

For the Defendants:

     BRENNAN & SULLIVAN, P.A.
     Attorneys at Law
     128 East De Vargas
     Santa Fe, New Mexico 87501
     BY: MR. JAMES P. SULLIVAN

Also Present:

     Mrs. Linda Trujillo




                         I N D E X

EXAMINATION OF JOHN TRUJILLO
     By Mr. Sullivan                         3

CERTIFICATE OF COMPLETION OF DEPOSITION     70

SIGNATURE/CORRECTION PAGE                   71




                                                          2
```

```
                       JOHN TRUJILLO
after having been duly sworn upon oath, was questioned
and testified as follows:
                        EXAMINATION
BY MR. SULLIVAN:
     Q.   Mr. Trujillo, would you tell Dianna Alvarez
your full name.
     A.   Pardon me?
     Q.   Your full name.
     A.   John Edward Trujillo.
     Q.   Have you gone by any other names in the past?
     A.   No. I mean, no, friends call me J.T.
     Q.   Okay.
     A.   But that's just an abbreviation, I guess.
     Q.   Mr. Trujillo, my name is Jamie Sullivan, I
introduced myself earlier. I'm the attorney
representing Defendants in this lawsuit you brought
against Rio Arriba County and various deputies. So I'm
here today to ask you about your case, about your
background and other related matters, okay? And let me
ask you this, have you ever had your deposition taken
before?
     A.   No.
     Q.   Well, just a few ground rules, I don't want to
make it too complex. But you're under oath so it's very
                                                          3
```

```
important that you understand my question. If you have
any doubt what I'm asking, stop me and I'll rephrase it
in a way you do understand, okay?
     A.   Okay.
     Q.   What did you do in preparation for your
deposition today? Did you look over any documents, for
instance?
     A.   Oh, I guess -- what's today? The days have
been -- the last couple of weeks have been rather hectic
for me related to another project that the days all kind
of run together. But we, of course, had to answer the
Interrogatories and I think that would be it.
     Q.   Okay. Did you meet with your attorneys
before?
     A.   Yes.
     Q.   When was that?
     A.   Yesterday briefly, less than an hour.
     Q.   In Albuquerque?
     A.   Yes.
     Q.   And you stayed in Albuquerque last night?
     A.   No, I stayed here.
     Q.   In Santa Fe?
     A.   Yes.
     Q.   You said the last couple of days have been
hectic, how so? Or the last couple of weeks have been
                                                          4
```

EXHIBIT C

```
 1  well enough to do this."  I said, "Okay."  Well, at one
 2  point I think he asked me to recite the part of the
 3  alphabet beginning at whatever, J and then M or
 4  something, I don't recall the exact letters, which
 5  obviously was not a challenge.  He asked me to touch my
 6  fingers to my thumb.  Well -- and I recall that he
 7  criticized me, but I had no right thumb as I did not
 8  touch my thumb over here.
 9      Q.  Why didn't you use your left hand?
10      A.  I did, but with both hands.
11      Q.  You did it with both hands?
12      A.  He asked me to do it with both hands.
13      Q.  Okay.
14      A.  Okay?
15      Q.  And you're sure about that?
16      A.  Yes.
17      Q.  At the same time simultaneously?
18      A.  I don't recall.
19      Q.  Or did you do it with one hand and then do it
20  with the other hand?
21      A.  I'm guessing, as you just described, it was
22  with the left or with the right.
23      Q.  So you probably did it with your one hand
24  first and then your other hand second; correct?
25      A.  That would be my guess.
                                                        49
```

```
 1      Q.  Okay, and were you able to do it?
 2      A.  Well, this was wasn't a problem, this one
 3  obviously is next to impossible.  There is no thumb.
 4      Q.  Right, but can you touch the stub of your
 5  thumb with your fingers?
 6      A.  No.
 7      Q.  You can't go like that, like I'm doing?
 8      A.  Okay, that is as far that comes.
 9      Q.  So you can put your fingers to the base of
10  your thumb; is that correct?
11      A.  Yes.
12      Q.  Did you do that that night?
13      A.  Yes.
14      Q.  And did you do it in the order that he said?
15      A.  Yes.
16      Q.  One, two, three, four, four, three, two, one?
17      A.  I don't recall that that was the order but I
18  was able to perform his task, yes.
19      Q.  And you did it with your left hand as well?
20      A.  Yes.
21      Q.  And you performed that task you say?
22      A.  Yes.
23      Q.  Okay.  And then what else happened?
24      A.  At one point he had the small breathalyzer.  I
25  couldn't describe it to you, I just recall it was
                                                        50
```

