## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN TRUJILLO,

       Plaintiff,

vs.                                                                                    No. CIV 15-0901 JB/WPL

RIO ARRIBA COUNTY ex rel, RIO ARRIBA
COUNTY SHERIFF'S DEPARTMENT, DEPUTY
GILBERT ATENCIO, in his individual capacity,
and LIEUTENANT MARVIN ARMIJO, in his
individual capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion to Extend Discovery Deadline, filed May 9, 2016 (Doc. 28)("Motion").  The primary issue is whether the Court should extend the discovery period when counsel for Defendants Rio Arriba County, Rio Arriba County Sheriff's Department, Deputy Gilbert Atencio, and Lieutenant Marvin Armijo agreed with Plaintiff John Trujillo's counsel to extend the time to take the depositions of the two Individual Defendants -- Atencio and Armijo -- even though Atencio and Armijo have filed a Motion for Qualified Immunity and Summary Judgment, filed June 7, 2016 (Doc. 34)("MSJ"), and the Defendants' Motion to Stay Discovery, filed June 9, 2016 (Doc. 35)("Motion to Stay"). The Court will grant the Motion, because: (i) the parties' agreement to extend the discovery period constitutes good cause under rule 16 of the Federal Rules of Civil Procedure; and (ii) it is unlikely that there is a qualified immunity defense in this case, making it unlikely the Court will need to stay discovery pending a ruling on the MSJ.

## FACTUAL BACKGROUND

This case arises out of the alleged wrongful arrest of Plaintiff John Trujillo on August 22, 2013, for driving under the influence of alcohol.  <u>See</u> Complaint to Recover Damages Pursuant to the New Mexico Tort Claims Act and for the Deprivation of Rights Guaranteed by the New Mexico Constitution ¶¶ 20-80, at 3-7, filed on August 20, 2015 in <u>John Trujillo v. Rio Arriba County ex rel Rio Arriba County Sheriff's Department, Deputy Gilbert Atencio, and Lieutenant Marvin Armijo</u>, D-117-CV-2015-00301, First Judicial District Court, County of Rio Arriba, State of New Mexico, case removed and pleadings filed in federal court on October 7, 2015 (Doc. 1)("Complaint").  Trujillo, an honorably discharged veteran of the United States Army, suffers from degenerative joint disease in his knees, nephropathy,[1] and end stage renal disease associated with diabetes mellitus.  <u>See</u> Complaint ¶¶ 8-9, at 2.  At approximately 7:00 p.m., Trujillo stopped at a Driving While Intoxicated checkpoint where Atencio asked Trujillo to perform sobriety tests.  <u>See</u> Complaint ¶¶ 36-78, at 4-6.  Because of his disability, Trujillo asked to "retrieve his walking cane from the trunk of his car."  Complaint ¶ 38, at 4.  Atencio denied him the opportunity to retrieve his cane, even though Trujillo "repeatedly attempted to explain to Deputy Atencio that he had physical disabilities and offered to produce his Handicap Placard to prove his physical limitations."  Complaint ¶¶ 43-44, at 4.  Atencio noted that Trujillo struggled to perform various walking and standing tests, but Trujillo informed Atencio "that he has knee problems" and other ailments that prevented him from performing the tests adequately. Complaint ¶¶ 64-73, at 6.

---

[1]"Nephropathy means kidney disease or damage.  Diabetic nephropathy is damage to your kidneys caused by diabetes.  In severe cases it can lead to kidney failure."  <u>Diabetic Nephropathy</u>, WebMD, http://www.webmd.com/diabetes/tc/diabetic-nephropathy-topic-overview.

Pursuant to Atencio's requests, Trujillo blew into a handheld Preliminary Breath Test, but Atencio "did not show the PBT results to Plaintiff or any other officer," and then discarded the test.  Complaint ¶¶ 48-51, at 4-5.   Atencio eventually arrested Trujillo for driving under the influence of alcohol.  See Complaint ¶¶ 36-78, at 4-6.  After arresting Trujillo at approximately 7:16 p.m., Atencio kept Trujillo in handcuffs until Trujillo's daughter paid his bail around midnight.  See Complaint ¶ 91, at 7.  Throughout the encounter, Trujillo was allowed out of the hundcuffs only once to sign paperwork related to his arrest.  See Complaint ¶ 92, at 7.