```
 1  relatively small.  He asked me to blow on it until I
 2  heard the beep.  At this -- when they -- when all of
 3  this commenced there were two or three other officers
 4  there, they walked away.  He handed -- or he put the
 5  breathalyzer in my mouth and he said blow until it
 6  stops, until you hear the beep.
 7          I began to blow almost instantaneously, he
 8  took it from my mouth and he dropped the tube to the
 9  ground.  And he said, "You have a 0.12."  I wanted to
10  laugh because I knew that was ridiculous actually.  And
11  so I -- I immediately told him that I wanted a blood
12  test to validate his claim of my having a 0.12.  And he
13  then asked me to -- we then moved over back by the back
14  of my car and he said, "Well, we're going to do some
15  more field sobriety tests."
16          And so we went to the rear of my car again and
17  it was at that point that he asked me to do the -- with
18  one foot in front of the other, kind of heal to toe.
19  And then, of course, because of the neuropathy it was
20  just impossible.  I think his report says that in my --
21  for my safety that he terminated the field sobriety test
22  at that point.  I couldn't do it here today.
23          So -- so he then at one point asked me to turn
24  and face the mountain which would have been to the
25  northeast, I guess, if you will, and put my arms
                                                        51
```

```
 1  outside.  And when I did that, he immediately slapped a
 2  cuff on my wrist.  And I'm grateful that because of my
 3  shoulders -- issues with, you know, arthritis in my
 4  shoulders and such that they did fortunately cuff me in
 5  front.  And I -- I do appreciate that consideration.
 6  But -- and then -- do you want me to continue or?
 7      Q.  Well, let's stop right there.
 8      A.  Okay.
 9      Q.  So up to the point where he handcuffed you in
10  the front, do you remember anything else that you and
11  the officer said up to that point?  Because I need to
12  know everything that you recall saying.
13      A.  The -- I do not recall if it was officer
14  Atencio or one of the other officers, someone asked
15  me -- at this point other officers had returned to the
16  scene.  And when I say the scene, the immediate locale.
17  So there were Officer Atencio as well as a couple of
18  other officers there.  And one of them asked, "Is there
19  anyone that can pick up your car?  Otherwise we will
20  have to have it towed."
21      Q.  Now was this before you were cuffed or after
22  you were cuffed?
23      A.  I'm guessing it was after I was cuffed.
24      Q.  I'm talking about the period of time when you
25  first saw the first officer up to the time that you were
                                                        52
```

John Trujillo vs. Rio Arriba County, et al.                                    John Trujillo

**Page 53**

1  handcuffed. You talked about the officer asked you to
2  get out of the car, you asked if you could use a cane;
3  right?
4     A.  Correct.
5     Q.  The officer took you through the finger test
6  on both hands.
7     A.  Correct.
8     Q.  We talked about that. The officer had you do
9  a field sobriety test, foot heal toe, and you couldn't
10 do that because of your disabilities you said; right?
11    A.  Correct.
12    Q.  He asked you to turn your face to the mountain
13 with your arms out?
14    A.  Correct.
15    Q.  And then he handcuffed you?
16    A.  One statement that I did make to him was, I
17 said -- I did attempt to reiterate, if you will,
18 emphatically that, "There is a handicap sticker right
19 there on the dash of my car."
20    Q.  And you told the officer that?
21    A.  I did in fact tell the officer that.
22    Q.  Before you were handcuffed?
23    A.  Multiple times.
24    Q.  Okay, that's what I'm looking for,
25 conversations you had with the police officer.

**Page 54**

1     A.  Yes.
2     Q.  Anything else you remember discussing with the
3  officers before the officer handcuffed you and put you
4  under arrest that we haven't talked about?
5     A.  No.
6     Q.  Okay.
7     A.  Not -- I don't recall. I mean, if you refresh