## PROCEDURAL BACKGROUND

Trujillo brings civil rights and tort claims against the Defendants pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), and the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -27.  In Count I, Trujillo alleges that Atencio violated state law when Atencio falsely imprisoned him, causing him to "suffer compensable damages in the form of bodily injury and emotional distress."  Complaint ¶¶ 109-112, at 9.  In Count II, Trujillo contends that Atencio violated state law when Atencio falsely arrested him without probable cause.  See Complaint ¶¶ 115-116, at 10.  In Count III, Trujillo asserts a state-law malicious-abuse-of-process claim against Atencio for "misus[ing] the criminal process by filing charges against Plaintiff without a reasonable belief that Plaintiff committed a crime."  Complaint ¶ 120, at 10.  Finally, in Count IV, Trujillo argues that Rio Arriba County violated Title II of the ADA.  See Complaint ¶¶ 125-137, at 10-12.  Trujillo states that, on "the basis of his disability, Plaintiff was denied the benefits of services, programs, and activities of the Department of Public Safety," including: (i) "encounters with officers properly trained to deal with citizens who suffer from service-related disabilities;" and (ii) "being treated with dignity by the government entity sworn to protect its community's citizens."  Complaint ¶ 130, at 11.  He

- 3 -

explains that the "Defendants discriminated against Plaintiff by arresting Plaintiff for the manifestations of his disability," and "failed to provide adequate accommodations for disabled persons" while conducting field sobriety tests and when they placed Trujillo in jail.  Complaint ¶¶ 132-134, at 11.  Trujillo therefore requests actual and compensatory damages, attorney's fees and costs, and other relief that the Court deems proper.  See Complaint at 12.

On January 20, 2016, the parties agreed to a Scheduling Order, filed January 20, 2016 (Doc. 12).  The Scheduling Order assigns the case a "standard" track classification.  Scheduling Order at 1.  Accordingly, it lists the "termination date for discovery" as May 9, 2016.  Scheduling Order at 1.  The discovery deadline "require[s] that discovery be completed on or before the above date."  Scheduling Order at 1 (emphasis in original).

On April 11, 2016, the Defendants' counsel asked for dates to depose Trujillo and his expert.  See Reply in Support of Plaintiff's Motion to Extend Discovery Deadline at 1, filed June 9, 2016 (Doc. 36)("Reply"); Email from Sabrina Salvato, Attorney for the Defendants, to Joseph P. Kennedy, Attorney for the Plaintiff (dated April 11, 2016), filed June 9, 2016 (Doc. 36-1).  On April 18, 2016, Trujillo's counsel requested dates to depose Atencio and Armijo.  See Reply at 1; Email from Joseph Kennedy, Attorney for the Plaintiff, to Sabrina Salvato, Attorney for the Defendants (dated April 18, 2016), filed June 9, 2016 (Doc. 36-2)("April 18 Email").  On April 26, 2016, the Defendants' counsel informed Trujillo's counsel that the two officers were scheduled to be in SWAT training for three weeks starting May 1, 2016, which meant that their depositions could not be conducted until after the SWAT training.  See Reply at 1; Emails between Sabrina Salvato, Attorney for the Defendants, and Joseph P. Kennedy, Attorney for the Plaintiff (dated April 26, 2016), filed June 9, 2016 (Doc. 36-3)("April 26 Email Exchange").  That same day, Trujillo's counsel asked "whether defense counsel would oppose an extension of

the discovery deadline so that Plaintiff would be able to take the depositions of the named defendants." Reply at 1. <u>See</u> April 26 Email Exchange. The Defendants' counsel responded: "Of course not"; the Defendants' counsel then proceeded to discuss future dates beyond the discovery deadline that might be available for depositions. Reply at 2-3. <u>See</u> Email from Sabrina Salvato, Attorney for the Defendants, to Joseph P. Kennedy, Attorney for the Plaintiff (dated April 26, 2016), filed June 9, 2016 (Doc. 36-4); Emails between Joseph Kennedy, Attorney for the Plaintiff, and Sabrina Salvato, Attorney for the Defendants (dated April 28, 2016), filed June 9, 2016 (Doc. 36-5)("April 28 Email Exchange"). Trujillo's counsel first proposed dates in early June, 2016, but the Defendants' counsel rejected those dates because of scheduling conflicts, and asked to schedule the depositions at the end of June, 2016. <u>See</u> Reply at 2; April 28 Email Exchange.

On May 9, 2016, the discovery deadline, counsel exchanged emails related to an extension of discovery. <u>See</u> Email from Alissa Ferguson, Paralegal for Kennedy, Kennedy & Ives, to Sabrina Salvato, Attorney for the Defendants (dated May 9, 2016), filed June 9, 2016 (Doc. 36-7). That same day, Trujillo filed the Motion asking the Court to extend the discovery deadline from May 9, 2016 to June 30, 2016. <u>See</u> Motion at 1. Trujillo asserts that the "parties have yet to take a number of important depositions." Motion at 1. He explains that, on April 18, 2016, he originally sought to depose the Defendants, but the Defendants did not respond until April 26, 2016. <u>See</u> Motion at 1. Trujillo further explains that the Defendants stated that they would be unavailable in early May, 2016 for SWAT training. <u>See</u> Motion at 1. Trujillo argues that, because of this delay, he needs more time to take the Defendants' depositions and to properly prepare the case for trial. <u>See</u> Motion at 1.