8  my memory maybe I can remember or fill in a gap for you
9  but I -- at this point I say, no.
10    Q.  So then you're handcuffed and what happens
11 next?
12    A.  I was asked if there was anyone who could pick
13 up my car. If not, it would have to be towed and there
14 would be a cost. I said, "Yes." I had my cell phone
15 here and I must have been wearing a shirt with a shirt
16 pocket. The one -- I'll refer to him as a deputy, I
17 think he was really the transport driver, and I said,
18 "In my phone here is Mike Romero who owns the
19 convenience store right there, you can call him." And I
20 said, "His number is in my phone."
21        And so the young deputy, I'm assuming it was a
22 deputy, I don't know, I don't know the hierarchy or
23 structure or the uniforms to recognize one from the
24 other but I assume it was the actual deputy. And so --
25 but he was a pleasant enough young man. He reached in

**Page 55**

1  and he took my phone and he scrolled through, used the
2  directory and found Mike's phone number. At that time I
3  did not hear -- I do not believe I heard the beginning
4  of the conversation with Mike. He instructed the
5  officer to take me across the road and put me into the
6  back of -- this is Officer Atencio, to put me in the
7  back of his vehicle.
8     Q.  Okay.
9     A.  And so they took and put me in the back of his
10 vehicle.
11    Q.  Do you remember any other discussions up to
12 that point with the police officers?
13    A.  No, I think I told you earlier that I was very
14 emphatic that I wanted a -- a blood test to validate his
15 claim of that 0.12. And that was -- oh, he -- he did at
16 one point -- let's see, I'm going to go back. He did at
17 one point something that you mentioned earlier, he said,
18 "Spit that -- spit that mint out of your mouth."
19        Well, I can understand that he probably
20 thought I was attempting to mask the odor of alcohol.
21 That, I was trying to explain, was not my concern.
22    Q.  Okay. Anything else you recall up to being
23 put into the back seat?
24    A.  No.
25    Q.  Okay. Who drove you in that car back to

**Page 56**

1  Espanola?
2     A.  Officer Atencio.
3     Q.  Did you have any discussions with Atencio from
4  the time you left Velarde back to Espanola?
5     A.  No.
6     Q.  And he took you to the hospital; is that
7  correct?
8     A.  Yes.
9     Q.  What do you recall happening at the hospital?
10    A.  We went to the hospital, he wanted them to do
11 a blood alcohol or -- well, obviously, I had requested
12 the blood alcohol test to validate his claim. We went
13 to the hospital, there was a doctor there as well as the
14 other medical staff and they eventually took a blood
15 draw.
16        I asked for a second blood draw. And quite
17 candidly the reason because I'm not familiar with blood
18 samples, who would have it, the chain of possession or
19 anything, so I wanted a blood sample that was
20 independently out of their control.
21    Q.  "Their" meaning the police?
22    A.  The police.
23    Q.  Okay.
24    A.  So I wanted a blood sample. I -- I don't know
25 if they can be altered or not be altered, I just wanted

1  what I would consider a totally independent blood
2  sample.
3      Q.  Okay.
4      A.  He, at that point, basically refused the staff
5  from taking a second blood draw from me.  And the doctor
6  did a physical on me and she told him that because of my
7  health issues and the peritoneal dialysis that under no
8  circumstances would she clear me for incarceration
9  unless I were going into a incarceration facility that
10 had medical care to accommodate my medical needs.  And
11 his response was, "Well, he should have been out -- he
12 shouldn't be out getting drunk and driving if he's so
13 damn worried about his health" or something to that
14 effect.
15     Q.  When you were getting the physical by the
16 doctor I assume your handcuffs were off; correct?
17     A.  No.  They -- I think they kept me handcuffed
18 the entire time.
19     Q.  At the hospital?
20     A.  At the hospital and while I was in the cell.
21     Q.  Are you sure about that?