The Defendants responded on May 23, 2016.  See Defendants' Response to Plaintiff's Motion to Extend Discovery Deadline, filed May 23, 2016 (Doc. 30)("Response").  They call Trujillo's Motion "futile," because they "intend to file a Motion for Summary Judgment raising the affirmative defense of qualified immunity."  Response at 1.  They explain that they will also file a Motion to Stay Discovery before the deadline for filing motions.  See Response at 1.  Moreover, they argue that Trujillo had four months to conduct discovery.  See Motion at 2.  The Defendants conclude that Trujillo has not shown good cause to extend discovery.  See Motion at 2.  They note, however, that they "*will not oppose* Plaintiff taking the depositions" if they do not prevail on the Motion for Summary Judgment.  Motion at 1-2 (emphasis in original).  Finally, they clarify that they oppose any attempt to enlarge all discovery.  See Motion at 2.  Since filing the Response, the Defendants have filed both a Motion for Qualified Immunity and Summary Judgment, filed June 7, 2016 (Doc. 34), and the Defendants' Motion to Stay Discovery, filed June 9, 2016 (Doc. 35).

On June 9, 2016, Trujillo replied.  See Reply at 1.  Trujillo describes the exchange between counsel.  See Reply at 1-2.  Trujillo provides the Court with the emails that confirm that the Defendants' counsel agreed to allow Trujillo to depose Atencio and Armijo in June, 2016.  See Reply at 1-2.  Trujillo asserts that he "would have set the depositions of the officers prior to the end of discovery" had "defense counsel not agreed to allow her clients to be deposed outside of the discovery deadline."  Reply at 2.  Trujillo therefore asks that the Court "find good cause for the extension of discovery for the sole purpose of taking defendants' depositions."  Reply at 3.

The Court held a hearing on June 10, 2016.  <u>See</u> Transcript of Hearing (taken June 10, 2016)("Tr.").[2]   The Court started the hearing by stating that it was inclined to grant the extension, because: (i) the Court was skeptical that the Individual Defendants could successfully raise qualified immunity; (ii) Rio Arriba County could not raise qualified immunity; and (iii) the Defendants had earlier agreed to allow Trujillo to depose the Individual Defendants.  <u>See</u> Tr. at 1:1-2:4 (Court).  Trujillo confirmed that he did not allege his ADA claim against the Individual Defendants.  <u>See</u> Tr. at 1:14-2:13 (Court, Kennedy).  Trujillo agreed with the Court's inclination that Rio Arriba County cannot raise qualified immunity as a defense, so the Individual Defendants cannot use qualified immunity as a ground to prevent discovery.  <u>See</u> Tr. at 1:14-2:13 (Court, Kennedy).  The Court then explained that the parties' "agreement you had earlier to allow the depositions of these two individuals" constitutes good cause to extend the time to take the depositions.  Tr. at 2:1-10 (Court).  The Defendants asserted that, if qualified immunity is not a viable defense here, "we of course would never object to the previous arrangement to have the depositions of the two named individuals taken."  Tr. at 3:10-16 (Rodriguez-Salvato).  The Court stated that it would grant the Motion and extend the time to take the Individual Defendants' depositions until the Individual Defendants were available.  <u>See</u> Tr. at 3:18-20 (Court).

## LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters."  <u>Si-Flo, Inc. v. SFHC, Inc.</u>, 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  <u>Accord Street v. Curry Bd. of Cty. Comm'rs</u>, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related.  "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'"  Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6.  See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order.").  In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure,[3] and noted:

---

[3]Rule 4(m) provides that

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.  This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m).  The Tenth Circuit in In re Kirkland interpreted rule 4(j), which was substantially identical.  See 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it would appear to require <u>at least as much</u> as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting <u>Putnam v. Morris</u>, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted).  The Tenth Circuit explained that <u>Putnam v. Morris</u> "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"  <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request.  For example, in <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order.  769 F. Supp. 2d at 1313 n.8.  In contrast, in <u>Street v. Curry Board Of County Commissioners</u>, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery."  2008 WL 2397671, at *11. The Court arrived at a similar determination in <u>Abraham v. WPX Production, LLC</u>, 2016 WL 548251 (D.N.M. Jan. 25, 2016)(Browning, J.).  There, the Court found good cause to amend a pleading when the plaintiffs had a very short amount of time to amend the pleadings, "even though discovery had only just begun."  2016 WL 548251, at *20.  "The Plaintiffs may not have obtained or reviewed all of the documents that might reveal their conspiracy claim's existence

before the deadline to amend passed." 2016 WL 548251, at \*20. Furthermore, the delay was minimal and would not prejudice the defendants. 2016 WL 548251, at \*20.

Overall, good cause requires diligence and a conscientious attempt to comply with the Court's scheduling order. When parties have not done so, the Court has not found good cause. In <u>Montoya v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 5353493 (D.N.M. Oct. 7, 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony. <u>See</u> 2012 WL 5353493, at \*14. The Court noted:

> The [plaintiffs] filed this case on April 15, 2010. Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at \*14.