22     A.  I'm pretty sure, yes.
23     Q.  And your handcuffs were in front the entire
24 time; right?
25     A.  Yeah.

                                                        57

1      Q.  Do you remember any other discussions at the
2  hospital?  Did you call your daughter, your
3  stepdaughter?
4      A.  I -- well, I called my daughter when they took
5  me across and put me in the car.  Momentarily before
6  Officer Atencio got in the car I took my phone and, as I
7  said, I was cuffed in front, I reached, I dialed her and
8  I told her I was under arrest.  And she thought I was
9  joking.  And I said, "No, I'm serious."  And so I -- she
10 asked me and as best I could I said, "I'm here and I
11 assume they're taking me to Espanola."
12     Q.  When was that phone call, Mr. Trujillo?  I
13 hate to interrupt but when was that, after the hospital?
14     A.  No, it was before, it was at the -- it was
15 while we were still in Velarde.
16     Q.  Okay.
17     A.  And they had -- the field sobriety issues had
18 just taken place.  They had just handcuffed me.  The
19 officer first used my phone to call Mike to come and
20 retrieve my vehicle.  They put me in the car in the back
21 seat, and it was during that time I called my daughter.
22 I saw -- fortunately they were able to get Mike who
23 lives right there at that little convenience store, and
24 lives up behind in the house.  And I saw Mike and his
25 wife come and retrieve my vehicle.

                                                        58

1      Q.  Okay.  After you left the hospital you were
2  taken where?
3      A.  To the jail, what I'll term is a jail.  It's
4  kind of like an administrative building, I didn't even
5  know it existed there in Espanola.
6      Q.  The Sheriff's Department?
7      A.  Yes, it's a little building kind of back on
8  the side street there.  I could find it, I -- I couldn't
9  drive straight to it but, you know, I know the general
10 area.
11     Q.  Did you have any discussions in the car
12 between the hospital and we'll call it the Sheriff's
13 Department with Mr. Atencio?
14     A.  No.
15     Q.  Okay.  So then you're at the Sheriff's
16 Department and what happens?
17     A.  They put me in a cell and I think I asked him
18 why I had not -- at some point, that I had still wanted
19 an independent blood sample and basically was ignored.
20 I stayed in the cell for a period of time.  I could hear
21 people who were in fact drunk in cells next to me.
22 Pretty soon they took me out of the cell and he asked me
23 to sign a document.  And I advised him that I did not
24 have my reading glasses and so I could not read the
25 document.

                                                        59

1          And at the time I had cataracts that
2  unfortunately my vision was not as good to -- you know,
3  in terms of reading and such and so I did not have my
4  reading glasses on.  He asked me to sign the document
5  and I said, "Officer, I can't."  I said, "I don't know
6  what I'd be signing."  And so it was at that point that
7  he said, "Well, here use mine."  And then there was an
8  officer to his right and across the desk and that
9  officer said, "Oh, no, use mine."  And they began to
10 ridicule me.
11         And I just thought it was best to just keep my
12 mouth shut and just sit there and let them carry on.
13 And so then he said, "You're not signing this then?"
14 And I said, "No."  I said, "I will be glad to sign it
15 once my daughter gets here.  And if she reads it and
16 tells me it's okay to sign it, I will sign it but not
17 until that time because I don't know what I'm signing."
18         I said, "My glasses are in the little fanny
19 pack.  I carry a fanny pack that I frequently carry in
20 the trunk of my car."  And so he then asked what I will
21 term the transport driver to put the handcuffs back on
22 me and they put me back into the jail cell.
23     Q.  The handcuffs in the front again?
24     A.  Yes.
25     Q.  So handcuffs were off for awhile?

                                                        60

John Trujillo vs. Rio Arriba County, et al.                                John Trujillo