Similarly, in <u>Scull v. Management & Training Corp.</u>, 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant. The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case. The Court found that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case. <u>See</u> 2012 WL 1596962, at \*8. The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline. 2012 WL 1596962, at \*8. "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [Defendant] MTC." 2012 WL 1596962, at \*8. Regarding the

defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC."  2012 WL 1596962, at *9.  The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case.  2012 WL 1596962, at *9.

When serious and unforeseen events prevent a party from complying with the Court's scheduling order, however, the Court has found good cause.  In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court found that a lawyer had shown excusable neglect when he missed a scheduling deadline because soon after his son's wedding, his father-in-law developed a tumor in his chest, the lawyer arranged his father-in-law's medical care, and, only after the lawyer returned to his work did he realize that a deadline passed.  See 275 F.R.D. 549-550.  The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but found that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence.  275 F.R.D. 549-550.  In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are

particularly helpful for the Court.  See 2010 WL 3834341, at *4-5.  On the other hand, in Liles v. Washington Tru Solutions, LLC, No. CIV 06-854 JB/CEG, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the only rationale that the plaintiff provided was that his counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at *2.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).   Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 818).   When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252

F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged that: (i) the defendant's actions violated his or her constitutional or statutory rights; and (ii) the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In determining whether the plaintiff has met his or her burden, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  See Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted in Pearson v. Callahan that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial.  See 555 U.S. at 241.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails.  See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court has suggested that, to avoid unnecessary exposure to burdensome discovery, the preferred practice is for the government officials to move to dismiss the action based on qualified immunity before discovery is ordered.  See Crawford-El v. Britton 523 U.S. 574, 598 (1998).  There are, however, exceptions to the rule that no discovery be allowed when government officials claim qualified immunity.  The officials are not protected from all discovery, "'but only from discovery which is either avoidable or overly broad.'"  Garrett v. Stratman, 254 F.3d 946, 953 (10th Cir. 2001)(quoting Maxey v. Fulton, 890 F.2d 279, 282 (10th Cir. 1989)).

In Todd. v. Montoya, No. CIV 10-0106 JB/KBM, 2011 WL 523900 (D.N.M. Oct. 4, 2011)(Browning, J.), the Court granted in part and denied in part motions to stay discovery, allowing the plaintiff to take the deposition of one of two inmates that beat him up in prison, the

- 14 -

conduct underlying his case.  See 2011 WL 523900, at *5.  The plaintiff brought a 42 U.S.C. §

1983 claim, based on the theory that one of the prison guards retaliated against the plaintiff for

an argument the two of them had by allowing two inmates to view the plaintiff's offenses and

that the two inmates subsequently beat up the plaintiff based on the offenses that they saw.  See

2011 WL 523900, at *1.  The defendant prison guard filed his summary judgment motion a year

and two months after the plaintiff filed the complaint.  See  2011 WL 523900, at *1.  The Court

limited the stay to allow the inmate's deposition, because the plaintiff's theory hinged upon the

prison guard showing the inmates the computer screen, or telling them of the plaintiff's offenses,

and the defendant denied ever doing either.  See   2011 WL 523900, at *4.  The Court allowed

the deposition to go forward, because it could be determinative of the case going forward, and

did not burden any government employees or entities:

> This testimony is possib[ly] determinative of [the Plaintiff]'s case, and this
> limited amount of discovery is narrowly crafted to get to the heart of the motion
> for summary judgment without allowing a lot of potentially unnecessary
> discovery.  [The Defendant] has said he did not show [the inmate witness] or [the
> other inmate] his computer screen, or tell them [the plaintiff]'s crimes; if [the
> inmate witness] says otherwise, there will likely be a genuine issue of fact
> requiring the Court to deny the motions and allow the parties to proceed to trial.
> It seems fundamentally unfair to dismiss [the plaintiff]'s case when a deposition
> of [the inmate witness] may make his case.  Further, this deposition will not
> burden any government employees or entities.  Accordingly, the Court finds that
> this limited discovery falls within the exceptions to disallowing discovery once
> the defense of qualified immunity has been raised. See Garrett v. C.A. Stratmen,
> M.D., 254 F.3d at 953 (recognizing that a discovery order in the context of
> qualified immunity is not immediately appealable "when the defendant's
> immunity claim turns at least partially on a factual question; when the district
> court is unable to rule on the immunity defense without further clarification of the
> facts; and which are narrowly tailored to uncover only those facts needed to rule
> on the immunity claim are neither avoidable or overly broad.").