```
 1    A.  For just a few minutes that I was there in
 2 front of him and while he was trying to get me to sign
 3 the -- the form.
 4    Q.  Okay.  Did you ever get a second blood test?
 5    A.  Eventually I did get a second blood test.
 6 They took me finally to -- back to the hospital and gave
 7 me a second blood test which he, I think at the
 8 administrative hearing, said, "Oh, well, that was well
 9 after the fact so that is not a valid blood test."  But
10 I -- what I know about the time restraints, I can't tell
11 you.
12    Q.  That was Atencio that took you back to the
13 hospital for the second blood test?
14    A.  No, it was the transport driver.
15    Q.  Okay.
16    A.  And they took me in a van.  They had a -- a
17 small plastic like one of those -- what we call the milk
18 crates, those little plastic milk crates, to get in and
19 out of the van.  Because of my weight, I did not trust
20 that milk crate because I didn't want to step through
21 that plastic and have it break and have it, you know,
22 cut into my leg or anything.
23         So I opted not to use their crate and instead
24 more of a -- crawled into the van that was further
25 elevated.  And -- which I would suggest they use
                                                      61
```

```
 1 something more sturdier than -- than that little plastic
 2 basket.  Because, you know, someone steps through it and
 3 it breaks and you've got another problem on your hands,
 4 it's unnecessary.
 5    Q.  So after you got the second blood test you
 6 were taken back to the jail?
 7    A.  I was taken back to the jail, handcuffed
 8 again.  Well, handcuffed and at the time I guess
 9 remained handcuffed.  Then an officer -- and, I'm sorry,
10 I don't remember her name now, she gave me her card,
11 it's in my statement here that she came to my cell and
12 she asked -- began to ask me questions.  And I said,
13 "Well" -- I began to explain the phone calls that I had
14 through the day and I understand and appreciated, you
15 know, that people would, you know, want to know, you
16 know, what I was doing and where I was and such.  But,
17 you know, I believe there's a proper courtesy.
18         In any event, I can't recall the lady's name.
19 I guess she was with one of the State agencies that
20 checks on the alcohol serving and issues tickets for
21 people that overserve or whatever.  She asked me -- she
22 came into my cell and then she went and retrieved my
23 phone.  I sat and explained to her moment by moment the
24 phone calls that I had made through the day.  I guess
25 from the time I left that morning, getting to
                                                      62
```

```
 1 Albuquerque and my doctor's appointment when I left, the
 2 phone calls I made after the doctor's appointment.
 3         And she's sitting there going through my phone
 4 and validated my comments.  And then she asked me for a
 5 copy of -- she asked me for -- if I would be willing to
 6 provide her with a copy of the receipt which I had told
 7 her what I had had for dinner and from the menu and what
 8 I had ordered in the way of drinks.  And I told her
 9 that, yes, I would.  And then, of course, after getting
10 out of jail and I hired Tom Clark and he advised against
11 it.  And so I did not provide her with that receipt.
12    Q.  Any other discussions you recall in jail that
13 you haven't talked about with the officers?
14    A.  No.
15    Q.  Okay.  And then I take it your daughter
16 appeared?
17    A.  She appeared.  Now, I -- there were no
18 conversations.  I did in fact hear Officer Atencio
19 telling the transport driver to take me to Rio -- to
20 Tierra Amarilla, and to -- to transport me up there to
21 put me in jail.  And that way I wouldn't be released
22 that night because of whatever.  And I heard that
23 conversation.
24         And then -- then what was even worse is even
25 after my daughter got there and they told her that my
                                                      63
```

```
 1 bail would be $3,000 plus $5 administrative fee or
 2 whatever, and she said, "Okay, let me go get it."  And,
 3 again, it took until the transport officer -- "Well,
 4 hurry up, let's ship him up there and let her deal with
 5 it in T. A."
 6    Q.  Atencio said that?
 7    A.  Yes.
 8    Q.  Well, why didn't he send you up to T. A.?
 9    A.  I was in the jail cell, I can't tell you that.
10 I mean, I couldn't see, I could just hear the
11 conversation and I think that the -- I can only
12 speculate that I think the -- the transport driver was
13 attempting to hopefully delay, I don't know.  But I was
14 fully being expected to be transported to T. A., yes.
15    Q.  Okay.
16    A.  Which would, obviously, you know, it was
17 already late at night and driving through the mountains
18 with the wildlife and such, you know, I think it's just
19 an unnecessary risk and -- and a safety factor to my
20 daughter that -- that I did not appreciate.
21    Q.  Anything else you recall?
22    A.  No.
23    Q.  Okay.  As I understand it, in this lawsuit,
24 you're claiming certain damages?
25    A.  Yes.
                                                      64
```