2011 WL 523900, at *5.

In B.T. v. Davis, 557 F. Supp. 2d 1262 (D.N.M. 2007)(Browning, J.), however, the Court

denied the plaintiff's request to be permitted more discovery after the defendant raised the

qualified immunity defense.  <u>See</u> 557 F. Supp. 2d at1287.  The Court refused to allow the plaintiff to depose witnesses whom the plaintiff alleged would evidence the defendants' knowledge of their alleged violation of the plaintiff's constitutional rights, because the defendant's depositions would not have affected the Court's conclusion that "the law regarding [the plaintiff]'s claims was not clearly established and that a reasonable person in the Defendants' position could have believed their actions were lawful."  557 F. Supp. 2d at 1287.

### LAW REGARDING TITLE II OF THE ADA'S APPLICATION TO ARRESTS

Title II of the ADA, 42 U.S.C. §§ 12131-12165, commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  <u>See</u> <u>Gohier v. Enright</u>, 186 F.3d 1216, 1219 (10th Cir. 1999)(explaining that this general standard, which tracks the statute's language, is "plainly correct").  "Although a plaintiff may claim intentional discrimination, the Tenth Circuit has not yet articulated the essential elements of a claim of intentional discrimination under Title II of the ADA or detailed what a plaintiff must plead at a minimum to establish such a claim."  <u>Braverman v. New Mexico</u>, No. CIV 11-0829 JB/WDS, 2012 WL 5378290, at * 22 (D.N.M. Sept. 26, 2012)(Browning, J.)(citing <u>Tyler v. City of Manhattan</u>, 118 F.3d 1400, 1405 (10th Cir. 1997)(Jenkins, J., dissenting), and <u>Young v. City of Claremore, Okla.</u>, 411 F. Supp. 2d

1295, 1314 (N.D. Okla. 2005)).

"Title II of the ADA does not provide for individual capacity suits against state officials."
Braverman v. New Mexico, 2011 WL 6013587, at *22 (D.N.M. Oct. 19, 2011)(Browning,
J.)("Title II's plain language would therefore suggest that official may not be sued in their
individual capacity."). See J.H. ex rel. J.P. v. Bernalillo Cty., 2014 WL 3421037, at *99
(D.N.M. July 8, 2014)(Browning, J.)(stating that no claim against an official in his individual
capacity exists under Title II of the ADA), aff'd on other grounds, 806 F.3d 1255 (10th Cir.
2015). The Tenth Circuit has also held that "the ADA precludes personal capacity suits against
individuals who do not otherwise qualify as employers under the statutory definition." Butler v.
City of Prairie Village, Kan., 172 F.3d at 744. Several other United States Courts of Appeal
have held that the ADA "does not provide for individual liability, only for employer liability."
Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996).

The United States Court of Appeals for the Eleventh Circuit has stated that "there is no
individual capacity liability under Title II of the ADA." Badillo v. Thorpe, 158 F. App'x 208,
211 (11th Cir. 2005). The United States Court of Appeals for the Seventh Circuit has "rule[d]
directly that only the employer, not individual employees, can be liable" under the ADA. EEOC
v. AIC Sec. Inv., 55 F.3d 1276, 1279-82 (7th Cir. 1995). See Busby v. City of Orlando, 931 F.2d
764, 772 (11th Cir. 1991)("The relief granted under Title VII [of the Civil Rights Act, 42 U.S.C.
§ 2000e(b), which defines 'employer' in the same way as the ADA,] is against the *employer*, not
individual employees whose actions would constitute a violation of the Act.")(emphasis in
original). The United States Courts of Appeals for the Second, Sixth, and Eighth Circuits have
also agreed that plaintiffs cannot maintain ADA suits against officials in their individual
capacities. See Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir. 2002)(holding that a

- 17 -

defendant must be held responsible in "his or her official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); <u>Garcia v. SUNY Health Scis. Ctr. of Brooklyn</u>, 280 F.3d 98, 107 (2d Cir. 2001)("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); <u>Alsbrook v. City of Maumelle</u>, 184 F.3d 999, 1005 n.8 (8th Cir. 1999)("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.'"); <u>Shabazz v. Texas Youth Comm'n</u>, 300 F. Supp. 2d 467, 473 (N.D. Tex. 2003)(Lynn, J.)("The Court holds that Plaintiff is precluded from bringing an action under the ADA, just as he is under Title VII, against a person acting for an employer.").

With respect to the ADA's application to police conduct, the Tenth Circuit addressed Title II's application to police conduct in <u>Gohier v. Enright</u>, 186 F.3d 1216 (10th Cir. 1999).  <u>See id.</u> at 1217-18.  The Tenth Circuit first recognized the two theories under which federal courts have addressed claims under the ADA arising from arrests: (i) where "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity;" and (ii) where "police properly investigated and arrested a person with a disability for a crime unrelated to that disability," but "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  <u>Gohier v. Enright</u>, 186 F.3d at 1217-18.  The Tenth Circuit rejected "a broad rule categorically excluding arrest from the scope of Title II," stating that "[i]t remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of <u>Lewis</u>[4] and <u>Jackson</u>[5] and the reasonable-accommodation-during-arrest theory of

---

[4]<u>Lewis v. Truitt</u>, 960 F. Supp. 175 (S.D. Ind. 1997).

Gorman.[6]" 186 F.3d at 1221 (footnotes added).

The United States Court of Appeals for the Fourth Circuit recently confirmed Gohier v. Enright's understanding of the claims that plaintiffs may bring under Title II in the arrest context:

> In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. See Gohier v. Enright . . . ; see also Gorman v. Bartch, 152 F.2d [at 912-13] (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints).

Waller ex rel Estate of Hunt v. Danville, 556 F.3d 171, 174 (4th Cir. 2009)(Wilkinson, J.).

## 1.      Wrongful Arrest Under the ADA.

"The essence of [the wrongful arrest] theory is that the police mistake legal conduct caused by the disability as illegal conduct." Glover v. City of Wilmington, 966 F. Supp. 2d 417, 428-29 (D. Del. 2013)(Andrews, J.). Under this theory, a plaintiff must establish three elements: (i) the plaintiff was disabled; (ii) the arresting officers knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability. See, e.g., Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997)(Godich, M.J.)("Courts have held that a plaintiff may recover under the ADA where he can show that (1) he was disabled, (2) the defendants knew or should have known he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability.").

Although the second element -- that the officer knew or should have known that the

---

[5]Jackson v. Town of Sanford, 1994 WL 589617 (D. Me. Sept. 23, 1994).

[6]Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998).

plaintiff was disabled -- sometimes gets lost in the more general articulation of the test, the element was vital to the outcome in the leading cases on which the Tenth Circuit relied.  For example, Lewis v. Truitt, on which the Tenth Circuit relied in Gohier v. Enright, see 186 F.3d at 1221, the Honorable John Paul Godich, United States Magistrate Judge for the United States District Court for the Southern District of Indiana, allowed the plaintiff's ADA claim to go forward because the defendants knew the plaintiff "was deaf but refused to take steps to communicate with him and then arrested him because he did not respond to them appropriately." 960 F. Supp. at 178-79 (citation omitted).

Similarly, in Jackson v. Inhabitants of Town of Sanford -- on which the Tenth Circuit also relied in Gohier v. Enright, see 186 F. 3d at 1221 -- the arresting officer had reason to know that the plaintiff was disabled.  See Jackson v. Inhabitants of Town of Sanford, 1994 WL 589617, at *1 (footnote omitted).  The Honorable D. Brock Hornby, United States District Judge for the United States District Court for the District of Maine, allowed an ADA claim to proceed, because "legislative history of the ADA demonstrates that Congress was concerned with unjustified arrests of disabled persons such as Jackson alleges here."  1994 WL 589617, at *6.  Judge Hornby noted that "Title II of the ADA clearly applies to acts of discrimination by a public entity against a disabled individual."  1994 WL 589617, at *6.  In sum, for a plaintiff to have a wrongful-arrest claim under Title II, the arresting officer must know or have reason to know that the arrestee is disabled.  See Sperry v. Maes, No. 10-CV-03171-RPM, 2013 WL 4365784, at *5-6 (D. Colo. July 10, 2013).

**2.    Reasonable Accommodation During Arrest.**

"The essence of [the reasonable-accommodation-during-arrest] theory is that once the police have a situation under control, the police have a duty to accommodate a disability."

Glover v. City of Wilmington, 96 F. Supp. 2d at 429.   The seminal case in this area is the decision of the United States Court of Appeals for the Eighth Circuit in Gorman v. Bartch.   In that case, a wheelchair-bound man, Gorman, tried to enter a bar's dance floor; a bar employee denied him access to the dance floor, pulled his wheelchair up the steps that went down to the dance floor, and evicted him from the bar.   See Gorman v. Bartch, 152 F.3d at 909.   The wheelchair-bound man told two nearby police officers what happened; he argued with them, and "they eventually arrested him for trespassing and called for transportation to take him to the police station."  152 F. 3d at 909.

> In response to the call officer Neil Becker arrived with a patrol wagon that was not equipped with a wheelchair lift or wheelchair restraints.  Gorman told the police that the van was not properly equipped for him to ride in it, and that due to his use of a urine bag it would be necessary for him to go to the bathroom before he was transported.  The officers lifted Gorman from his chair and placed him on a bench inside the van.  Gorman states that they complied with his instructions on how to lift him from his chair, but not with his requests that he be allowed to go to the bathroom prior to transport or that they place the seat cushion from his wheelchair underneath him to help support his legs. Because of his paraplegia Gorman was not independently able to maintain himself upright on the bench, and the police tied him with his belt to a mesh wall behind the bench and also fastened a seatbelt around him.  During the drive to the station the belts came loose, and Gorman fell to the floor.  The fall injured his shoulders and back severely enough to require surgery and also broke his urine bag, leaving him soaked in his own urine.

152 F.2d at 909.  The Eighth Circuit held that Gorman has a good a Title II claim, because "[a] local police department falls squarely within the statutory definition of 'public entity.'"  Gorman v. Bartch, 152 F.3d at 912.  The Eight Circuit explained that "[t]ransportation of an arrestee to the station house is thus a service of the police within the meaning of the ADA."  Gorman v. Bartch, 152 F.3d at 912.  Congress noted that "discrimination against individuals with disabilities persists in such critical areas as . . . transportation . . . institutionalization  .  .  .  and access to public services" and that disabled individuals face the discriminatory effects of "failure to make

- 21 -

modifications to existing facilities and practices."  42 U.S.C. 12101(a).  The Eight Circuit further explained that the "defendants are representatives of the Kansas City police establishment, a department of local government and a public entity."  Gorman v. Bartch, 152 F.3d at 912-13.

## ANALYSIS

The Court will grant the Plaintiffs' Motion.  Under rule 16, a party must demonstrate good cause for amending a scheduling order.  Because the Defendants prevented Trujillo from complying with the Court's Scheduling Order, and because the parties agreed to extend the time to take the Individual Defendants' depositions, Trujillo has demonstrated good cause under rule 16.  Moreover, the policy of staying discovery in qualified immunity cases does not apply here.  Accordingly, the Court will grant the Motion.

"[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."  Fed. R. Civ. P. 16, advisory committee's note to the 1983 amendments.  When a party has diligently sought to comply with all scheduling deadlines, the Court has found good cause for extending discovery.  See Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *11 (concluding that good cause existed where the plaintiff "was diligent within the confines of discovery and within the confines of counsels' schedules," and there was "no suggestion from the record that [the plaintiff] unreasonably delayed initiation of discovery").  Here, Trujillo diligently endeavored to comply with the Court's Scheduling Order by attempting to schedule a time to take the Individual Defendants' depositions nearly a month before the discovery deadline.  See Reply at 1 (citing April 18 Email at 1).  When the Defendants informed Trujillo that they were unavailable, Trujillo diligently sought to find a time to take the depositions.  See Reply at 1-3.  Trujillo relied on the assertion of the Defendants' counsel that he could take the Individual Defendants'

depositions after May 9, 2016.  See April 26 Email Exchange at 1; April 28 Email Exchange at 1.  He sought to schedule deposition dates as soon as possible, but the Defendants informed him that they were unavailable until late June, 2016.  See April 28 Email Exchange at 1.  In all, Trujillo attempted not only to comply with the Court's Scheduling Order, but also to work with the Defendants' schedule.  But for the Defendants' assertions that they could be deposed after the discovery deadline, Trujillo would have completed discovery within that deadline.  See Reply at 2-3.  Accordingly, Trujillo was not inattentive and made no mistakes that would show a lack of diligence.  See In re Kirkland, 86 F.3d at 175 (stating that "simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice").  Instead, Trujillo demonstrated diligence and good cause.  See In re Kirkland, 86 F.3d at 175.

Moreover, the policy behind staying discovery when a defendant raises the qualified immunity defense does not apply here.  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, 2009 WL 1329834, at *10 (emphasis added)(quoting Siegert v. Gilley, 500 U.S. at 232).  "[A] municipality is not entitled to the shield of qualified immunity from liability under § 1983." Brandon v. Holt, 469 U.S. 464, 473, (1985).  See Leatherman v. Tarrant County Narcotics and Intelligence Unit, 507 U.S. 163, 166 (1993)("Unlike various government officials, municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983."); Owen v. City of Indep., 445 U.S. 622 (1980)(distinguishing between suits against government officials "in their individual capacities" on the one hand, and those in which "only the liability of the municipality itself was at issue," on the other).  Accordingly, only the Individual Defendants -- not Rio Arriba County -- can raise any qualified immunity defense.  See Butler v. City of Prairie

Village, Kan., 172 F.3d 736, 745 (10th Cir. 1999)("The doctrine of qualified immunity shields individual government officials performing discretionary functions . . . .").

Trujillo does not sue the individual defendants under the ADA.  See Reply at 3 ("The individual defendants are not being sued under the American[s] with Disabilities Act.  The Act only applies to entities."); Tr. at 1:14-2:13 (Court, Kennedy).  Even if Trujillo's statements in open court and the Complaint were not entirely clear that Trujillo alleges the ADA claim solely against Rio Arriba County, the Court and numerous Courts of Appeals have concluded that "Title II of the ADA does not provide for individual capacity suits against state officials." Braverman v. New Mexico, 2011 WL 6013587, at *22.  See J.H. ex rel. J.P. v. Bernalillo Cty., 2014 WL 3421037, at *99 (stating that no claim against an official in his individual capacity exists under Title II of the ADA); Butler v. City of Prairie Village, Kan., 172 F.3d at 744; Badillo v. Thorpe, 158 F. App'x at 211; Carten v. Kent State Univ., 282 F.3d at 396-97 (holding that a defendant must be held responsible in "his or her official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); Garcia v. SUNY Health Scis. Ctr. of Brooklyn, 280 F.3d at 107 ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); Alsbrook v. City of Maumelle, 184 F.3d at 1005 n.8 ("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.'"); Busby v. City of Orlando, 931 F.2d at 772 ("The relief granted under Title VII [of the Civil Rights Act, 42 U.S.C. § 2000e(b), which defines 'employer' in the same way as the ADA,] is against the *employer*, not individual employees whose actions would constitute a

- 24 -

violation of the Act."); <u>Mason v. Stallings</u>, 82 F.3d at 1009; <u>Shabazz v. Texas Youth Comm'n</u>, 300 F. Supp. 2d at 473.

The Defendants cite two cases in support of their argument that individual officers can raise a qualified immunity defense against ADA claims: <u>Roberts v. City of Omaha</u>, 723 F.3d 966 (8th Cir. 2013), and <u>Torcasio v. Murray</u>, 57 F.3d 1340 (4th Cir. 1995).   Although the Fourth Circuit in <u>Torcasio v. Murry</u> concluded that the defendants were entitled to qualified immunity in the plaintiff's ADA suit against them, the defendants were individual state officials.   <u>See</u> 57 F.3d at 1355.   The plaintiff did not sue the state or county.   <u>See</u> 57 F.3d at 1355-56 (addressing the individual officials' actions).   Similarly, in <u>Roberts v. City of Omaha</u>, the United States Court of Appeals for the Eighth Circuit held that the "qualified immunity defense is available" to individual officials "for ADA and Rehabilitation Act claims."   723 F.3d at 972.   <u>See</u> <u>Gorman v. Bartch</u>, 152 F.3d at 914 (8th Cir. 1998)(concluding that "[t]he <u>officers</u> are entitled to qualified immunity on [the plaintiff's] ADA" claims)(emphasis added).   Unlike here, the plaintiffs in these cases sued individual officers -- not a state entity or county -- who raised qualified immunity. <u>See</u> <u>Roberts v. City of Omaha</u>, 2014 WL 4161993, at *1 (D. Neb. Aug. 20, 2014)(Thalken, J.)("[T]he Eighth Circuit dismissed Roberts' ADA and Rehabilitation Act claims and determined Officers Ricker, Jones, and Raders were entitled to qualified immunity."); <u>Allison v. Dep't of Corrections</u>, 94 F.3d 494, 496 (8th Cir. 1996)(concluding that "the individual defendants are entitled to qualified immunity from suit").

Where no individual-capacity suits exist under the ADA, qualified immunity is not available.   For instance, in <u>Mason v. Stallings</u>, the Eleventh Circuit held that the defendants could raise qualified immunity on the ADA claims alleged against them.   <u>See</u> <u>Mason v. Stallings</u>, 82 F.3d at 1010.   There, the plaintiff sued "Cherokee County, Alabama, the Cherokee County

Commission, and the County Commissioners in both their official and their individual capacities." 82 F.3d at 1009.  The Eleventh Circuit first held that the ADA "does not provide for individual liability, only for employer liability."  82 F.3d at 1009.  The Eleventh Circuit concluded that the individual county commissioners should therefore be dismissed for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.  See 82 F.3d at 1009. Because the plaintiff could not assert ADA claims against the individuals, the Eleventh Circuit affirmed the district court's denial of summary judgment.  See 82 F.3d at 1010.  The Eleventh Circuit explained that the ADA case was "not the kind of case for which 'qualified' immunity from suit was designed. . . ." 82 F.3d at 1010.

Because Trujillo does not sue the Individual Defendants for violating the ADA, the Defendants cannot raise qualified immunity as a defense.  Nor do the Defendants assert a qualified-immunity defense in their MSJ on Rio Arriba County's behalf.  See MSJ at 10-14 (raising the qualified-immunity defense only for the Individual Defendants).  Accordingly, there is no policy in favor of staying discovery or helping the Defendants avoid the burden of discovery.  In light of this fact, and because Trujillo diligently attempted to comply with the Court's Scheduling Order by agreeing with the Defendants to extend the discovery period, the Court finds good cause to extend discovery.

**IT IS ORDERED** that the Plaintiff's Motion to Extend Discovery Deadline, filed May 9, 2016 (Doc. 28), is granted.  The discovery period is extended until Trujillo can take the Individual Defendants' depositions.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Theresa V. Hacsi
Kennedy, Kennedy & Ives, LLC
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

James P. Sullivan
Sabrina Rodriguez Salvato
Brennan & Sullivan, P.A.
Santa Fe, New Mexico

       *Attorneys for the Defendants*