IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN TRUJILLO,

     Plaintiff,

vs.                                     No. CIV 15-0901 JB/WPL

RIO ARRIBA COUNTY ex rel. RIO ARRIBA
COUNTY SHERIFF'S DEPARTMENT; DEPUTY
GILBERT ATENCIO, in his individual capacity;
and LIEUTENANT MARVIN ARMIJO, in his
individual capacity,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Qualified Immunity and Summary Judgment, filed June 7, 2016 (Doc. 34)("MSJ"). The Court held a hearing on September 21, 2016. The primary issues are: (i) whether Defendants Rio Arriba County, Rio Arriba County Sheriff's Department, and Deputy Gilbert Atencio are entitled to summary judgment on Plaintiff John Trujillo's federal claim for discrimination in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA")(Count IV), and his state law claims for false imprisonment (Count I), false arrest (Count II), and malicious abuse of process (Count III); and (ii) whether Atencio is entitled to qualified immunity with respect to the ADA claim. The Court will grant in part and deny in part the MSJ. The Court concludes that the Defendants are entitled to summary judgment on the ADA claim, because Trujillo was arrested pursuant to probable cause that he was driving while intoxicated and because Trujillo was not refused a reasonable accommodation as the ADA requires. The Court declines, however, to exercise supplemental jurisdiction over the remaining state law claims and remands the case for further state court proceedings. The final issue

-- whether Atencio is entitled to qualified immunity -- is moot, because the Defendants have withdrawn their qualified immunity motion in light of the fact that Trujillo's ADA claim is not asserted against Atencio.

## FACTUAL BACKGROUND

The Court will provide two factual background sections, which are set forth below. First, the Court will contextualize the MSJ by providing a brief overview of the facts based on the allegations in the Complaint to Recover Damages Pursuant to the New Mexico Tort Claims Act and for the Deprivation of Rights Guaranteed by the New Mexico Constitution, filed October 7, 2015 (Doc. 1-1)("Complaint"). Second, the Court will set forth the undisputed facts based on the parties' briefings for purposes of deciding the MSJ under rule 56(a) of the Federal Rules of Civil Procedure.

### 1.      The Complaint's Factual Allegations.

This action arises out of the alleged wrongful arrest of Trujillo on August 22, 2013, for driving under the influence ("DUI"). See Complaint ¶¶ 20-80, at 3-7. Trujillo is an honorably discharged United States Army veteran who suffers from degenerative joint disease in his knees and nephropathy, an end stage renal disease associated with diabetes mellitus.[1] See Complaint ¶¶ 8-9, at 2. At 7:00 p.m. on August 22, 2013, Trujillo stopped at a Rio Arriba County Sheriff's Department DUI checkpoint on Highway 68 in Velarde, New Mexico. See Complaint ¶¶ 21-22, at 3. Trujillo admitted to consuming two beers with dinner, and Armijo instructed Trujillo to pull to the side of the road. See Complaint ¶¶ 24-27, at 3. Atencio approached the car and instructed Trujillo to perform

---

[1]Diabetes mellitus (more commonly, diabetes) is a "chronic, lifelong condition that affects your body's ability to use the energy found in food." WebMD, Types of Diabetes Mellitus, http://www.webmd.com/diabetes/guide/types-of-diabetes-mellitus#1 (last visited November 7, 2016). Diabetic nephropathy is a progressive kidney disease (renal failure) caused by longstanding diabetes mellitus. See Medscape, Diabetic Nephropathy, http://emedicine.medscape.com/article/238946-overview (last visited November 7, 2016).

sobriety tests.  See Complaint ¶¶ 28-38, at 3-4.  Because of his disabilities, Trujillo asked to "retrieve his walking cane from the trunk of his car."  Complaint ¶ 38, at 4.  Trujillo attempted to explain his disabilities and offered to present his Handicap Placard as proof, but Atencio denied Trujillo's request.  See Complaint ¶¶ 43-44, at 4.  Trujillo struggled to perform various walking and standing tests, and informed Atencio of his knee problems and other ailments.  See Complaint ¶¶ 64-73, at 6.  Atencio then administered a preliminary breath test and informed Trujillo that his breath alcohol level was 0.12.  See Complaint ¶¶ 48-51, at 4-5.  At 7:16 p.m., Atencio arrested Trujillo for DUI.  See Complaint ¶¶ 36-78, at 4-6.  Atencio then took Trujillo to Presbyterian Española Hospital in Española, New Mexico, for blood testing.  See Complaint ¶ 82, at 7.  Atencio kept Trujillo in handcuffs until Trujillo's daughter paid his bail around midnight.  See Complaint ¶ 91, at 7.  The results of the blood test later indicated that Trujillo had no alcohol in his system.  See Complaint ¶ 99, at 8.

### 2. **Undisputed Facts.**

On August 22, 2013, Rio Arriba County Sheriff's Department was conducting a DUI checkpoint "on Highway 68 near mile marker 14.50 in Velarde, New Mexico."  MSJ ¶ 4, at 4 (setting forth this fact).  See Plaintiff's Response to Defendants' Motion for Qualified Immunity and Summary Judgment ¶ 3, at 9, filed August 1, 2016 (Doc. 55)("MSJ Response")(not disputing this fact).  Trujillo encountered the DUI checkpoint at approximately 7:00 p.m.  See MSJ ¶ 5, at 4 (setting forth this fact); MSJ Response ¶ 4, at 9 (not disputing this fact).  Upon meeting Armijo, Trujillo "admitted to drinking two beers within the past few hours."  MSJ ¶ 6, at 4 (setting forth this fact).  See MSJ Response ¶ 5, at 9 (not disputing this fact).  Trujillo was instructed to move to a "separate staging area where he was directed to complete a series of DUI field sobriety tests."  MSJ ¶ 7, at 5 (setting forth this fact).  See MSJ Response ¶ 6, at 9 (not disputing this fact).  Once in the

area, Atencio gave Trujillo a preliminary breathalyzer test ("PBT").  See MSJ ¶ 8, at 5 (setting forth

this fact)(citing Complaint ¶ 51, at 5).[2]  Trujillo was also administered a horizontal gaze nystagmus

---

[2]The Defendants allege that the PBT's results "showed that [Trujillo] had a blood alcohol in excess of the legal limit of .08."  MSJ ¶ 8, at 5 (citing Complaint ¶ 51, at 5).  The Defendants rely on paragraph 51 of the Complaint, which states: "Deputy Atencio discarded the tube that Plaintiff had blown into and informed Plaintiff that he had a breath alcohol level of 0.12."  Complaint ¶ 51, at 5.  Trujillo disputes this fact, contending that "Atencio testified that he did not remember completing a PBT," that "Trujillo alleged in his complaint that Atencio falsely accused Trujillo of having a breath alcohol content of 0.12," and that "Trujillo alleged that Defendant Atencio lied about the results."  MSJ Response ¶ 7, at 9 (relying on Videotaped Deposition of Gilbert Atencio at 78:12-25 (taken July 6, 2016), filed August 1, 2016 (Doc. 55-5)("Atencio Depo.")(Kennedy, Atencio); Complaint ¶¶ 52-54, at 5).  Trujillo argues that, "given the allegation that Defendant Atencio lied about any PBT and the testimony that Defendant Atencio did not remember any PBT testing, Defendants' allegation that Plaintiff Trujillo's breath alcohol content was over 0.08 finds no support in the record."  MSJ Response ¶ 7, at 9 (citing Atencio Depo. at 78:12-25 (Kennedy, Atencio)).

Based on these arguments, the Court deems the allegations concerning the PBT's results to be genuinely disputed.  The Defendants, citing only to the Complaint, allege that Trujillo's blood alcohol content exceeded .08 percent.  See MSJ ¶ 8, at 5 (citing Complaint ¶ 51, at 5).  The Complaint's subsequent paragraphs, however, allege that Atencio did not preserve the PBT results, that he lied about the results, and that Trujillo "immediately disputed the results."  Complaint ¶¶ 52-54, at 5.  Further, at his deposition, Atencio had no recollection of administering a PBT to Trujillo.  See Atencio Depo. at 78:12-25 (Kennedy, Atencio).  The Defendants cite nothing in the record other than Trujillo's Complaint that supports their allegation that the PBT revealed a .08 percent alcohol content, see MSJ ¶ 8, at 5, nor has the Court, in its own review of the record, found any supporting documentation.  The Court therefore deems this fact to be disputed.

Indeed, rather than controvert Trujillo's allegations, the Defendants simply reply that this dispute is "immaterial," because the results of the PBT "are not necessary to prove probable cause."  Defendant's [sic] Reply in Support of Their Motion for Summary Judgment and Withdrawal of Their Motion for Qualified Immunity at 8, filed September 15, 2016 (Doc. 62)("MSJ Reply").  The Defendants' assertion of immateriality does not, however, resolve the dispute.  See Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("Contending that a fact is not relevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.")(citing D.N.M.LR-Civ. 56.1(b)), aff'd sub nom. Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016).  Materiality is a legal question and not a factual one.  If necessary, the Court will address materiality in the Analysis, but will deem the fact of the results of the PBT disputed for the Factual Background.  See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(explaining that the proper course is to determine relevance in the analysis section rather than in the factual background section).

All this notwithstanding, none of Trujillo's responses dispute the Defendants' asserted fact that a breathalyzer test was performed on Trujillo; Trujillo disputes only the test's results.  The Court therefore deems the fact that a PBT was performed as undisputed.

test ("HGN"),[3] which he failed.  See MSJ ¶ 9, at 5 (setting forth this fact)(citing Deposition of

Murray Conrad at 40:19-23 (taken May 2, 2016), filed June 7, 2016 (Doc. 34-2)("Conrad

Depo.")(Conrad, Sullivan)).[4]  The HGN test correlates with indicia of intoxication.  See MSJ ¶ 10, at

5 (setting forth this fact)(citing Conrad Depo. At 45:19-23)(Conrad)).[5]

---

[3]In Pennsylvania v. Muniz, 496 U.S. 582 (1990), the Supreme Court of the United States of
America explained that the HGN test

> measures the extent to which a person's eyes jerk as they follow an object moving
> from one side of the person's field of vision to the other.  The test is premised on the
> understanding that, whereas everyone's eyes exhibit some jerking while turning to
> the side, when the subject is intoxicated "the onset of the jerking occurs after fewer
> degrees of turning, and the jerking at more extreme angles becomes more distinct."  1
> R. Erwin et al., Defense of Drunk Driving Cases § 8A.99, pp. 8A-43, 8A-45 (1989).

496 U.S. at 585 n.1.  According to the National Highway Traffic Safety Administration Training
Manual, an officer conducting the HGN test is trained to look for three "clues":

> (1) the inability of the suspect to follow a slowly moving stimulus smoothly with his
> or her eyes, (2) the presence of "distinct" nystagmus when the suspect has moved his
> or her eyes as far to the left or right as possible (referred to as holding the eyes at
> "maximum deviation") and held them in this position for approximately four seconds
> and (3) the presence of nystagmus before the eyes have moved 45 degrees to the left
> or right (which, the manual states, usually means that the subject has a BAC above
> 0.10).

United States v. Horn, 185 F. Supp. 2d 530, 537 (D. Md. 2002)(Grimm, J.)(citation omitted).  See
NHTSA SFST Manual (revised 10/2015) Session 8, at 32-45 ("NHTSA Manual")(explaining the
mechanics of each clue).  The investigating officer is trained to look for each of these three "clues"
in each of the suspect's eyes, meaning there are six possible "clues."  United States v. Horn, 185 F.
Supp. 2d at 537.  If the officer observes four or more clues, the NHTSA Manual concludes that "it is
likely that the subject's BAC is at or above 0.08."  NHTSA Manual Session 8, at 32.

[4]Trujillo purports to dispute this fact, contending: "Murry Conrad never testified that Plaintiff
Trujillo failed the horizontal gaze nystagmus test, instead, he agreed that Defendant Atencio claimed
that Trujillo had all six indicators on the nystagmus."  MSJ Response ¶ 8, at 9-10 (citing Deposition
of Murray Conrad at 40:17-19; 42:17-25; 46:1-6 (taken May 2, 2016), filed August 1, 2016 (Doc.
55-6)("Conrad Depo.")(Sullivan, Conrad)).  This argument creates a distinction without a difference.
Asked at his deposition whether Trujillo failed the HGN test, Conrad, Trujillo's expert, stated: "The
-- the deputy indicates that he had all six indicators on the nystagmus, correct."  Conrad Depo. at
40:17-19 (Conrad).  Conrad further stated that he did not "have any reason to doubt that . . .
[Trujillo] exhibited all six indicators."  Conrad Depo. at 42:17-25 (Sullivan, Conrad).  According to

the NHTSA Manual, exhibition of all six indicators of horizontal gaze nystagmus is synonymous with failure of the test.  See NHTSA Manual at 32 ("[If an officer] observe[s] four or more clues it is likely that the subject's BAC is at or above 0.08.").  More fundamentally, Trujillo's objection does not create a genuine dispute as to this asserted fact.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(stating that, once the movant shows absence of genuine issue of material fact, the burden shifts to the non-movant to produce evidence showing a genuine issue). Trujillo does not contend that he did not exhibit all six clues or even that he exhibited only a few; rather, he merely attempts to draw a distinction between "failure" of the test and agreement that he "exhibited all six indicators."  MSJ Response ¶ 8, at 9-10.  There is no sound distinction between failure of the test and exhibition of all six clues, especially when exhibition of just four clues makes it "likely" that the subject's BAC exceeds 0.08.  NHTSA Manual at 32.  The Court therefore deems this fact undisputed.

[5]The Defendants assert that the HGN test "is 'considerably' greater than 77% accurate at predicting intoxication."  MSJ ¶ 10, at 5 (setting forth this fact)(citing Conrad Depo. at 45:19-23 (Conrad)).  Trujillo disputes this assertion on grounds of evidentiary admissibility.  See MSJ Response ¶ 9, at 10-11.  First, Trujillo argues that the Court "should not consider Defendants' assertion that Plaintiff failed the nystagmus test . . . because Defendant has failed to establish the reliability of HGN testing as required by Daubert[ v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)(Daubert)]."  MSJ Response ¶ 9, at 10.  Trujillo contends that "'HGN testing is a scientific process, and that a scientific foundation must be laid in order for the results of such testing to be admitted.'"  MSJ Response ¶ 9, at 10 (quoting State v. Aleman, 2008-NMCA-137, ¶ 10, 194 P.3d 110).  Here, Trujillo argues, the Defendants have "laid no such scientific foundation and cannot properly rely on Plaintiff's alleged failure of the HGN test in their Motion for Summary Judgment as a basis to believe that Mr. Trujillo was impaired while driving."  MSJ Response ¶ 9, at 10.  Second, Trujillo argues that the "Defendants have failed to qualify Defendant Atencio as a non-scientific expert in administering the highly technical test."  MSJ Response ¶ 9, at 10-11.  Trujillo argues that, "[w]ithout an expert certifying Defendant Atencio's actions, Defendants [sic] reliance on the nystagmus test must be excluded."  MSJ Response ¶ 9, at 11.

In deciding a motion for summary judgment, a district court "cannot rely on evidence that will not be admissible at trial."  Lopez v. Am. Baler Co., 2014 U.S. Dist. LEXIS 44193, at *3 n.16 (D.N.M. 2014)(Browning, J.)(citing Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)).  See Fed. R. Civ. P. 56(c)(2)("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Expert testimony involving the application of scientific, technical, or other specialized information is admissible under rule 702 of the Federal Rules of Evidence if it is both relevant and reliable.  See United States v. Avitia-Guillen, 680 F.3d 1253, 1256 (10th Cir. 2012)(citing Daubert, 509 U.S. at 589 (scientific knowledge); Kumho Tire Co. Ltd. V. Carmichael, 526 U.S. 137, 141 (1999)(technical and other specialized knowledge)(Kumho Tire)).  The United States Court of Appeals for the Tenth Circuit has stated that, generally, a district court "must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."  United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir.)(en banc)(quoting Fed. R. Evid. 702).  "If the expert is sufficiently qualified, then 'the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology.'"  United States v. Avitia-Guillen, 680 F.3d at 1256 (quoting United States v. Nacchio, 555 F.3d at 1241 (citing Fed. R. Evid. 702)).

---

New Mexico state courts hold that HGN testing is a scientific process requiring both expert testimony and compliance with Daubert and Kumho Tire. See State v. Torres, 1999-NMSC-010, ¶ 31, 976 P.2d 20 ("[T]he significance of the HGN observation is based on principles of medicine and science not readily understandable to [a] jury."); State v. Aleman, 2008-NMCA-137, ¶ 10, 194 P.3d 110 ("[A] scientific foundation must be laid in order for the results of [HGN] testing to be admitted."). In this context, New Mexico courts conclude that "'non-scientific experts may testify, provided that another, scientific expert first establishes the evidentiary reliability of the scientific principles underlying the test.'" State v. Aleman, 2008-NMCA-137, ¶ 31, 194 P.3d 110 (quoting State v. Torres, 1999-NMSC-010, ¶ 46, 976 P.2d 20). Because of their "training, experience, and specialized knowledge," such "non-scientific experts" may "testify as to the *administration* and *specific results* of the test after it has been shown to meet the requirement of evidentiary reliability." State v. Torres, 1999-NMSC-010, ¶ 47, 976 P.2d 20 (emphasis in original). This testimony requires a showing "(1) that the expert has the ability and training to administer the HGN test properly, and (2) that the expert did, in fact, administer the HGN test properly at the time and upon the person in question." State v. Torres, 1999-NMSC-010, ¶ 35, 976 P.2d 20.

Here, Atencio is qualified to testify as to the "*administration* and *specific results*" of the HGN test, State v. Torres, 1999-NMSC-010, ¶ 47, 976 P.2d 20, because he is trained and able to administer the test properly, see State v. Torres, 1999-NMSC-010, ¶ 35, 976 P.2d 20. Atencio has completed Standardized Field Sobriety Testing training and Advanced Roadside Impaired Driving Enforcement training, both of which "utilize the Horizontal Gaze Nystagmus (HGN) test to assess whether a driver is impaired." Declaration of Gilbert Atencio ¶¶ 7-9, at 2 (executed September 12, 2016), filed September 15, 2016 (Doc. 62-5)("Atencio Decl."). Atencio has "received extensive training and certification in properly conducting the . . . HGN test, to help establish probable cause to arrest for DWI." Atencio Decl. ¶ 10, at 2. He estimates that he has conducted 400 field sobriety tests throughout his career and that he has "always include[d] the HGN" in those tests. Atencio Decl. ¶¶ 11, 13, at 2. Atencio is also qualified to testify because he administered the HGN test properly, see State v. Torres, 1999-NMSC-010, ¶ 35, 976 P.2d 20, to Trujillo on August 22, 2013, see Atencio Decl. ¶¶ 15-19, at 3. Under New Mexico law, however, Atencio may testify only after "another, scientific expert establishes the evidentiary reliability of the scientific principles underlying the [HGN] test." State v. Aleman, 2008-NMCA-137, ¶ 31, 194 P.3d 110 (internal quotation marks and citation omitted). Conrad, a Drug Recognition Expert ("DRE"), see MSJ Reply at 4, is not competent to testify for this purpose, see State v. Aleman, 2008-NMCA-137, ¶ 31, 194 P.3d 110 (concluding that DRE's are "non-scientific experts" whose testimony regarding HGN testing is permitted only once a "scientific expert" testifies). If the Defendants proffer the testimony of a competent scientific expert to lay a proper foundation for HGN testing at trial, Atencio would be able to testify in New Mexico state court.

The Court finds instructive New Mexico state courts' application of rule 702 and Daubert/Kumho Tire to HGN evidence. In short, such evidence is admissible in New Mexico if the prosecutor proffers testimony of an expert witness establishing the reliability of the test as well as testimony of the officer who administered the test. See State v. Aleman, 2008-NMCA-137, ¶ 31, 194 P.3d 110 (citation omitted). There is no sound reason that the Court or other federal courts would require more. It is unlikely, however, that the Court would require an expert to testify at trial prior to the officer who administered the test. If, before trial, the Court determined that HGN testing is reliable, the Court need not then present evidence establishing the test's reliability to the jury. The Court serves a gatekeeping function under Daubert; scientific experts are not required to repeat

everything to the jury under rule 702.  See Goebel v. Denver Rio Grande Western RR Co., 215 F. 3d 1083, 1087 (10th Cir. 2000)(stating that Daubert "changed the law of evidence by establishing a 'gatekeeper' function for trial judges under Federal Rule of Evidence 702," and that district courts have discretion in performing that function)(citing Kumho Tire, 526 U.S. at 1176).  Thus here, should the Court decide that the HGN test is reliable, it would allow Atencio to testify as to his administration of the test to Trujillo and to the test's results.

The Court does not presently decide whether the "underlying reasoning and methodology," United States v. Avitia-Guillen, 680 F.3d at 1256 (internal quotation marks and citations omitted), of HGN testing is reliable for purposes of Daubert.  New Mexico courts, however, have found HGN testing to be reliable under the Daubert framework.  See State v. Aleman, 2008-NMCA-137, ¶¶ 21-30 (concluding that HGN testing is reliable under Daubert because it (i) has been tested; (ii) has been subjected to peer review and publication; (iii) its error rate is low; and (iv) it is generally accepted among forensic toxicologists).  Trujillo has not filed a Daubert motion, and the parties have not fully briefed the issue of HGN testing's scientific reliability before the Court.  The Court nonetheless notes, based on its review of New Mexico case law, that, as a general matter, HGN testing is accepted as reliable and admissible to prove intoxication in New Mexico.  See State v. Aleman, 2008-NMCA-137, ¶ 10.

All this notwithstanding, the Defendants rely on the HGN test to establish probable cause, not as direct or circumstantial evidence that Trujillo was intoxicated.  Compare MSJ Response ¶ 9, at 10 (evidence of the HGN test cannot be considered "as a basis to believe that Mr. Trujillo was impaired while driving"), with MSJ Reply at 2 ("[T]he threshold question before the Court is whether Defendant Atencio had probable cause to arrest, not whether Plaintiff was too intoxicated to drive.").  To establish probable cause to arrest a suspect, all that is required is "reasonably trustworthy information" that would support a reasonable belief that the suspect committed an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964)(citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949); Henry v. United States, 361 U.S. 98 (1959)).  See Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)(stating that probable cause requires only a "fair probability on which reasonable and prudent people, not legal technicians, act")(internal quotations, citations, and alterations omitted).  Evidence offered to prove probable cause need not, therefore, meet Daubert's "reliability" standard, because probable cause determinations turn on "'practical, nontechnical'" considerations.  Beck v. Ohio, 379 U.S. at 91 (quoting Brinegar v. United States, 338 U.S. at 176).  See Illinois v. Gates, 462 U.S. 213, 235 (1983)("Finely tuned standards . . . have no place in the [probable cause] decision.").  Indeed, probable cause may be founded on otherwise inadmissible evidence, such as hearsay.  See United States v. Sanchez, 725 F.3d 1243, 1247 (10th Cir. 2013)(citing Franks v. Delaware, 438 U.S. 154, 165 (1978)).  It is sufficient that "the information put forth is believed or appropriately accepted by the affiant as true."  Franks v. Delaware, 438 U.S. at 165.  See United States v. Campbell, 603 F.3d 1218, 1228 (10th Cir. 2010)("[N]egligence or innocent mistakes are insufficient to justify the exclusion of evidence.").

Applying this "flexible, common-sense standard," Florida v. Harris, 133 S. Ct. at 1053 (citation and internal quotation marks omitted), the Court concludes that evidence of Trujillo's HGN test will be admissible at trial to establish probable cause, see Fed. R. Civ. P. 56(c)(2) (a court may consider only admissible evidence when deciding summary judgment).  Regardless whether HGN testing is sufficiently reliable under Daubert to be admissible as direct or circumstantial evidence of intoxication, it is, at a minimum, a "reasonably trustworthy" method of determining probable cause to arrest a suspect for DUI.  Beck v. Ohio, 379 U.S. at 91.  See United States v. Horn, 185 F. Supp.

Trujillo was administered a finger dexterity test, which he performed with both hands.  See MSJ ¶ 12, at 5 (setting forth this fact); MSJ Response ¶ 11, at 11 (not disputing this fact).  Trujillo is missing his right thumb.  See MSJ ¶ 11, at 5 (setting forth this fact); MSJ Response ¶ 10, at 11 (not disputing this fact).  Trujillo failed the finger dexterity test with his right hand.  See MSJ ¶ 13, at 5 (setting forth this fact).[6]

---

2d at 533 ("There is a well-recognized . . . causal connection between the ingestion of alcohol and the detectable presence of exaggerated horizontal gaze nystagmus in a person's eyes.").  Indeed, investigating officers are trained extensively on the mechanics of HGN testing based on the notion that nystagmus is correlated with intoxication.  See, e.g., NHTSA Manual Session 8, at 32-45 (explaining the mechanics of the nystagmus "clues," and concluding that exhibition of four or more clues makes it "likely that the subject's BAC is at or above 0.08").  Here, it is sufficient that Atencio "believed or appropriately accepted" this correlation as true when he concluded that there was probable cause to arrest Trujillo for DUI.  Franks v. Delaware, 438 U.S. at 165.

Trujillo's objections are non-responsive to this analysis.  See MSJ Response ¶ 9, at 10-11.  Trujillo has not cited, and the Court has not found, any cases or authority holding that police officers or courts cannot rely on an HGN test to determine probable cause.  If the Court determines at trial that Trujillo's HGN test can come into evidence for only a limited purpose -- to show probable cause -- and not for proof that Trujillo committed a DUI, the Court can give a limiting instruction pursuant to rule 105 of the Federal Rules of Evidence directing the jury not to consider the test or its results as proof that Trujillo was driving while intoxicated.

Because Trujillo raises only Daubert/rule 702 objections, which are inapplicable to probable cause determinations, the Court deems the Defendants' assertion that the HGN test and its results are correlated with indicia of intoxication to be undisputed.  The Court deems the Defendants' assertion that the HGN test "is 'considerably' greater than 77% accurate at predicting intoxication," MSJ ¶ 10, at 5, to be genuinely disputed, however, because the Defendants have not laid a sufficient scientific foundation establishing the test's reliability and relevance under Daubert/rule 702.

[6]The Defendants allege that Trujillo "failed the finger dexterity test" -- presumably with both hands.  MSJ ¶ 13, at 5 (citing State of New Mexico v. Trujillo, No. M-43-DR-201300206, Statement of Probable Cause at 2 (filed August 26, 2013 in State of New Mexico Magistrate Court, Rio Arriba County), filed in federal court June 7, 2016 (Doc. 34-4)("Probable Cause Statement").  Trujillo attempts to dispute this fact, arguing that Trujillo "was able to perform the finger dexterity task successfully."  MSJ Response ¶ 12, at 11.  Trujillo argues that, with respect to his right hand, the test "was near impossible due to Plaintiff not having a right thumb," but that he "completed the task in the correct order as advised by Defendant Atencio."  MSJ Response ¶ 12, at 11 (citing Deposition of John Trujillo at 50:1-22 (taken May 5, 2016), filed August 1, 2016 (Doc. 55-2)(Sullivan, Trujillo)("Trujillo Depo.")).

This dispute appears to be genuine with respect to Trujillo's performance with his left hand only; Trujillo's failure of the test with his right hand is evidently undisputed.  The Defendants assert -- without referring to a specific hand -- that Trujillo "failed the finger dexterity test."  MSJ ¶ 13, at

During this encounter, Atencio[7] "observed an odor of alcohol and that [Trujillo] had bloodshot eyes." MSJ ¶ 14, at 5 (setting forth this fact).[8] Atencio also observed that Trujillo had slurred speech and that he had a breath mint in his mouth. See MSJ Reply at 6.[9]

---

5. At his deposition, however, Trujillo stated that his left hand's performance "wasn't a problem." Trujillo Depo. at 50:1-3 (Sullivan, Trujillo). The Defendants offer no rebuttal in their MSJ Reply to this assertion. See MSJ Reply at 8. Instead, they argue that this dispute is "immaterial," because Trujillo's performance on the finger dexterity test is "not necessary to prove probable cause." MSJ Reply at 8. As discussed supra, the Defendants' assertion of immateriality does not resolve the dispute. See Walton v. N.M. State Land Office, 49 F. Supp. 3d at 924 n.2 (citing D.N.M.LR-Civ. 56.1(b)). If necessary, the Court will address the legal question of materiality in the Analysis, but will deem the fact of Trujillo's left hand performance on the finger dexterity test to be disputed for the Factual Background and the Court's statement of undisputed facts. See O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.

The Court deems the fact that Trujillo failed the finger dexterity test with his right hand to be undisputed, however. See MSJ ¶ 13, at 5 (asserting that Trujillo failed the dexterity test); MSJ Response ¶ 12, at 11 (conceding inability to perform dexterity test with right hand). Asked at his deposition whether he can touch the stub of his right thumb with his fingers, Trujillo responded "no" and explained that he can touch his fingers only "to the base of [his] thumb." Trujillo Depo. at 50:1-22 (Sullivan, Trujillo). Because Trujillo was unable to touch all of his fingers to his right thumb -- regardless whether he attempted each connection in the "correct order," MSJ Response ¶ 12, at 11 -- he failed the finger dexterity test. See Probable Cause Statement at 2 ("Driver would not touch all fingers as he counted 1 to four then four to one.").

[7]The Defendants' MSJ states that "Armijo also observed an odor of alcohol and that Plaintiff had bloodshot eyes." MSJ ¶ 14, at 5. In their MSJ Reply, the Defendants clarify that this attribution is mistaken and that it was Atencio who made these observations. See MSJ ¶ 14, at 5. Trujillo's purported objections to this fact, outlined infra, are not premised upon whether Armijo or Atencio made the alleged observations respecting Trujillo's condition. See generally MSJ Response. The Court therefore deems the fact that Atencio made these observations to be undisputed.

[8]Trujillo purports to dispute this fact, arguing that "Atencio appears to have created these facts after he made a decision to arrest." MSJ Response ¶ 13, at 11. Trujillo argues that his speech was not slurred, see MSJ Response ¶ 13, at 11 (citing Trujillo Depo. at 67:12-20 (Trujillo, Sullivan)(explaining that his apparent slurred speech was just his "Oklahoma drawl")), that "his eyes were not blood shot or watery," and that "he regularly takes mints into his mouth to cover his bad breath from his diabetes." MSJ Response ¶ 13, at 11-12. Trujillo further contends, citing deposition testimony of his expert, Commander Conrad that "Atencio made no mention of bloodshot or watery eyes, slurred speech, or that anyone even smelled alcohol until the very end of his interaction with Trujillo." MSJ Response ¶ 13, at 12 (citing Conrad Depo. at 36:3-8 (Conrad)("[T]here's no indication anywhere until the bitter end that anyone even smelled alcohol . . . [or] that he had bloodshot watery eyes or slurred speech.").

Preliminarily, Conrad's testimony does not create a genuine dispute, because his observations are not based on his personal knowledge of events as rule 56(c)(4) of the Federal Rules of Civil Procedure requires.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . .").  Conrad was not present at the DUI checkpoint where Trujillo was stopped on August 22, 2013, and his deposition was not taken until May 2, 2016, nearly three years after the events of that night transpired.  See Conrad Depo. at 1.

Moreover, the allegations that Trujillo had slurred speech, that Atencio smelled an odor of alcohol, and that Trujillo had bloodshot eyes, see MSJ ¶ 14, at 5, are well-documented.  First, the evidence of Trujillo's slurred speech is documented in Atencio's narrative attached to the August 22, 2013, State of New Mexico Uniform Incident Report.  See State of New Mexico v. Trujillo, State of New Mexico Uniform Incident Report No. 22-1986 at 4 (taken August 22, 2013), filed September 15, 2016 (Doc. 62-6)("I then noticed the slurred speech on the driver and his flushed face.").  Trujillo's objection is that Atencio mistook his "Oklahoma drawl" for slurred speech. Trujillo Depo. at 67:12-20 (Trujillo, Sullivan).  Whether Trujillo's "drawl" sounds slurred does not create a genuine issue of fact as to Atencio's observation of abnormal speech for purposes of probable cause analysis.  See Munday v. Johnson, 257 Fed. App'x. 126, 134 (10th Cir. 2007)("[P]olice officers are not required to forego making an arrest based on facts supporting probable cause simply because the arrestee offers a different explanation.")(citing Romero v. Fay, 45 F.3d 1472, 1478 n.3 (10th Cir. 1995)).  The Court agrees with the Defendants that "Atencio is a law enforcement officer, not a linguist. He cannot reasonably be expected to distinguish a regional dialect from evidence of intoxication." MSJ Reply at 7.  More fundamentally, Trujillo does not dispute that his speech came across as slurred to Atencio -- he merely offers an alternative explanation for why his speech sounded slurred.  Whatever the explanation for Trujillo's slurred speech, it is undisputed that his speech sounded slurred to Atencio.  See Trujillo Depo. at 67:12-20 (Trujillo, Sullivan)(stating that Atencio "just didn't understand that perhaps it's my . . . speech impediment . . . . it's the Oklahoma Drawl").  Accordingly, the Court deems the fact that Trujillo had slurred speech to be undisputed.

Second, Trujillo's odor of alcohol and bloodshot eyes are documented in the DUI Citation at 1, see State of New Mexico v. Trujillo, issued 8/22/2013, filed in federal court June 7, 2016 (Doc. 34-6), in the Notice of License Revocation at 1, see State of New Mexico v. Trujillo, issued August 22, 2013, filed in federal court June 7, 2016 (Doc. 34-5), and in the Scientific Laboratory Division, Chain of Custody for Implied Consent Evidence Form at 2, see State of New Mexico v. Trujillo, issued September 12, 2016, filed in federal court September 15, 2016 (Doc. 62-4).  Trujillo's bare assertion that "his eyes were not blood shot or watery," MSJ Response MSJ Response ¶ 13, at 11-12, was not made under oath, nor does it identify any support in the record as required by the local rules and the Federal Rules of Civil Procedure, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute must . . . refer with particularity to those portions of the record upon which the non-movant relies."); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . .").  Additionally, as mentioned above, Trujillo's reliance on Conrad's testimony that "Atencio made no mention of bloodshot or watery eyes," MSJ Response ¶ 13, at 12, does not create a genuine issue, because Conrad's observations are not based on personal knowledge, see Fed. R. Civ. P. 56(c)(4).  As a result, the Court deems the facts that Trujillo had an odor of alcohol and bloodshot eyes to be undisputed.

Finally, Trujillo's attempted explanation that he uses breath mints "to cover his bad breath from his diabetes," MSJ Response ¶ 13, at 12, does not create a genuine dispute.  Trujillo's use of

Trujillo "was arrested at approximately 7:16 pm."  MSJ ¶ 15, at 5 (setting forth this fact).

See MSJ Response ¶ 14, at 12 (not disputing this fact).  Trujillo's arrest was for "driving 'while

impaired to the slightest degree.'"  MSJ ¶ 16, at 5 (setting forth this fact).[10]  "As a courtesy to

[Trujillo] and for his comfort, he was handcuffed with his hands in the front of his body."  MSJ ¶ 17,

at 5 (setting forth this fact).  See MSJ Response ¶ 16, at 12 (not disputing this fact).  Trujillo

"'appreciate[d the] consideration' Officer Atencio showed him by placing the handcuffs in the front

of his body."  MSJ ¶ 18, at 5 (setting forth this fact)(alteration in original).  See MSJ Response ¶ 17,

---

mints as an apparent attempt to hide an alcoholic odor is documented in Atencio's statement of
probable cause.  See Probable Cause Statement at 1 ("I noticed the driver had . . . [a] breath mint.
Breath mints are often placed in mouths to hide an odor.").  Trujillo's subjective explanation for
using such a mint is immaterial to the probable cause analysis, because officers are not required to
accept an arrestee's innocent explanation for their conduct.  See Munday v. Johnson, 257 Fed.
App'x. at 134 ("[T]he possibility there was an innocent explanation for the arrestee's action [does]
not defeat probable cause.")(citation omitted).  In any case, the Court reserves its determination of
materiality for its Analysis section.  See O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.  Here, it is
undisputed that Atencio observed Trujillo to have a breath mint in his mouth.

[9]The Defendants do not explicitly allege that Atencio observed Trujillo's slurred speech or
that Trujillo had a breath mint.  See MSJ ¶ 14, at 5.  As the discussion, supra note 8, makes clear,
however, Trujillo's MSJ Response objected to the Defendants' asserted fact by contending that his
speech was not slurred and that "he regularly takes mints into his mouth to cover his bad breath from
his diabetes."  See MSJ Response ¶ 13, at 11.  The Defendants' MSJ Reply engaged these
objections.  See MSJ Reply at 6-7.  Based on the Court's analysis, supra note 8, the Court deems the
additional facts that Trujillo had slurred speech and that he took a breath mint to be undisputed.

[10]Trujillo purports to dispute this fact, contending that "[t]he arrest was for driving under the
influence of intoxicating liquor or drugs.  The common name of the statute is 'Driving Under the
Influence of Intoxicating Liquor or Drugs.'"  MSJ Response ¶ 15, at 12 (citing NMSA § 66-8-10).
This objection does not create a genuine dispute.  In his Probable Cause Statement, Atencio relayed
that he "had probable cause to believe the Driver operated a motor vehicle in Rio Arriba County
while his ability was impaired to the slightest degree."  Probable Cause Statement at 2.  As a result,
he concluded: "Trujillo was charged with driving under the influence of alcohol 66-8-102."
Probable Cause Statement at 2.  Trujillo's objection does not controvert this account; it simply adds
the information that NMSA § 66-8-102 is commonly known as "Driving Under the Influence of
Intoxicating Liquor or Drugs."  MSJ Response ¶ 15, at 12.  The parties ultimately agree that Trujillo
was arrested for violating NMSA § 66-8-102 and quibbling about the "common name" of that statute
does not create a genuine dispute about its violation.  Accordingly, the Court deems this fact
undisputed.

at 12 (not disputing this fact).  Trujillo was then taken to Española Hospital for a blood alcohol test.

See MSJ ¶ 19, at 5 (setting forth this fact); MSJ Response ¶ 18, at 12 (not disputing this fact).

Trujillo was not incarcerated, but was "held at the Sheriff's office temporary detention area until he was released on bond around midnight."  MSJ ¶ 20, at 5-6 (setting forth this fact).  See MSJ Response ¶ 19, at 12 (not disputing this fact).  Trujillo never asked Atencio to remove or loosen his handcuffs.  See MSJ ¶ 21, at 6 (setting forth this fact); MSJ Response ¶ 20, at 12 (not disputing this fact).  Nor did Trujillo ask "any other Rio Arriba County official to remove or loosen his handcuffs."  MSJ ¶ 22, at 6 (setting forth this fact).  See MSJ Response ¶ 21, at 12 (not disputing this fact).  When he was released, Trujillo was "provided a State of New Mexico Taxation and Revenue Department Motor Vehicle Division, Notice of [Driver's License] Revocation pursuant to NMSA 1978, §66-8-11."  MSJ ¶ 23, at 6 (setting forth this fact)(alteration in original).  See MSJ Response ¶ 22, at 12 (not disputing this fact).

Trujillo's driver's license revocation hearing was held on November 5, 2013, "or within the statutory ninety-day period."  MSJ ¶ 24, at 6 (setting forth this fact).  See MSJ Response ¶ 23, at 12 (not disputing this fact).  "At the time of the hearing, the results of the state blood alcohol test were unavailable" and, accordingly, "the hearing officer was unable to 'find one way or the other, under the Implied Consent Act, whether there was a violation.'"  MSJ ¶ 25, at 6 (setting forth this fact)(quoting Recording of Plaintiff's License Revocation Hearing at 4:44 (held November 5, 2013), filed June 7, 2016 (Doc. 34-7)("License Hearing"); NMSA §§ 66-8-105 to -112).[11]  The revocation

_____

[11]Trujillo purports to dispute this fact, contending: "The 'Findings by the Preponderance' noted that there was insufficient evidence to establish whether the chemical test was administered to Plaintiff pursuant to the provision of the Implied Consent Act and the requirements could not be established.  The revocation was rescinded."  MSJ Response ¶ 24, at 12.  Trujillo provides no citation to the record for this proposition as the local rules and the Federal Rules of Civil Procedure require.  See D.N.M.LR-Civ. 56.1(b); Fed. R. Civ. P. 56(c)(1).  Even if he did, his purported opposition to the Defendants' factual assertion does not create a genuine issue.  His assertion that

of Trujillo's driver's license was rescinded.  See MSJ Response ¶ 24, at 12 (setting forth this fact);

MSJ Reply at 8 (not disputing this fact).[12]

"The results of the state toxicology test were not mailed to Defendants until November 25,

2013."  MSJ ¶ 26, at 6 (setting forth this fact).  See MSJ Response ¶ 25, at 12 (not disputing this

fact).  Trujillo's blood test "showed he had diazepam and [] its metabolite, noridazepam in his

system."  MSJ ¶ 27, at 6 (setting forth this fact).[13]  Diazepam has various effects, and a single dose

"can reduce a driver's reaction times, ability to perform multiple tasks, adversely affects memory

---

"there was insufficient evidence to establish whether the chemical test was administered to Plaintiff pursuant to the provision of the Implied Consent Act," MSJ Response ¶ 24, at 12, is not inconsistent with the Defendants' statement that "the hearing officer was unable to 'find one way or the other, under the Implied Consent Act, whether there was a violation,'" MSJ ¶ 25, at 6 (citing License Hearing at 4:44; NMSA §§ 66-8-105 to -112).  Trujillo's assertion simply restates the Defendants' assertion.  Moreover, Trujillo's assertion that "[t]he revocation was rescinded," MSJ Response ¶ 24, at 12, merely adds information to the record.  Accordingly, the Court deems the fact that the hearing officer at Trujillo's license revocation hearing was unable to determine whether there was a violation under the Implied Consent Act to be undisputed.

[12]As discussed supra note 11, Trujillo's MSJ Response asserted that, due to the revocation hearing officer's inability determine whether there was a violation under the Implied Consent Act, the revocation of Trujillo's driver's license was rescinded.  See MSJ Response ¶ 24, at 12.  The Defendants do not dispute this factual assertion.  See MSJ Reply at 8.  As a result, the Court deems the fact that Trujillo's driver's license revocation was rescinded to be undisputed.

[13]Trujillo purports to dispute this fact.  See MSJ Response ¶ 26, at 12-13.  Trujillo "disputes the reliability or the admissibility of the toxicology report," and argues that the "Defendants have offered no foundation for its consideration."  MSJ Response ¶ 26, at 12-13.  As mentioned supra note 5, the Court "cannot rely on evidence that will not be admissible at trial."  Lopez v. Am. Baler Co., 2014 U.S. Dist. LEXIS 44193, at *3 n.1.  See Fed. R. Civ. P. 56(c)(2)("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Here, however, the disputed report is submitted in a form that will be admissible at trial.  First, the toxicology report qualifies under the "public records" exception to the rule against hearsay.  Fed. R. Evid. 803(8).  Second, the report is self-authenticating, because it bears the New Mexico State Seal, and because a reviewer and a laboratory employee signed the report.  See Fed. R. Evid. 902(1)(A).  Moreover, Trujillo's actual use of diazepam (valium) is undisputed.  See, e.g., Trujillo Depo. 34:25-35:2 (Sullivan, Trujillo)(responding "yes" when asked "[a]re you still taking Diazepam on a daily basis?").  The Court therefore deems the results of the toxicology report to be undisputed.

and cognition, increases fatigue, and decreases the ability of the driver to remain in his lane." MSJ ¶ 1, at 4 (setting forth this fact)(citing Commander Murray A. Conrad Statement of Qualifications at 1, filed September 15, 2016 (Doc. 62-1)("Conrad Qual.")(citing United States Department of Transportation, National Highway Traffic Safety Administration, <u>Drug and Human Performance Fact Sheets</u> at 31 (revised April 2014)("NHTSA Fact Sheets")).[14]  When combined with low concentrations of alcohol, diazepam "increases impairment."  MSJ ¶ 2, at 4 (setting forth this

---

[14]Trujillo disputes this fact "as immaterial to any probable cause determination."  MSJ Response ¶ 1, at 7.  Trujillo argues that Atencio "had no information about diazepam when he arrested Trujillo" and that "[a]fter the fact discovered evidence can never be used to justify an unlawful arrest."  MSJ Response ¶ 1, at 7 (citing <u>Maryland v. Garrison</u>, 480 U.S. 79, 85 (1987)).  Further, Trujillo notes that "Atencio admitted in his deposition that he did not suspect prescription drug use" and that he "had no knowledge of what the toxicology report revealed even after reading it."  MSJ Response ¶ 1, at 7.  Finally, Trujillo "disputes the reliability or the admissibility of the toxicology report," because the "Defendants have offered no foundation for its consideration."  MSJ Response ¶ 1, at 7 (citing Atencio Depo. at 87:3-7, 14-23; 94:11-25; 95:1-25; 96:1-8 (Kennedy, Atencio)).

Trujillo's assertion of immateriality does not create a genuine dispute as to this fact.  <u>See</u> <u>Walton v. N.M. State Land Office</u>, 49 F. Supp. 3d at 924 n.2 (citing D.N.M.LR-Civ. 56.1(b)).  The Court will, if necessary, address the legal question of materiality in the Analysis, but will deem the fact of diazepam's effects to be undisputed for the Factual Background.  <u>See</u> <u>O'Brien v. Mitchell</u>, 883 F. Supp. 2d at 1058 n.1.

Trujillo's objection, moreover, that Atencio "had no information about diazepam when he arrested Trujillo," MSJ Response ¶ 1, at 7, misses the point.  The question is not whether Atencio relied on any knowledge of Trujillo's ingestion of diazepam as evidence of intoxication when he arrested Trujillo on August 22, 2013; rather, evidence of the effects of diazepam is offered to illustrate that Atencio did not simply imagine Trujillo's apparent signs of intoxication.  <u>See</u> MSJ Reply at 3.  It is therefore irrelevant whether Atencio "did not suspect prescription drug use," MSJ Response ¶ 1, at 7; he suspected alcohol use, and Trujillo's ingestion of diazepam allegedly caused Trujillo to exhibit similar signs of intoxication that confirmed Atencio's suspicion.  Indeed, as the Defendants note, even Conrad, Trujillo's expert, admitted in his deposition that diazepam is a "central nervous system depressant" with similar effects as alcohol.  Conrad Depo. 42:22-25 (Conrad).

The Court has already dealt with the "reliability" and "admissibility" of the toxicology report.  <u>See</u> discussion, <u>supra</u> note 13.  The toxicology report is submitted in a form that will be admissible at trial because: (i) it qualifies under the "public records" exception to the rule against hearsay, Fed. R. Evid. 803(8); and (ii) the report is self-authenticating, <u>see</u> Fed. R. Evid. 902(1)(A).

Based on the above analysis, the Court deems the fact of diazepam's effects to be undisputed.

fact)(citing Conrad Qual. at 1 (citing NHTSA Fact Sheets at 31)).[15]  Moreover, "[d]iazepam will

cause the same effects as alcohol in the body and 'can make the effects of alcohol seem worse than

they are.'"  MSJ ¶ 3, at 4 (setting forth this fact)(quoting Conrad Depo. 52:12-18 (Conrad)).[16]

---

[15]Trujillo disputes this fact "as immaterial to any probable cause determination."  MSJ Response ¶ 1, at 7.  Trujillo makes the same objections to this fact as with the Defendants' assertion, discussed supra note 14, that diazepam has effects such as reducing a driver's reaction times.  See MSJ Response ¶ 1, at 7.  Accordingly, the Court incorporates its analysis from note 14, supra, and deems the fact of diazepam's effects when combined with alcohol to be undisputed.

[16]Trujillo purports to dispute this fact, contending that the "Defendants cannot use expert opinions to support their position when the expert lacks expertise in the area."  MSJ Response ¶ 2, at 7.  Trujillo argues, in short, that Conrad's testimony is not admissible under Daubert, because it is not "reliably related to his experience."  MSJ Response ¶ 2, at 7 (citing Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *8 (D.N.M. 2003)(Browning, J.)).  Trujillo advances two arguments in support of this objection.  First, Trujillo contends that Conrad "does not have the background to opine about the effects of Diazapam [sic]."  MSJ Response ¶ 2, at 7.  Trujillo presses that "Conrad is not a medical doctor and his testimony regarding the impact of diazepam on a driver is inadmissible."  MSJ Response ¶ 2, at 8.  Trujillo argues: "Conrad bases his opinion . . . from his training as a police officer, but not on medical training or training as a toxicologist."  MSJ Response ¶ 2, at 9.  Trujillo analogizes to Hernandez v. City of Albuquerque, where the Court, in Trujillo's reading, applied "the reliability standards in Daubert . . . [and] found that [a] police procedures expert was not qualified to testify to medical opinions because the police procedures expert lacked medical training."  MSJ Response ¶ 2, at 8.  Second, Trujillo argues that, like the expert in Hernandez v. City of Albuquerque, Conrad fails to "'show how his experience is reliably applied to the facts of this case.'"  MSJ Response ¶ 2, at 8 (quoting Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *10).  Conrad's testimony fails the Daubert reliability test, Trujillo contends, because the "Defendants do not offer an explanation for how Commander Conrad's statement that diazepam can impair a driver has any relation to his opinions based on police procedures."  MSJ Response ¶ 2, at 9.
    Trujillo's first argument conflates Daubert's reliability test with rule 702's threshold inquiry regarding an expert's qualifications.  See Fed. R. Evid. 702.  Whether a witness is qualified as an expert under rule 702 turns on the witness' "knowledge, skill, experience, training, or education," Fed. R. Evid. 702; Daubert's reliability test, by contrast, applies to the "reasoning and methodology" underlying the expert's opinion, United States v. Avitia-Guillen, 680 F.3d at 1256 (quoting United States v. Nacchio, 555 F.3d at 1241 (citing Fed. R. Evid. 702)).  See United States v. Harry, 20 F. Supp. 3d 1196, 1222-1226 (D.N.M. 2014)(Browning, J.)(treating expert qualifications and reliability under Daubert as separate inquiries).  In Hernandez v. City of Albuquerque, the Court did not, as Trujillo asserts, conclude that, based on "the reliability standards in Daubert," the proffered witness "was not qualified to testify to medical opinions . . . ."  MSJ Response ¶ 2, at 8.  Rather, the Court held that the witness was not qualified under rule 702 to testify to "opinions that involve medical expertise," because the witness had "no medical training or experience on which to base his opinion."  Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *9.  The Court then

proceeded to analyze the proffered expert's opinions under <u>Daubert</u>'s reliability test. <u>See</u> <u>Hernandez</u> <u>v. City of Albuquerque</u>, 2003 U.S. Dist. LEXIS 26585, at *10-12.

Regardless, Trujillo's appeal to the Court's reasoning with respect to the witness' qualifications in <u>Hernandez v. City of Albuquerque</u>, <u>see</u> MSJ response at ¶ 2, at 7-9, is unavailing. There, the defendant proffered a police procedures expert's opinion regarding whether a blow to the head during the plaintiff's arrest caused the plaintiff's head injury. <u>See</u> <u>Hernandez v. City of Albuquerque</u>, 2003 U.S. Dist. LEXIS 26585, at *2. Because the witness had only "basic first-aid training," the Court held that he did not have the medical expertise to opine on the origin of the plaintiff's head wound. 2003 U.S. Dist. LEXIS 26585, at *3, 9-10. Here, by contrast, Conrad's testimony is not elicited as specific commentary on Trujillo's apparent intoxication; Conrad will not, in other words, opine whether diazepam ingestion caused Trujillo's indicia of impairment. Rather, Conrad will testify more generally to the impairing effects of diazepam. <u>See</u> MSJ ¶ 3, at 4 (alleging, in the abstract, that "[d]iazepam will cause the same effects as alcohol in the body and can make the effects of alcohol seem worse than they are"). While the former testimony would require a witness competent to render a medical diagnosis, the latter requires only specialized knowledge of drug impairment on an abstract level. Testimony regarding such specialized knowledge should be permitted if it assists the trier of fact to understand the evidence. <u>See</u> <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994). Here, Conrad has more expertise and specialized knowledge about drug impairment than most laypersons or even the Court, and thus, his testimony would assist the trier of fact to understand the evidence.

More to the point, the Court concludes that Conrad is qualified by training and experience to render an opinion on the physical effects of diazepam. <u>See</u> <u>United States v. Nacchio</u>, 555 F.3d at 1241 (citing Fed. R. Evid. 702). Conrad is a certified DRE, meaning he is "trained in the actions and interactions of drugs, and combinations of drugs." MSJ Reply at 4 (citing Conrad Qual. at 1). <u>See</u> <u>United States v. Everett</u>, 972 F. Supp. 1313, 1323 (D. Nev. 1997)(Hunt, M.J.)(noting that DREs "receive[] special training and gather[] experience in drawing specific conclusions about impairment and the identification of potential classes of drugs as the cause of the impairment"). Conrad is also a DRE trainer, which requires a higher level of technical proficiency and specialized knowledge of drug impairment symptoms. <u>See</u> MSJ Reply at 4 (citing Conrad Qual. at 1). From 1994 to 2006, Conrad served as DRE Coordinator for the State of New Mexico, where he "trained hundreds of officers how to detect, apprehend, and process drug impaired drivers." Conrad Qual. at 2. The National Traffic Safety Administration has certified Conrad as a Standardized Field Sobriety Testing ("SFST") instructor. <u>See</u> MSJ Reply at 4 (citing Conrad Qual. at 1). SFST instruction involves training regarding Central Nervous System ("CNS") depressants -- including Anti-Anxiety Tranquilizers such as diazepam -- which, according to the SFST Participant Guide, cause people to "look and act like people under the influence of alcohol." DWI Detection and Standardized Field Sobriety Testing Participant Guide, Session 0, at 12 (revised May 2013)("SFST Guide"). Finally, Conrad has testified regarding SFSTs and as a DRE in Bernalillo County Metropolitan Court and in Bernalillo County District Court. <u>See</u> Conrad Qual. at 2. Taken together, this experience qualifies Conrad as an expert on diazepam's physical effects. <u>Cf.</u> <u>Hernandez v. City of Albuquerque</u>, 2003 U.S. Dist. LEXIS 26585, at *9-10 (witness not qualified to testify because he had only "basic first-aid training"). Several federal courts have found DREs with far less experience than Conrad competent to testify to the symptoms of drug impairment. <u>See</u>, <u>e.g.</u>, <u>Mares v. Voeltz</u>, 2002 U.S. Dist. LEXIS 28360, at *3 (C.D. Cal. 2002)(Wilson, J.)(permitting DRE to testify, based on his "credentials and experience," to indicia of cocaine use and whether arresting officers' observations

were consistent with cocaine use); <u>United States v. Everett</u>, 972 F. Supp. at 1320 (allowing DRE testimony about the physical impact of various classes of drugs).

It is noteworthy that, under New Mexico law, Conrad may not be competent to testify to the effects of diazepam on the body simply because he is a DRE.  <u>See</u> <u>State v. Aleman</u>, 2008-NMCA-137, ¶ 31, 194 P.3d 110 (concluding, in the context of HGN testimony, that DREs are "non-scientific experts" whose testimony is permitted only once a "scientific expert" testifies).  New Mexico state courts hold that, although lay persons easily comprehend alcohol impairment, <u>see</u> <u>State v. Neael</u>, 2008-NMCA-008, ¶ 27, 176 P.3d 330, assessing a drug's physical manifestations is "beyond [the] capability" of lay persons to discern and understand, <u>State v. Gonzales</u>, No. 33,627, ¶ 17 (N.M. Ct. App. May 5, 2016)(unpublished).  <u>See</u> <u>State v. Aleman</u>, 2008-NMCA-137, ¶ 19, 194 P.3d 110 (expressing "doubt that a typical juror would have had the detailed information about the correlation between [DRE-test] observations and a particular category of drug").  Accordingly, New Mexico state courts require that DREs possess scientific expertise satisfying <u>Daubert</u> and <u>State v. Alberico</u>, 1993-NMSC-047, 861 P.2d 192, before they permit DREs to testify to the correlation between drug use and physical manifestations of drug impairment.  <u>See</u> <u>State v. Torres</u>, 1999-NMSC-010, ¶ 40, 976 P.2d 20; <u>State v. Gonzales</u>, No. 33,627, ¶ 18.

As noted above, the Court does not analyze expert qualifications under <u>Daubert</u>'s reliability test.  <u>See</u> <u>United States v. Harry</u>, 20 F. Supp. 3d at 1222-1226.  Moreover, even if it is generally true that lay persons are incapable of assessing a specific drug's physical manifestations, <u>see</u> <u>State v. Aleman</u>, 2008-NMCA-137, ¶ 19, 194 P.3d 110 -- a point with which the Court may not agree in a specific case, given the widespread use of drugs in New Mexico -- diazepam would seem to present an exception to the rule.  Diazepam, like alcohol, is a CNS depressant, and both have similar physical manifestations.  <u>See</u> SFST Guide, Session 0, at 12 (stating that diazepam causes people to look and act like they are under the influence of alcohol).  If, as New Mexico courts hold, lay persons are capable of understanding alcohol impairment without the assistance of a scientific expert, <u>see</u> <u>State v. Neael</u>, 2008-NMCA-008, ¶ 27, 176 P.3d 330, they can discern the same effects when manifested by diazepam.  Finally, an expert "'should not be required to satisfy an overly narrow test of his own qualifications.'"  <u>United States v. Harry</u>, 20 F. Supp. 3d at 1223 (quoting <u>Gardner v. Gen. Motors Corp.</u>, 507 F.2d 525, 528 (10th Cir. 1974)).  Expert testimony should be liberally admitted under rule 702, <u>see</u> <u>United States v. Gomez</u>, 67 F.3d 1515, 1526 (10th Cir. 1995), and the trial court has broad discretion in deciding whether to admit or exclude such testimony, <u>see</u> <u>Werth v. Makita Elec. Works, Ltd.</u>, 950 F.2d 643, 647 (10th Cir. 1991).  In any event, the Court concludes that, in light of his extensive training and experience, Conrad is qualified to testify to his specialized knowledge of drug impairment.

Having established Conrad's qualifications, the Court must decide whether the proffered evidence will be reliable under <u>Daubert</u>.  <u>See</u> <u>United States v. Avitia-Guillen</u>, 680 F.3d at 1256 ("If the expert is sufficiently qualified, then 'the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology.'")(quoting <u>United States v. Nacchio</u>, 555 F.3d at 1241 (citing Fed. R. Evid. 702)).  Expert opinion testimony is reliable if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Although rule 702 enshrines a "liberal standard," <u>Werth v. Makita Elec. Works, Ltd.</u>, 950 F.2d at 647, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it," <u>Hernandez v. City of Albuquerque</u>, 2003 U.S. Dist. LEXIS 26585, at *8 (citing <u>Daubert</u>, 43 F.3d at 1319).

Trujillo "is disabled due to degenerative joint disease, kidney disease, diabetes, and nephropathy."  MSJ ¶ 28, at 6 (setting forth this fact).  See MSJ Response ¶ 27, at 13 (not disputing

---

Here, Conrad's proffered testimony is "the product of a reliable methodology" and sound reasoning.  United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  Conrad's knowledge of diazepam's effects is grounded in scientific principles detailed at length in the NHTSA Fact Sheets at 29-33.  See MSJ ¶ 1, at 4 (citing NHTSA Fact Sheets at 31).  The NHTSA Fact Sheets reflect "the state of current scientific knowledge," and are "designed to provide practical guidance to toxicologists, pharmacologists, law enforcement officers, attorneys, and the general public on issues related to drug impaired driving."  NHTSA Fact Sheets at 3.  They note that diazepam's manufacturer "suggests patients treated with diazepam be cautioned against . . . driving a motor vehicle" and that "studies have shown that diazepam produces significant driving impairment over multiple doses."  NHTSA Fact Sheets at 31.  They caution, moreover, that "[s]ignificant impairment is further increased when diazepam is combined with low concentrations of alcohol."  NHTSA Fact Sheets at 31.  Trujillo controverts none of these statements of diazepam's effects.  See MSJ Response ¶ 2, at 7-9.  Regardless, "well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert, 509 U.S. at 593 n. 11.  Because the NHTSA Fact Sheets reflect "the state of current scientific knowledge," NHTSA Fact Sheets at 3, and because even diazepam's manufacturer warns against the impairing effects of diazepam, see NHTSA Fact Sheets at 31, the Court concludes that those effects are well-established, see Daubert, 509 U.S. at 593 n. 11.  In any case, because Trujillo does not challenge this data, the Court has no sound reason to question its legitimacy.

Trujillo's sole challenge to the reliability of Conrad's proffered testimony is that he fails to show how his DRE and SFST experience is "'reliably applied to the facts of this case.'"  MSJ Response ¶ 2, at 8 (quoting Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *10).  See Fed. R. Evid. 702 (allowing expert opinion testimony if "the witness has applied the principles and methods reliably to the facts of the case").  As noted above, there is no genuine issue with respect to the reliability of Conrad's application of his knowledge of diazepam's effects to this case's facts.  The Defendants elicit Conrad's testimony to establish diazepam's impairing effects generally and not as specific commentary on Trujillo's intoxication.  See MSJ ¶ 3, at 4 (alleging that "[d]iazepam will cause the same effects as alcohol in the body and can make the effects of alcohol seem worse than they are").  Conrad will testify only to well-established principles in the abstract and not to their specific application to this case's facts.  Again, Trujillo has not controverted those principles' underlying reasoning or methodology.  See MSJ Response ¶ 2, at 7-9.  Accordingly, the Court concludes that Conrad's testimony is "reliably applied" in this case, Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *10, insofar as Conrad seeks only to recite well-established principles.

Having determined that Trujillo is qualified to testify by training and experience, and that the evidence will be reliable, the Court deems the asserted fact -- that diazepam causes the same effects as alcohol and can enhance the effects of alcohol -- to be undisputed.

this fact).  "The First Judicial District Attorney's office prosecuted the case until [Trujillo's] criminal case was dismissed on January 14, 2014."  MSJ ¶ 29, at 7 (setting forth this fact).[17]

## PROCEDURAL BACKGROUND

Trujillo commenced this action in the First Judicial District Court, Rio Arriba County, State of New Mexico on August 20, 2015.  See Complaint at 1.  Trujillo's Complaint alleges four counts, three of which are asserted against Atencio for violations of state law: Count I asserts a state law claim for false imprisonment, see Complaint ¶¶ 108-113, at 9; Count II asserts a state law claim for false arrest, see Complaint ¶¶ 114-118, at 10; and Count III asserts a state law claim for malicious abuse of process, see Complaint ¶¶ 119-124, at 10.  Count IV, Trujillo's only federal claim, asserts that Rio Arriba County discriminated against Trujillo "[o]n the basis of his disability" in violation of Title II of the ADA.  Complaint ¶¶ 125-37, at 10-12.  On October 7, 2015, the Defendants removed the case to federal district court on the basis of federal question jurisdiction.  See Notice of Removal ¶¶ 8-9, at 2, filed October 7, 2015 (Doc. 1).

The Defendants moved for summary judgment on the Complaint on June 7, 2016.[18]  The Defendants advance two primary arguments: (i) that Trujillo was arrested pursuant to probable cause that he was driving while intoxicated; and (ii) that Atencio did not deny Trujillo a reasonable

---

[17]Trujillo purports to dispute this fact, stating that "Atencio filed the complaint."  MSJ Response ¶ 28, at 7.  The Defendants respond that this "simply adds the undisputed and immaterial fact that Defendant Atencio filed the criminal complaint."  MSJ Reply at 8.  The Court agrees with the Defendants.  Trujillo's objection does not, as the local rules require, "specifically controvert[]," D.N.M.LR-Civ. 56.1(b), the Defendants' allegation that "[t]he First Judicial District Attorney's office prosecuted the case until [Trujillo's] criminal case was dismissed," MSJ ¶ 29, at 7.  Accordingly, the Court deems this fact admitted.  If necessary, the Court will address the materiality of Trujillo's added fact that "Atencio filed the criminal complaint," MSJ Reply at 8, in the Analysis.

[18]The parties refer to the "Defendants" throughout their briefings without specifying to whom they are referring.  Where possible, the Court will specify when an argument is asserted by or against only Atencio.  Otherwise, the Court's use of the generic "Defendants" reflects the parties' usage in their briefings.

accommodation for his disability during Trujillo's arrest or subsequent transportation and booking. The Court will review the Defendants' arguments, the responsive pleadings, and, finally, the hearing.

### 1.    <u>The MSJ</u>.

The Defendants move for summary judgment on Trujillo's Complaint. <u>See</u> MSJ at 1. The Defendants' primary argument is that all of Trujillo's "claims fail because the undisputed facts show that Defendant Atencio had probable cause to arrest" Trujillo for driving under the influence of alcohol, MSJ at 3, and that this probable cause determination was based on neutral factors unrelated to Trujillo's alleged disabilities, <u>see</u> MSJ at 7. The Defendants also assert that Trujillo's ADA claim fails for the additional reason that Trujillo "never asked for an accommodation for his handcuffs." MSJ at 3-4. Finally, Armijo[19] and Atencio assert that they are entitled to qualified immunity with respect to Trujillo's ADA claim. <u>See</u> MSJ at 4. The Court will discuss the Defendants' recitation of the legal standards applicable to the MSJ and then turn to the Defendants' substantive arguments.

### a.    <u>Applicable Legal Standards</u>.

After reviewing the undisputed facts, the Defendants discuss several legal standards. First, the Defendants contend that it is unlawful for a person who is "under even the 'slight' influence of alcohol" to operate a motor vehicle in New Mexico. MSJ at 7 (quoting <u>Vondrak v. City of Las Cruces</u>, 535 F.3d 1198, 1207 (10th Cir. 2008)(citing <u>State v. Sisneros</u>, 1938-NSMC-049, ¶ 18, 82 P.2d 274). The Defendants contend that, in New Mexico, an arresting officer is not required to "'observe a suspect actually driving in an impaired manner if the officer, based upon all the facts and

---

[19]Armijo was originally named as a Defendant in this action, <u>see</u> Complaint at 1, and was still a party when the Defendants moved for summary judgment on June 7, 2016, <u>see</u> MSJ at 1. On July 12, 2016, the parties stipulated to a dismissal of Armijo from the case with prejudice. <u>See</u> Stipulation to Dismiss Defendant Marvin Armijo at 1, filed July 12, 2016 (Doc. 44). The Court entered an order granting the stipulation to dismiss Armijo on July 29, 2016. <u>See</u> Order Granting Stipulation to Dismiss Defendant Marvin Armijo at 1, filed July 29, 2016 (Doc. 52). Accordingly, although the MSJ discusses Armijo's liability, the subsequent briefings do not refer to Armijo, because he was no longer a party when those briefings were filed.

circumstances, has reasonable grounds to believe that the suspect has been driving while intoxicated.'" MSJ at 8 (quoting State v. Sanchez, 2001-NMCA-109, ¶ 6, 36 P.3d 446, cert. denied, 131 N.M. 382, 37 P.3d 99 (2001)). Second, the Defendants assert that a "brief seizure at a sobriety checkpoint is reasonable if conducted in a neutral manner." MSJ at 8 (citing Vondrak v. City of Las Cruces, 535 F.3d at 1206 (citing United States v. Galindo-Gonzalez, 142 F.3d 1217, 1221 (10th Cir. 1998)). The Defendants argue that probable cause is required to arrest a driver for DUI, and that an officer's probable cause determination "will be upheld if a reasonable officer in the same or similar circumstances would have had grounds to believe that the suspect had been driving while intoxicated." MSJ at 8 (citing State v. Sanchez, 2001-NMCA-109, ¶¶ 6-7, 36 P.3d 446). Third, and finally, the Defendants note that the Supreme Court "has declined to rule as to whether the ADA applies to arrests and whether public entities can be held liable for damages under Title II of the ADA for an arrest made by its police officers." MSJ at 8-9 (citing City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1773-74 (2015)). The Defendants argue, however, that lower federal courts have recognized two theories forming the basis of Title II claims: (i) wrongful arrest based on "misapprehension of the effects of [an individual's] disability as criminal conduct;" and (ii) failure to provide reasonable accommodations to a disabled individual either during the investigation or arrest. MSJ at 9 (citing Gohier v. Enright, 186 F.3d 1216, 1220-1221 (10th Cir. 1999)(citation omitted in MSJ)). The Defendants conclude that "[a]n arrest based on probable cause and a failure to ask for accommodations for disability may invalidate ADA arrest claims." MSJ at 9 (citing J.H. v. Bernalillo Cnty., 806 F.3d 1255, 1261 (10th Cir. 2015)).

### b.   **Qualified immunity.**

Turning to their substantive argument, the Defendants contend that Atencio and Armijo are entitled to qualified immunity on Trujillo's ADA claim. See MSJ at 9 (noting that "[q]ualified

immunity has been recognized as a defense for ADA and Rehabilitation Act claims")(citing Roberts v. City of Omaha, 723 F.3d 966 (8th Cir. 2013)(citation omitted in MSJ); Torcasio v. Murray, 57 F.3d 1340 (4th Cir. 1995)).  To defeat qualified immunity, the Defendants argue, Trujillo "must demonstrate his statutory rights under the ADA were violated and the right was clearly established on August 22, 2013."  MSJ at 10.  With respect to the first inquiry, the Defendants assert that Trujillo's rights under the ADA were not violated, because: (i) he was arrested based on probable cause; (ii) his disability was accommodated during the field sobriety tests; and (iii) he did not request further accommodation during his arrest and detention.  See MSJ at 9-13.[20]

The Defendants assert that, first, Trujillo's ADA rights were not violated during his arrest or detention.  See MSJ at 10.  The Defendants contend that "Atencio did not misperceive Plaintiff's disability as intoxication" but, rather, he "perceived neutral indicia of driving under the influence." MSJ at 10-11.  In essence, they assert, Trujillo "was arrested based on the probable cause that he was intoxicated."  MSJ at 11.  The Defendants point to State v. Sanchez, 2001-NMCA-109, ¶¶ 9-10, 36 P.3d 446, arguing that the Court of Appeals of New Mexico upheld a probable-cause determination based on "virtually identical" facts.  MSJ at 11.  In both cases, they contend, the driver admitted to having two beers, had bloodshot eyes, and smelled of alcohol.  See MSJ at 11.  They postulate, however, that Atencio had "more facts to support probable cause than were required in *Sanchez*," including "the results of the portable breathalyzer, the finger dexterity test, and . . . the results of the failed eye gaze test . . . ."  MSJ at 12.  They argue that Atencio's suspicions based on these indicia

---

[20]Although the Atencio and Armijo have since withdrawn their assertion of qualified immunity, because Trujillo's ADA claim "is brought solely against the municipal defendant," MSJ Reply at 1, the Court nonetheless considers the Defendants' qualified immunity arguments at length, because they are relevant to the Court's ultimate disposition of the MSJ.

were "born [sic] out by the blood test results," which showed that Trujillo had "impairment drugs (diazepam) in his system."  MSJ at 12.

The Defendants turn second to Trujillo's contention that Atencio violated the ADA by failing to provide accommodations for Trujillo's disability during the field sobriety tests, namely, that "the walk and turn test and the finger test were not appropriate."  See MSJ at 12 (citing Complaint ¶¶ 64-73, at 6).  The Defendants assert that "the walk and turn test was not necessary for probable cause," because Atencio "had more than enough facts from Plaintiff's admitted drinking, appearance, failed preliminary breath test, and other failed tests to support a finding of probable cause."  MSJ at 12.  With respect to the finger test, the Defendants argue that Trujillo "performed the test with *both* hands not only the alleged deformed hand," and, thus, "the implication that Plaintiff's missing right thumb was an impediment to successfully performing the dexterity test is a red herring . . . ."  MSJ at 12 (citing MSJ ¶ 12, at 5)(emphasis in original).  In any case, the Defendants assert, no mobility was required for Trujillo to reveal his recent alcohol consumption, take a breathalyzer test, smell like alcohol, have bloodshot eyes, lack finger dexterity, and fail the HGN test.  See MSJ at 12-13.  Thus, the Defendants argue, Trujillo's disabilities were accommodated.  See MSJ at 13.

Third, and finally with respect to qualified immunity, the Defendants note that Trujillo argues that his rights under the ADA were violated "based on the handcuffing of Plaintiff and his detention at the Sheriff's office for four hours."  MSJ at 13.  The Defendants assert that Trujillo concedes that "the placement of his handcuffs in the front of his body was an accommodation to him."  MSJ at 13 (citing MSJ ¶ 18, at 5).  The Defendants also contend that Trujillo "never asked Defendant Armijo or Atencio for an accommodation for his disability . . . at the scene of the arrest, on the way to the hospital, at the hospital, on the way to the Sheriff's Office, or at the Sheriff's Office."  MSJ at 13 (citing MSJ ¶¶ 21-22, at 6).

Turning to the clearly established prong of qualified immunity analysis, the Defendants argue that Trujillo's rights under the ADA were not clearly established at the time of his arrest on August 22, 2013.  See MSJ at 13.  The Defendants contend that a right is clearly established only if its "'contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it.'"  MSJ at 13 (quoting City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1774)(alterations in MSJ).  As of 2015, they assert, "the Tenth Circuit still had not decided that accommodations are necessary when disabled individuals are arrested."  MSJ at 14 (citing J.H. v. Bernalillo Cnty., 806 F.3d at 1260-61 (citing Gohier v. Enright, 186 F.3d at 1221)).  They contend that the Supreme Court also "has yet to weigh in on the issue."  MSJ at 14 (citing City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1773-74).  As a result, they assert, the right to have ADA-compliant arrests "is not clearly established now and was not clearly established in August of 2013 when Plaintiff was arrested."  MSJ at 14.

### c.      Trujillo's State Tort Claims.

The Defendants turn next to Trujillo's state tort claims, beginning with his claims for false imprisonment and false arrest.  See MSJ at 15.  The Defendants assert that "[f]alse arrest is merely one way of committing false imprisonment" and that "[b]oth causes of action will fail if Defendant Atencio had probable cause to arrest Plaintiff."  MSJ at 15 (citing Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d 6).  Here, the Defendants contend, "the progression of events, from when Plaintiff first encountered Defendant Armijo until his arrest by Defendant Atencio, supports the probable cause to arrest Plaintiff."  MSJ at 15.  In support of this contention, the Defendants note that Trujillo admitted to drinking two beers, that the results of his preliminary breath test showed that his blood alcohol level exceeded .08, that he failed the HGN and finger dexterity tests, that he had bloodshot eyes, and that he smelled of alcohol.  See MSJ at 15 (citing

Complaint ¶¶ 22-25, at 3).  The Defendants conclude that "Atencio had probable cause to arrest Plaintiff based on these combined observations."  MSJ at 15 (citing State v. Sanchez, 2001-NMCA-109, 36 P.3d 446).

Turning to Trujillo's malicious-abuse-of-process claim, the Defendants note that the tort is "narrowly construed" and that the tort's elements are: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages."  MSJ at 16 (citing Durham v. Guest, 2009-NMSC-007, ¶ 29, 204 P.3d 19).  The first prong, the Defendants note, is met where there is either "lack of probable cause," or "procedural impropriety [] suggesting 'extortion, delay, or harassment' in the form of abusive 'discovery, subpoenas' or similar misuse of procedural devices."  MSJ at 16 (quoting Durham v. Guest, 2009-NMSC-007, ¶ 29, 204 P.3d 19).  Regarding the first of these theories, the Defendants reiterate that Atencio had probable cause to arrest Trujillo, and, thus, Trujillo's "malicious abuse of process claim cannot stand based on probable cause theory."  MSJ at 16.  The second theory likewise fails, the Defendants assert, because there is no evidence that Atencio tried to extort Trujillo or delay any judicial proceeding.  See MSJ at 16.

The Defendants further contend that it is unclear whether Trujillo's administrative license revocation hearing qualifies as a "judicial proceeding" under the tort's first prong.  MSJ at 16 (citing Durham v. Guest, 2009-NMSC-007, ¶ 34, 204 P.3d 19; State Taxation & Revenue Dep't, Motor Vehicle Div. v. Bargas, 2000-NMCA-103, ¶ 10, 14 P.3d 538; Dente v. State Taxation and Revenue Dep't, 1997-NMCA-099, ¶ 7, 946 P.2d 1104, overruled in part by State Taxation & Revenue Dep't, Motor Vehicle Div. v. Bargas, 2000-NMCA-103, 14 P.3d 538).  Even assuming that the hearing is a judicial proceeding, they assert, there is no evidence of impropriety, because Trujillo's revocation hearing was timely and conformed to the applicable rules.  See MSJ at 17.  The Defendants argue

that Trujillo was given timely notice of the revocation, that the hearing was timely held within ninety days of that notice, and that the results of Trujillo's blood test were not yet available at the time of the hearing.  See MSJ at 17 (citing Implied Consent Act, NMSA § 66-8-111).  The Defendants note that Trujillo highlights Atencio's objection to Trujillo's wife's presence at the hearing as evidence of harassment, but "making an objection," the Defendants advance, "is not a procedural shenanigan, it is simply voicing concern about a possible rule violation."  MSJ at 17 (citing Complaint ¶ 101, at 8). In any event, the Defendants argue, Atencio's objection was inconsequential, because it "was overruled as a matter of course by the hearing officer."  MSJ at 17.

### d.      Trujillo's ADA Claim.

Lastly, the Defendants address Trujillo's ADA Title II claim against Rio Arriba County.  See MSJ at 17.  The Defendants assert that, for a public entity to be held liable under the ADA, it "must have knowledge of the individual's disability and need for accommodation."  MSJ at 18 (citing Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1196 (10th Cir. 2007)).  Here, the Defendants contend, "there is no evidence to support Plaintiff's claim that Rio Arriba County Sheriff's office had any knowledge of Plaintiff's need for accommodation."  MSJ at 18.  Trujillo "spoke to several officers to arrange to have his friend take his car," the Defendants note, but "never once communicated a need for special accommodations due to his disability."  MSJ at 18 (citing Deposition of John Trujillo at 54:2-5 (taken May 5, 2016), filed June 7, 2016 (Doc. 34-3)(Sullivan, Trujillo)("Trujillo Depo.")).  The Defendants further note that Trujillo "said he did not have any other communications with officers at the scene of the DUI stop," MSJ at 18 (citing Trujillo Depo. at 55:11-13 (Sullivan, Trujillo)); that Trujillo "said he did not have any conversations with Defendant Atencio from the traffic stop to the Espanola Hospital," MSJ at 18 (citing Trujillo Depo. at 56:3-5 (Sullivan, Trujillo)); that Trujillo "did not ask for any accommodations at the hospital," MSJ at 18

(citing Trujillo Depo. at 56:9-57:22 (Sullivan, Trujillo)); that Trujillo "did not have any discussions with Atencio from the Hospital to the Sheriff's department," MSJ at 18 (citing Trujillo Depo. at 60:11-13 (Trujillo)); that, when his handcuffs were removed to sign a document, Trujillo "did not ask for any accommodations . . . before he was handcuffed again," MSJ at 18 (relying on Trujillo Depo. at 60:11-17 (Trujillo)); and that, finally, Trujillo did not ask either the transport driver or "the female officer who visited him in his cell for any accommodations," MSJ at 18 (citing Trujillo Depo. at 61:12-14; 62:5-17 (Sullivan, Trujillo)).

In short, the Defendants argue that, throughout the events surrounding Trujillo's arrest, he repeatedly refrained from requesting any accommodations for his disability.  See MSJ at 18. Accordingly, the Defendants assert, Trujillo's reliance on his "disability placard as evidence that he should have been offered accommodations" is unavailing.  MSJ at 18.  Even so, the Defendants note, despite Trujillo's failure to request accommodations or complain, "the officers handcuffed Plaintiff in the front as a courtesy and for Plaintiff's comfort . . . ."  MSJ at 18.  The Defendants conclude, therefore, that Trujillo's ADA rights were not violated "and the ADA claims against Rio Arriba County fail as a matter of law."  MSJ at 19.

## 2.    **The MSJ Response.**

Trujillo responded to the MSJ on August 1, 2016.  See MSJ Response at 1.  Trujillo argues that his theory of the case is "simple" -- that "Atencio improperly used observations of his disability to determine probable cause for a DWI arrest."  MSJ Response at 1.  Trujillo argues that, rather than suggest impairment, Atencio's observations of Trujillo "stumbling to get out of his car and leaning on his car revealed that [he] was disabled . . . ."  MSJ Response at 1.  "When Atencio's observations of Trujillo's disability are stripped away," Trujillo contends, "a reasonable jury could find that Atencio had no probable cause to arrest Trujillo."  MSJ Response at 1.  Accordingly, Trujillo argues,

"taking the facts in the light most favorable to the non-moving party, a reasonable jury could find Defendant Rio Arriba County violated John Trujillo's rights under Title II of the Americans with Disabilities Act . . . and the New Mexico Tort Claims Act." MSJ Response at 1. In the alternative, Trujillo argues, should the Court grant summary judgment on Trujillo's ADA claim, the Court should "remand his state tort claims." MSJ Response at 1.

Trujillo proceeds to controvert a number of the Defendants' factual assertions, which the Court has reviewed supra in its discussion of the Undisputed Facts. After disputing these facts, Trujillo asserts that the Court, in determining whether to grant summary judgment, "must view the evidence 'in the light most favorable to the opposing party.'" MSJ Response at 13 (quoting Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)). Trujillo stresses that "the moving party must support its alleged facts with admissible evidence." MSJ Response at 13 (citing Fed. R. Civ. P. 56(c)(2)). Here, Trujillo argues, the toxicology report is inadmissible, because: (i) the "Defendants have laid no foundation for its reliability or authenticity and have no evidence as to any interpretation of the results and what, if anything, the Diazapam [sic] means;" and (ii) "no part of Atencio's decision arrest [sic] Trujillo was based upon the toxicology report." MSJ Response at 13. As a result, Trujillo asserts, "the toxicology report is hearsay and immaterial." MSJ Response at 13.

Trujillo advances four primary arguments in opposition to the MSJ. First, Trujillo contends that the MSJ should be denied, because the Defendants violated Trujillo's rights under the ADA. See MSJ Response at 14. Trujillo argues that Atencio "improperly used evidence of Trujillo's disability to provide probable cause" and that, absent evidence of Trujillo's disability, "a reasonable jury could find that Atencio had insufficient probable cause." MSJ Response at 14. Trujillo asserts that the Tenth Circuit has "assumed without deciding that the ADA applies to arrests," MSJ Response at 14 (citing Gohier v. Enright, 186 F.3d at 1219), and that other Courts of Appeals have

- 29 -

approved that assumption, see MSJ at 14 (citing Waller ex rel Estate of Hunt v. Danville, 556 F.3d 171, 174 (4th Cir. 2009)); MSJ at 15 (citing Thompson v. Davis, 295 F.3d 890, 897 (9th Cir. 2002)). Trujillo notes that the United States Court of Appeals for the Ninth Circuit, for example, holds that, "under the ADA regulations, law enforcement is obligated to modify 'policies that result in discriminatory arrests *or abuse of individuals with disabilities*.'"  MSJ at 15 (quoting Lum v. Cnty. of San Joaquin, 756 F. Supp. 2d 1243, 1253 (E.D. Cal. 2010)(Karlton, J.)(quoting Thompson v. Davis, 295 F.3d 890, 897 (9th Cir. 2001))(emphasis in MSJ and in Lum v. Cnty. of San Joaquin, but not in Thompson v. Davis).  Trujillo notes, moreover, that the Court has stated that "one theory of violation of Title II is the wrongful arrest theory, which posits that an entity is liable when 'police arrest a suspect based on his disability, not for any criminal activity.'"  MSJ Response at 14 (citing J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *314 (D.N.M. 2014)(Browning, J.)(citing Waller ex rel Estate of Hunt v. Danville, 556 F.3d at 174), aff'd , 806 F.3d 1255 (10th Cir. 2015)).  Trujillo contends that the wrongful arrest theory requires proof that: "(i) the plaintiff was disabled; (ii) the arresting officers knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability."  MSJ Response at 14 (quoting J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *394-95)(citation omitted).

Turning to the facts of this case, Trujillo argues that he "was compliant in all of the officer's requests," and that he did not "pose a threat [of] harm to the officer's safety or the safety of others." MSJ at 15 (comparing Trujillo's conduct to that of the plaintiff in Glover v. City of Wilmington, 966 F. Supp. 2d 417 (D. Del. 2013)(Andrews, J.)).  Trujillo insists that "[t]here were no exigent circumstances to disregard Plaintiff's visible disability" and that "Atencio used Trujillo's disabilities to improperly make a determination of impairment."  MSJ at 15.  Trujillo asserts that he repeatedly

informed Atencio that he was disabled, that his handicapped placard sign was hung on his rear view mirror "in plain sight of an officer approaching a vehicle," and that he "asked to use his cane." MSJ Response at 15. Trujillo concludes that, viewing the facts in the light most favorable to him, he "merely admitted to consuming beer, performed well on a finger dexterity test and terminated the heel-to-toe test due to his disability." MSJ Response at 15.

At the same time, Trujillo contends that, "[e]ven when viewed in the light most favorable to Atencio, Trujillo's complaint of an improper consideration of his disability is apparent." MSJ Response at 15. Trujillo notes that Atencio asked him to step out of his car and that, upon exiting, he "manifested his disability by grabbing onto the door for assistance to exit." MSJ Response at 15-16. Trujillo notes, moreover, that he "requested his walking cane multiple times to assist him in standing and maintaining his balance," and "offered to produce proof of his disability . . . ." MSJ Response at 16. Trujillo asserts that Atencio, like the officer in Glover v. City of Wilmington, mistook these manifestations of disability for criminal activity and based his determination of probable cause on that misperception. See MSJ Response at 16 (citing Glover v. City of Wilmington, 966 F. Supp. 2d at 429). Trujillo notes, however, that the court in Glover v. City of Wilmington denied summary judgment on the plaintiff's ADA Title II claim, despite that the officer did not require the plaintiff to perform any field sobriety tests which her disability would have affected, and despite that the officer was trained on interacting with persons with disabilities. See MSJ Response at 16 (citing Glover v. City of Wilmington, 966 F. Supp. 2d at 429-30). Trujillo contends that, if summary judgment was denied based on those facts, the Court should likewise deny the MSJ, because Atencio subjected Trujillo to field sobriety tests that his disability affected, and because "Rio Arriba County has no training in identification of disabilities and no policies to exclude evidence of disabilities as evidence of impairment." MSJ Response at 16.

Second, Trujillo addresses Atencio's assertion of qualified immunity with respect to Trujillo's ADA claim.  See MSJ Response at 16-17.  Trujillo contends that, in 1999, "the Tenth Circuit established that there are no individual capacity suits under the ADA."  MSJ Response at 16 (citing Butler v. City of Prairie Vill., 172 F.3d 736, 744 (10th Cir. 1999)).  Trujillo argues that his ADA claim is consistent with the Tenth Circuit's holding -- that he asserts the claim only against Rio Arriba County, a public entity, and not against Atencio.  See MSJ Response at 17 (citing Complaint ¶¶ 125-37, at 10-12).  Trujillo contends, moreover, that public entities such as Rio Arriba County do "not have sovereign immunity for claims arising under the ADA."  MSJ Response at 17 (citing 42 U.S.C. § 12202).

Third, Trujillo asserts that, should the Court grant summary judgment on the ADA claim, it should remand Trujillo's state law claims.  See MSJ Response at 17.  Trujillo asserts that the Court has "acknowledged the Supreme Court's and the Tenth Circuit's preference for remand of state claims when federal claims are dismissed."  MSJ Response at 17 (citing Armijo v. New Mexico, 2009 U.S. Dist. LEXIS 101917, at *4 (D.N.M. 2009)(Browning, J.); Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d 1108, 1115 (10th Cir. 2002)).  Trujillo asserts that, under 28 U.S.C. § 1367(c)(3), a district court should decline to exercise supplemental jurisdiction over state law claims when it "dismisses a claim that provided original federal-question jurisdiction[.]"  MSJ Response at 17.  Trujillo emphasizes the Court's pronouncement in Armijo v. New Mexico that "'New Mexico state courts are more experienced and knowledgeable about the contours of state law.  Also, federal courts should strive to avoid deciding issues of state law when . . . it is possible to do so.'"  MSJ Response at 18 (quoting Armijo v. New Mexico, 2009 U.S. Dist. LEXIS 101917, at *4).

Fourth, and finally, Trujillo contends that a jury should decide his false-arrest and malicious prosecution claims.  See MSJ Response at 18.  Trujillo reasons that a claim for false arrest "consists

of lack of probable cause for arrest." MSJ Response at 18 (citing Ulibarri v. Maestas, 1964-NMSC-212, ¶ 3, 395 P.2d 238). Trujillo asserts that Atencio did not have probable cause to arrest him and that "Atencio cannot assert after discovered evidence to support a finding of probable cause." MSJ Response at 18 (citing Maryland v. Garrison, 480 U.S. at 85). Trujillo notes that he concedes that he drank two beers, but that "[e]very other allegation of impairment is disputed or is evidence of a disability." MSJ Response at 19. Trujillo contends that he "disputes slurred speech," that he "disputes failing a finger dexterity test," that he "performed well on an alphabet recitation test," that he "drove his car without incident into the secondary area," that "Atencio admits Trujillo did well" on an alternative test, and that, on the other alternative test, "Trujillo disputes Atencio's claims." MSJ Response at 19. From this record, Trujillo argues, "a reasonable jury could determine Atencio lacked probable cause." MSJ Response at 19.

3.    **The MSJ Reply**.

The Defendants replied on September 15, 2016. See MSJ Reply at 1. The Defendants open by withdrawing Atencio's assertion of qualified immunity, because Trujillo clarified in the MSJ Response that his ADA claim "is brought solely against the municipal defendant." MSJ Reply at 1. Turning to the merits, the Defendants contend that Trujillo "raised no genuine issues of material fact in his Response and no reasonable jury could find Defendant Atencio lacked probable cause to arrest Plaintiff on suspicion of driving while intoxicated." MSJ Reply at 1. The Defendants advance that, because "the fundamental issue of Plaintiff's Complaint is whether probable cause existed, all of Plaintiff's claims should be dismissed with prejudice and judgment entered in favor of the Defendants." MSJ Reply at 1-2. The Defendants make two primary arguments in support of this contention: (i) that Trujillo was arrested based on probable cause; and (ii) that, under the doctrine of res judicata, Trujillo's remaining state law claims fail as a matter of law.

a.   **Probable Cause**.

The Defendants first argue that, "giving all reasonable inferences to Plaintiff, the undisputed facts demonstrate Defendant Atencio had probable cause to arrest."  MSJ Reply at 8.  Trujillo was arrested "based upon facts that are not influenced by Plaintiff's disability," the Defendants assert, not based upon a misapprehension of Trujillo's "disability as evidence of criminality."  MSJ Reply at 8. The Defendants proffer the following "undisputed facts" which, they argue, demonstrate that there was "probable cause without Plaintiff's stumbling and balance issues": (i) Trujillo's "admission to drinking two 12-ounce beers"; (ii) Trujillo's "observable eye horizontal gaze nystagmus"; (iii) the odor of alcohol; (iv) Trujillo's bloodshot eyes; and (v) Trujillo's slurred speech.  MSJ Reply at 8-9. The Defendants note that probable cause in New Mexico requires an objectively reasonable belief that an arrestee "'had been driving while he was to the slightest degree impaired, that is, unable to exercise the clear judgment and steady hand necessary to handle a vehicle in a safe [manner].'"  MSJ Reply at 9 (quoting State v. Granillo-Macias, 2008-NMCA-021, ¶ 9, 176 P.3d 1187)(internal quotation marks omitted in MSJ Reply)(alteration added).  The federal standard for probable cause, the Defendants note, requires "'facts and circumstances . . . sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  MSJ Reply at 9 (quoting Brown v. Dietz, 12 F. App'x. 848, 851 (10th Cir. 2001)(citing Brinegar v. United States, 338 U.S. at 175-76)).

The Defendants proceed to analogize this case to the facts of state and federal cases which have upheld an officer's determination of probable cause.  See MSJ Reply at 9-11.  The Defendants argue that New Mexico state courts have found probable cause "where the driver had not exhibited erratic driving but had bloodshot and watery eyes, smelled of alcohol, admitted drinking, and refused to take field sobriety tests," MSJ Reply at 9 (citing State v. Sanchez, 2001-NMCA-109, ¶ 2, 36 P.3d

446); where "the driver had admitted to drinking two beers, smelled of alcohol, had bloodshot watery eyes, had slurred speech, swayed during conversation, and was unable to complete the field sobriety tests," MSJ Reply at 9-10 (citing State v. Jones, 1998-NMCA-076, ¶ 10, 964 P.2d 117); and where the officer relied on "reports of the driver's prior consumption of alcohol, the officer's observation of the smell of alcohol, and the driver's slurred speech," MSJ Reply at 10 (citing State v. Hernandez, 1980-NMCA-138, ¶¶ 2-9, 619 P.2d 570).  The Defendants assert that the "Tenth Circuit has also found probable cause to arrest under similar circumstances."  MSJ Reply at 10 (citing United States v. Chavez, 660 F.3d 1215, 1223 (10th Cir. 2011)).  The Defendants cite United States v. Chavez, where, they argue, the Tenth Circuit upheld a probable-cause determination "based on bloodshot watery eyes, the smell of alcohol, and the Officer's observations during the driver's performance of the three field sobriety tests."  MSJ Reply at 10 (citing United States v. Chavez, 660 F.3d at 1224).  The Defendants note that the Tenth Circuit relied on Sherbrooke v. City of Pelican Rapids, 577 F.3d 984 (8th Cir. 2009), which "held probable cause existed based on the smell of alcohol on the driver's breath, the driver's admission to drinking, and the driver's failure of one of the three field sobriety tests."  MSJ Reply at 10 (citing Sherbrooke v. City of Pelican Rapids, 577 F.3d at 987-88).

The Defendants assert that these cases illustrate that failure of "one of the three standard field sobriety tests" -- such as the HGN test -- is very strong evidence of probable cause.  MSJ Reply at 10 (relying on Sherbrooke v. City of Pelican Rapids, 577 F.3d at 987-88).  The Defendants contend that "[o]fficers are trained that failure of the HGN is highly predictive of alcohol consumption."  MSJ Reply at 11 (citing MSJ ¶ 10, at 5).  The Defendants argue, moreover, that officers "reasonably give more weight to their observations during the HGN test over the other more subjective field sobriety tests."  MSJ Reply at 11 (citing United States v. Hernandez-Gomez, 2008 U.S. Dist. LEXIS 26810,

at *5 (D. Nev. 2008)).  Finally, the Defendants assert that "[c]ourts around the country have held the results of the HGN test are admissible evidence in a DWI/DUI case."  MSJ Reply at 11 (citing United States v. Horn, 185 F. Supp. 2d at 546-53).

Turning to this case's facts, the Defendants contend that "the undisputed failure of the HGN test . . . , the smell of alcohol, Plaintiff's admission to drinking," along with Atencio's "observations of bloodshot eyes and slurred speech, would lead any reasonable officer [] to believe Plaintiff had been driving while he was impaired in violation of NMSA 66-8-102."  MSJ Reply at 11.  Thus, the Defendants argue, "no reasonable jury could find otherwise and the Court should hold, as a matter of law, that Defendant Atencio had probable cause to arrest Plaintiff on August 22, 2013."  MSJ Reply at 11.  The Defendants conclude by contending that, because Trujillo was arrested based on probable cause, Trujillo's ADA claim fails, because he was not arrested "by reason of disability."  MSJ Reply at 11.  Rather, the Defendants assert, Trujillo's "arrest was reasonably based on factors that do not include mistaking his disability for illegal activity."  MSJ Reply at 11.

### b.    **Res Judicata.**

The Defendants turn second to address Trujillo's request that the Court remand his state law claims in the event it grants summary judgment on his ADA claim.  See MSJ Reply at 11.  The Defendants respond that, if the Court concludes that Trujillo's arrest was based on probable cause, Trujillo's state tort claims fail as a matter of law under the doctrine of res judicata.  See MSJ Reply at 11.  The Defendants assert that "[t]he existence of probable cause . . . will dispose of Plaintiff's remaining claims by removing the necessary element of unlawfulness that is required to prove false arrest/imprisonment or malicious abuse of process."  MSJ Reply at 12 (citing Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d 6; Durham v. Guest, 2009-NMSC-007, ¶ 18, 204 P.3d 19).  "If probable cause is established," the Defendants argue, "the arrest and the filing of the

criminal complaint are lawful," and, therefore, "there is no false arrest, no false imprisonment, and no malicious abuse of process."  MSJ Reply at 12.  The Defendants conclude that, "under the doctrine of res judicata, once probable cause is established, the state claims fail as a matter of law." MSJ Reply at 12.

    4.    **The Hearing**.

    The Court held a hearing on the MSJ on September 21, 2016.  See Transcript of Motion Hearing held on September 21, 2016 at 1 ("Tr.").[21]  The Court opened the hearing by stating that it was inclined to agree with the Defendants that Atencio had probable cause to arrest Trujillo, which may "end[] the inquiry on the ADA claim" as it did in J.H. v. Bernalillo County.  Tr. at 2:24-3:6 (Court).  At the same time, the Court indicated that it was inclined to remand Trujillo's state law claims for the state court's resolution.  See Tr. at 3:7-13 (Court).

    The Defendants briefly took up argument, largely reiterating the arguments in the MSJ and MSJ Reply.  See Tr. at 3:18 (Salvato).  The Defendants contended that whether Atencio had probable cause to arrest Trujillo is the "fundamental issue before the Court" and that the facts outlined in the MSJ "would lead any reasonable officer to conclude that Plaintiff had violated New Mexico Statute 1978 66-8-102A."  Tr. at 3:20-4:2 (Salvato).  Regarding Trujillo's request for remand, the Defendants asserted that federal courts routinely rule on criminal matters, "especially in the area of DWI based on state law."  Tr. at 4:3-9 (Salvato).

    In rejoinder, Trujillo asserted that the facts, when read in the light most favorable to him, do not support probable cause.  See Tr. at 5:7-9 (Kennedy).  Rather, Trujillo argued that the facts show that he was "clearly . . . disabled."  Tr. at 5:18-19 (Kennedy).  Trujillo recalled that he stumbled as

---

[21]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

he exited his car, that he leaned on his car, that "[t]here was a sticker on his car that indicated that he was disabled," and that he asked for his cane, a request which Atencio denied.  Tr. at 6:16-21 (Kennedy).  Trujillo argued that these facts are distinguishable from those in J.H. v. Bernalillo County, because here, Trujillo requested an accommodation, Atencio arrested Trujillo based on his disabilities, and Atencio was not educated on how to interact with disabled individuals.  See Tr. at 6:4-14 (Kennedy).  Trujillo advances that J.H. v. Bernalillo County is nonetheless controlling, because the Tenth Circuit concluded that the ADA's Title II "does prohibit arrest based on people's disabilities."  Tr. at 7:12-19 (Kennedy).  See id. (Kennedy)(noting that the United States Courts of Appeals for the Fourth and Ninth Circuits have followed the Tenth Circuit's reasoning).  Trujillo argued that, moreover, he passed the only test that constituted a reasonable accommodation under the ADA -- the "ABC test."  Tr. at 6:15-21 (Kennedy).

Trujillo turned to address Atencio's use of the HGN test as a basis for probable cause.  See Tr. at 76:22 (Kennedy).  Trujillo argued that, "in the deposition of Atencio, he conceded that the HGN test does not provide probable cause."  Tr. at 6:22-23 (Kennedy).  Trujillo posited that Atencio "understands that the [HGN] clues . . . can be caused by sugar, can be caused by caffeine," and that "it certainly isn't an indication that someone has ingested alcohol."  Tr. at 6:24-7:1 (Kennedy).  In Trujillo's view, the HGN test is "typically used by officers as a reasonable suspicion," and "HGN is not admissible in court in criminal cases."  Tr. at 7:2-7 (Kennedy).

Trujillo proceeded to contend that the Defendants improperly submitted facts "gathered after the handcuffing, after the arrest" and that those facts -- namely, "the DRE analysis" -- "cannot be considered."  Tr. at 8:4-7 (Kennedy).  Trujillo noted that Atencio "admitted in his deposition that he did no investigation as to whether Mr. Trujillo had ingested any . . . type of medication that would inhibit his ability to operate a moving vehicle."  Tr. at 8:8-11 (Kennedy).  Trujillo argued that, "in a

- 38 -

case of probable-cause analysis, [the Court] can only consider the facts the officer knew at the time prior to the arrest." Tr. at 8:12-14 (Kennedy). "If you strip the Defendants' proposed material facts from this," Trujillo asserted, "the facts that the officer knew at the time of the arrest were that he had had two beers with dinner two hours previously, and that's it." Tr. at 8:14-18 (Kennedy). Trujillo argued that, moreover, that he was acquitted after his arrest illustrates that he is "an innocent [man] who is disabled and who is arrested as a result of his disability, which is a viable claim that a jury should be able to consider." Tr. at 9:7-12 (Kennedy).

The Court interjected, noting that "[t]he Tenth Circuit's already said that a person drinking one beer several hours before provides reasonable suspicion." Tr. at 10:3-6 (Court)(referring to Vondrak v. City of Las Cruces). In light of that, the Court asked Trujillo what more is needed for his admission of two beers to constitute probable cause. See Tr. at 10:7-11 (Court). Trujillo responded that drinking two beers does not constitute probable cause, especially when there is no evidence of bad driving. See Tr. at 10:12-15 (Kennedy). Further, Trujillo argued that Atencio's probable-cause investigation did not begin when Trujillo told Armijo that he drank two beers, but, rather, when Trujillo stepped out of the car and requested his cane -- the point at which, in Trujillo's view, Atencio "beg[an] to discriminate against Mr. Trujillo." Tr. at 10:16-11:10 (Kennedy). Trujillo argued, therefore, that the only fact giving rise to probable cause that preceded Atencio's discrimination against him was his admission of drinking two beers at some unspecified time. See Tr. at 11:11-15 (Kennedy). Trujillo stressed that the "key fact" is that Atencio refused to allow him to use his cane, which illustrates that Rio Arriba County does not have a "procedure to investigate those suffering from disabilities." Tr. at 11:23-12:4 (Kennedy). In short, Trujillo asserted that Atencio "is simply untrained and [i]ncapable of making an objective probable cause determination when faced with a subject who is disabled, and that's discrimination." Tr. at 12:1-4 (Kennedy).

The Court queried what accommodation, "other than not giving him this cane," Trujillo alleges that Atencio failed to provide him. Tr. at 12:5-7 (Court). Trujillo suggested that "counting backwards from one to ten is a classic field sobriety test for those who are physically disabled and overweight." Tr. at 12:8-12 (Kennedy). Yet, Trujillo asserted, Atencio "asked a man who's asking for a cane to stand on one leg. That is almost animus towards the disability." Tr. at 12:13-20 (Kennedy). Trujillo noted that Atencio also required "a man who lost his thumb . . . [to] do the finger-counting test." Tr. at 12:21-24 (Kennedy). Accordingly, Trujillo argued, "[i]n the light most favorable to Plaintiff, you have an officer who's almost mocking a man's disabilities by forcing him to engage in testing which clearly he's physically incapable of doing." Tr. at 12:25-13:3 (Kennedy). Trujillo added that he passed the "alphabet test" and that he "should have been released after he passed the alphabet test." Tr. at 13:4-5 (Kennedy). Trujillo contended that the subsequent HGN test -- conducted after he was "denied his cane" -- may have provided "reasonable suspicion . . . , but it certainly isn't probable cause." Tr. at 13: 6-10 (Kennedy).

The Court turned to the Defendants, inquiring at which point during the encounter Atencio developed probable cause, and asking whether they agreed that Atencio did not develop probable cause "simply by Mr. Trujillo saying that he had had two beers[.]" Tr. at 13:18-24 (Court). The Defendants responded that they "agree that he did not develop probable cause based on consumption of the 24 ounces of beer." Tr. at 13:25-14:2 (Salvato). Rather, they posited, "[p]robable cause was developed through a totality of the circumstances," including Trujillo's smell of alcohol, and, "very critically," the presence of "all six clues of the horizontal gaze nystagmus." Tr. at 14:3-8 (Salvato). The Defendants asserted that HGN "is a completely neutral test" that is not "based upon the disability of his joints or his thumb." Tr. at 14:9-11 (Salvato). The Defendants added that, during the HGN test, Atencio "had plenty of time to observe" Trujillo's bloodshot eyes and slurred speech.

- 40 -

Tr. at 14:16-19 (Salvato). The Defendants reasoned that Atencio is "reasonably trained" that "all six clues of horizontal gaze nystagmus pla[y] heavily into the probable cause analysis." Tr. at 14:22-25 (Salvato). The Defendants conceded that Trujillo's disability would prevent him from performing "the other two field sobriety tests which require[] coordination," but contended that those tests "aren't weighted as heavily." Tr. at 15:1-4 (Salvato). Indeed, the Defendants asserted, "[r]easonable officers in the field rely on the horizontal gaze nystagmus test." Tr. at 15:5-6 (Salvato). The Defendants explained that officers are trained that HGN correlates with blood alcohol content -- that "greater than 45 degrees equals greater than .1 percent [blood alcohol content], [which] is a per se violation of the statute . . . , because .08 is the legal limit." Tr. at 16:7-11 (Salvato). Accordingly, in response to the Court's original question, the Defendants concluded that "probable cause really came into play at the horizontal gaze nystagmus test." Tr. at 15:21-24 (Salvato).

The Court pivoted to Trujillo, asking whether, disregarding all else, Trujillo's admission to drinking two beers and his failure of the HGN test constituted probable cause. See Tr. at 16:12-19 (Court). In response, Trujillo asserted that "no officer thinks that the nystagmus test establishes probable cause. That's why you do the field tests." Tr. at 16:20-24 (Kennedy). Trujillo posited that, indeed, "[e]veryone knows nystagmus can be caused by things other than alcohol" and that "[s]ome people naturally have nystagmus." Tr. at 17:5-8 (Kennedy). For those reasons, Trujillo asserted, the HGN test is "inadmissible at trial," and the "jury would never be able to consider the test." Tr. at 17:1-3 (Kennedy). Trujillo extrapolated that the HGN test is "inadmissible" in New Mexico state court, because "officers cannot lay the foundation for it, and they know that." Tr. at 17:18-23 (Kennedy). Again, Trujillo asserted, HGN supplies "reasonable suspicion but not probable cause." Tr. at 17:24-25 (Kennedy). Thus, Trujillo argued, Atencio could only determine probable cause

based on Trujillo's admission to drinking two beers "sometime in the past, which isn't sufficient probable cause." Tr. at 18:9-16 (Kennedy).

The Court interposed, stating that whether the HGN test is admissible in state court "is sort of irrelevant" to the probable-cause determination. Tr. at 18:17-21 (Court). Trujillo demurred, arguing that "an officer can only rely on admissible evidence in determining probable cause" and that the "jury wouldn't be able to hear about the nystagmus as a basis for probable cause." Tr. at 18:22-19:2 (Kennedy). Trujillo posited, however, that, disregarding the admissibility issue, "an officer in the field [cannot] rely on nystagmus for probable cause." Tr. at 19:3-6 (Kennedy). Trujillo advanced that "[t]hat's why they have to do objective fields and [not] discriminate based on a disability." Tr. at 19:6-7 (Kennedy). In rejoinder, the Court noted that courts frequently base probable cause determinations for search warrants and arrest warrants on inadmissible evidence such as hearsay. See Tr. at 19:14-20 (Court). The Court reasoned that, accordingly, an officer may properly rely on the HGN test under federal law, regardless whether such evidence "would be admissible in a state case for DWI." Tr. at 19:21-20:3 (Court). Trujillo noted his agreement with the Court, but maintained that "an objectively reasonable officer in the field does not find probable cause based on nystagmus." Tr. at 20:4-7 (Kennedy).

The Defendants argued one last time. See Tr. at 21:6 (Salvato). They argued that, despite Trujillo's assertion to the contrary, Atencio and Armijo had an idea how recently Trujillo consumed the two beers. See Tr. at 21:15-17 (Salvato). The Defendants noted that Trujillo said he was returning from dinner at a restaurant located half an hour from the DUI checkpoint, which he encountered at 7:00 p.m. See Tr. at 21:6-14 (Salvato). Logically, the Defendants reasoned, Trujillo must have left the restaurant at 6:30 p.m. See Tr. at 21:11-14 (Salvato). The Defendants also responded to Trujillo's argument that Atencio "fabricated [probable cause] after the fact,"

- 42 -

contending that Trujillo's smell of alcohol, his bloodshot eyes, and his slurred speech were "documented on the same day as the arrest."  Tr. at 21:18-23 (Salvato).  Finally, the Defendants conceded that the HGN test "in and of itself does not establish probable cause, but when viewed in the totality of the circumstances, it absolutely does."  Tr. at 21:24-22:2 (Salvato).  Moreover, the Defendants contended that the test is "absolutely admissible in both criminal cases [] once a proper foundation has been laid in the state of New Mexico" and that United States v. Horn held that the test is "admissible for the purposes of probable cause in federal court."  Tr. at 22:2-6 (Salvato).

Having heard extensive arguments from both sides, the Court stated that it was still inclined to conclude that Atencio had probable cause.  See Tr. at 22:9-11 (Court).  The Court noted that, accordingly, it was "inclined to grant the motion in part and dismiss the ADA claim and [remand] the state claims."  Tr. at 22:11-14 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S.

at 331 (Brennan, J., dissenting)(emphasis in original).[22]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party

---

[22]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

- 45 -

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that
version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. at 380 (emphasis in original).  Applying these standards to a factual dispute
over whether the plaintiff-respondent "was driving in such fashion as to endanger human life," the
Supreme Court held that the plaintiff-respondent's "version of events is so utterly discredited by the
record that no reasonable jury could have believed him."  Scott v. Harris, 550 U.S. at 380.  Thus, the
Supreme Court concluded, "[t]he Court of Appeals should not have relied on such visible fiction; it
should have viewed the facts in the light depicted by [a] videotape" which showed the plaintiff-
respondent driving extremely dangerously.  Scott v. Harris, 550 U.S. at 381.

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304
(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a
> plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts."
> York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v.
> Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads v.

Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[23]] explained that the

---

[23]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").
The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.  However,
> if an unpublished opinion or order and judgment has persuasive value with respect to
> a material issue in a case and would assist the court in its disposition, we allow a
> citation to that decision.

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted), aff'd, 499 Fed. App'x. 771.

> In evaluating a motion for summary judgment based on qualified immunity, we take
> the facts "in the light most favorable to the party asserting the injury." Scott v.
> Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's
> version of the facts," id. at 378, unless that version "is so utterly discredited by the
> record that no reasonable jury could have believed him," id. at 380. In Scott, the
> plaintiff's testimony was discredited by a videotape that completely contradicted his
> version of the events. 550 U.S. at 379. Here, there is no videotape or similar
> evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only
> other witnesses' testimony to oppose his version of the facts, and our judicial system
> leaves credibility determinations to the jury. And given the undisputed fact of injury,
> Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not
> its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating
> rendered without resistance or provocation. If believed by the jury, the events he
> describes are sufficient to support a claim of violation of clearly established law
> under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In

a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United

States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of

qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded

in the record such that they may permissibly comprise the universe of facts that will serve as the

foundation for answering the legal question before the court," before inquiring into whether there are

genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J.,

concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J.,

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds
that Rhoads v. Miller, and Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011), have persuasive
value with respect to material issues, and will assist the Court in its preparation of this Memorandum
Opinion and Amended Order.

dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, 2009 U.S. Dist. LEXIS 45670, at *10 (D.N.M. 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.      Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory

approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of

"constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[24]

---

[24]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of §

1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[25]  The Tenth Circuit will

---

remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, 2014 WL 936835, at *9 n.24 (D.N.M. 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[25]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually

is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. [Three recent qualified immunity cases] the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarsky v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.    Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing

---

the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment [to the Constitution of the United States of America] is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188

(emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  <u>See</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

### LAW REGARDING TITLE II OF THE ADA'S APPLICATION TO ARRESTS

Title II of the ADA, 42 U.S.C. §§ 12131-12165, commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  <u>See</u> <u>Robertson v. Las Animas Cnty. Sheriff's Dep't</u>, 500 F.3d at 1193; <u>Gohier v. Enright</u>, 186 F.3d at 1219 (stating that this general standard, which tracks the statute's language, is

"plainly correct").  "Although a plaintiff may claim intentional discrimination, the Tenth Circuit has not yet articulated the essential elements of a claim of intentional discrimination under Title II of the ADA or detailed what a plaintiff must plead at a minimum to establish such a claim."  Braverman v. New Mexico, 2012 U.S. Dist. LEXIS 155676, at * 22 (D.N.M. 2012)(Browning, J.)(citing Tyler v. City of Manhattan, 118 F.3d 1400, 1405 (10th Cir. 1997)(Jenkins, J., dissenting); Young v. City of Claremore, Okla., 411 F. Supp. 2d 1295, 1314 (N.D. Okla. 2005)).

"Only public entities are subject to Title II[.]"  City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1773 (citing Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 208 (1998)).  Title II "does not provide for individual capacity suits against state officials."  Braverman v. New Mexico, 2011 U.S. Dist. LEXIS 138808, at *22 (D.N.M. 2011)(Browning, J.)("Title II's plain language would therefore suggest that officials may not be sued in their individual capacity.").  See J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *99 (stating that no claim against an official in his individual capacity exists under Title II).  The Tenth Circuit has also held that "the ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition."  Butler v. City of Prairie Vill., 172 F.3d at 744.  Several other United States Courts of Appeals have held that the ADA "does not provide for individual liability, only for employer liability."  Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996).  See, e.g., Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir. 2002); Garcia v. SUNY Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); EEOC v. AIC Sec. Inv., 55 F.3d 1276, 1279-82 (7th Cir. 1995); Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).

The Supreme Court recently declined to decide whether the ADA applies to arrests.  See City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1773.  In City & County of San Francisco v.

Sheehan, police officers were dispatched to a group home for individuals dealing with mental illness in response to a request to take a potentially violent resident suffering from schizoaffective disorder to a secure facility.  135 S. Ct. at 1770.  Upon the officers' arrival, the resident became violent and threatened the officers with a kitchen knife.  See City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1770.  A violent altercation ensued in which the officers pepper-sprayed and shot the resident multiple times until she fell.  See City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1771.  The Supreme Court noted that, in deciding to enter the room without backup, the officers "did not pause to consider whether Sheehan's disability should be accommodated."  City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1771.  The resident subsequently brought suit, alleging, in part, that San Francisco violated the ADA "by subduing her in a manner that did not reasonably accommodate her disability."  City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1771.  The district court granted summary judgment for the City and County of San Francisco.  The United State Court of Appeals for the Ninth Circuit vacated in part, holding that "the ADA's accommodation requirement should be read to 'to encompass 'anything a public entity does.'"  City & Cnty. of San Francisco v. Sheehan, 743 F.3d, at 1232 (quoting Sheehan v. City & Cnty. of S.F., 743 F.3d 1211, 1232 (9th Cir. 2014)).  On writ of certiorari, the City and County of San Francisco asked the Supreme Court to determine whether "the ADA governs the manner in which a qualified individual with a disability is arrested."  City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1773.  The Supreme Court declined to resolve the issue, however, because the petitioners did not present the same question below at the Ninth Circuit and because the parties all agreed that the ADA applies to arrests.  See City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1772-73.  The Supreme Court reasoned that the ADA's applicability to arrests is "an important question that would benefit from briefing and an adversary presentation," and that, accordingly, "it would [not] be prudent to decide the question in this case."

City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1772-73.

The Tenth Circuit, by contrast, has recognized that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law," Gohier v. Enright, 186 F.3d at 1221, but has repeatedly declined to determine the precise scope of the ADA's applicability to arrests.  In Gohier v. Enright, the Tenth Circuit reviewed two theories of liability under Title II that other federal courts have applied in the context of arrests: (i) "that police wrongly arrested someone with a disability because they misperceived the effects of that disability as a criminal activity," 186 F.3d at 1221-22 (citing Lewis v. Truitt, 960 F. Supp. 175, 176-77 (S.D. Ind. 1997); Jackson v. Inhabitants of Town of Sanford, 1994 U.S. Dist. LEXIS 15367 (D. Me. 1994)); and (ii) that police "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees," Gohier v. Enright, 186 F.3d at 1221 (citing Gorman v. Bartch, 152 F.3d 906, 912-13 (8th Cir. 1998); Rosen v. Montgomery County, 121 F.3d 154, 157-58 (4th Cir. 1997); Patrice v. Murphy, 43 F. Supp. 2d 1156 (W.D. Wash. 1999)).  Nevertheless, the Tenth Circuit concluded that "[i]t remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of *Lewis* and *Jackson* and the reasonable-accommodation-during-arrest theory of *Gorman*."  Gohier v. Enright, 186 F.3d at 1221.

More recently, the Tenth Circuit analyzed an ADA claim under both the wrongful-arrest and reasonable-accommodation-during-arrest theories, but again did not decide the question of those theories' viability.  See J.H. v. Bernalillo Cnty., 806 F.3d at 1260-62.  In J.H. v. Bernalillo County, the Tenth Circuit affirmed the Court's grant of summary judgment on an ADA claim arising from a deputy sheriff's arrest, handcuffing, and transportation to a juvenile detention center of an eleven year old girl with special needs whom the deputy sheriff observed kicking a teacher.  See 806 F.3d at 1262.  Regarding the wrongful-arrest theory, the Tenth Circuit stated that the deputy sheriff "may

- 61 -

have violated the Americans with Disabilities Act if he had arrested [the girl] 'by reason of a disability,' but we decline to decide that issue today."  806 F.3d at 1260 (citing Gohier v. Enright, 186 F.3d at 1221).  The Tenth Circuit added, however, that, "[e]ven if this theory were viable, it would not apply here: Deputy Sharkey arrested [the girl] based on suspicion that she had committed a crime, not based on her disability." J.H. v. Bernalillo Cnty., 806 F.3d at 1260.  With respect to the reasonable-accommodation-during-arrest theory, the Tenth Circuit "assume[d] -- without deciding -- that accommodations may be necessary when disabled individuals are arrested."  806 F.3d at 1260 (citing Gohier v. Enright, 186 F.3d at 1221).  Assuming as much, the Tenth Circuit concluded that, because the girl did not request an accommodation and because the deputy sheriff was not otherwise aware of the girl's need for an accommodation, "Deputy Sharkey did not violate the Americans with Disabilities Act by failing to reasonably accommodate [the girl's] alleged disability." J.H. v. Bernalillo Cnty., 806 F.3d at 1261-62.

The Tenth Circuit's reasoning in J.H. v. Bernalillo County is instructive.  Although the Tenth Circuit assumed only "[f]or the sake of argument" the viability of the wrongful-arrest and reasonable-accommodation-during-arrest theories of liability under the ADA, 806 F.3d at 1261, the Tenth Circuit also signaled that probable cause and failure to request an accommodation may defeat each theory, respectively, see 806 F.3d at 1260 ("These claims are invalid as a matter of law.  Deputy Sharkey could make the arrest based on probable cause, and there is no evidence indicating that he was aware of a need to accommodate J.P.'s alleged disability.").  The Court will discuss both theories in turn.

### 1.    Wrongful Arrest Under the ADA.

"The essence of [the wrongful arrest] theory is that the police mistake legal conduct caused by the disability as illegal conduct." Glover v. City of Wilmington, 966 F. Supp. 2d at 428-29.  In

Gohier v. Enright, the Tenth Circuit cited cases which articulated different standards for ADA
wrongful-arrest claims.  See 186 F.3d at 1220.  One case suggests that a wrongful-arrest claim
requires proof of three elements: (i) the plaintiff was disabled; (ii) the arresting officer knew or
should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff
because of legal conduct related to the plaintiff's disability.  See Lewis v. Truitt, 960 F. Supp. at 178.
Another case, however, states that, if probable cause to arrest is present, a plaintiff has no ADA
claim.  See Patrice v. Murphy, 43 F. Supp. 2d at 1161 ("[P]laintiff was arrested because she probable
cause existed, as discussed more fully below, not because she is disabled.  Absent a causal link
between plaintiff's disability and the injury of which she complains (her arrest), there can be no
claim under § 12132.").  As noted above, the Tenth Circuit declined to address the propriety of any
of these tests, noting that "[i]t remains an open question in this circuit whether to adopt either or both
the wrongful-arrest theory of *Lewis* and *Jackson* and the reasonable-accommodation-during-arrest-
theory of *Gorman*."  186 F.3d at 1221.

In J.H. ex rel. J.P. v. Bernalillo County, the Court examined various cases applying these two
theories.  See 2014 U.S. Dist. LEXIS 94132, at *315-33.  Regarding the three-part test articulated in
Lewis v. Truitt, the Court noted that the test's "second element -- that the officer knew or should
have known that the plaintiff was disabled -- sometimes gets lost in the more general articulation of
the test."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *316.  The Court
concluded, however, that "the element was vital to the outcome in the leading cases on which the
Tenth Circuit relied."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *316.
For example, the Court noted that Lewis v. Truitt presented the following facts:

> Plaintiff Charles Lewis lived at 117 South 14th Street in Richmond, Indiana.  David
> Lewis was at this address with family and friends mourning the death of Jacqueline
> Weaver during the late afternoon of August 13, 1994. Also present at the home were

Plaintiff Daniel Lewis, Jennifer Leedy ("Leedy"), Stacey Sneed ("Sneed"), Christopher Anderson and others.

While this gathering was taking place, Defendants Truitt, McClure, and Retherford, all Richmond city police officers, arrived at Charles Lewis' home. The officers came to the address in order to take Amanda Lewis to police headquarters where an agent of Child Protective Services would be contacted to make a custody placement determination. Earlier that day, Amanda's maternal grandmother had contacted the Richmond City Police Department and requested that custody of Amanda be given to her.

The officers had not obtained a court order or a warrant prior to arriving at Charles Lewis' home. They had made no independent determination that Amanda was in need of services and made no effort to contact Detective Jon Carrico regarding the child's well-being.

Shortly after the officers arrived, they were met outside the home by Leedy, Sneed, and David and Charles Lewis. The officers explained the situation to David Lewis, who decided to cooperate with them. He told them that he would go inside and get Amanda and would accompany them to the police department. During this time, Charles Lewis expressed his belief that David should not comply with the officer's request because he believed that the officers needed to have authority to remove the child from the custody of David Lewis. The officers told David and Charles that no warrant was necessary because David had kidnapped his child.

After David Lewis entered the house, the officers attempted to speak with Charles Lewis. Sneed and Leedy tried to explain to the officers that Charles was deaf and that the best way to communicate with him was to write down questions on a piece of paper. Officer Truitt in particular refused to believe that Charles was deaf and would not write down any questions for him.

Defendants have conceded for the purposes of their Motion that Plaintiff Charles Lewis is deaf. None of the officers attempted to communicate with Charles Lewis on paper, even though at least one of the officers should have known that he was deaf (Defendant Retherford had come to Charles Lewis' home to help set up communications via teletype with the 911 emergency system). Before David Lewis returned with Amanda, Charles Lewis, Sneed, and Leedy went back into the house. They did not invite the officers inside. Despite this fact, the officers entered the home.

Upon entering the home, Defendants Truitt and McClure allegedly physically assaulted Charles Lewis. They pulled him to the floor by his hair, handcuffed him, placed him under arrest, and proceeded to kick and hit him. Charles suffered bruises, contusions, and severe internal injuries. This force was used on Charles even though Sneed and Leedy warned the officers repeatedly that Charles was deaf and could not hear their instructions. Defendant Truitt allegedly used abusive and inappropriate

> language to convey her belief that they were lying and that Charles really did know what she was saying.
>
> Leedy also warned the officers that Charles had recently undergone extensive surgery for cancer which had left a large incision on his abdomen. The stitches that had held this incision closed had recently been removed. Handcuffing Charles stretched and opened the incision, which had to be re-stitched with the aid of a mesh insert. Leedy also offered to prove that Charles Lewis was deaf by contacting the teletype system connected by the telephone to 911, which had been set up in case of an emergency. Officer Truitt told Leedy to shut-up and threw her into a large piece of furniture.

J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *316-19 (quoting Lewis v. Truitt, 960 F. Supp. at 176-77)(citation omitted).  The Court noted that the Honorable John Paul Godich, United States Magistrate Judge for the United States District Court for the Southern District of Indiana, allowed the claim to go forward, explaining:

> Plaintiffs argue that Defendants knew Charles Lewis was deaf but refused to take steps to communicate with him and then arrested him because he did not respond to them appropriately.  Defendants have cited to no evidence to contradict this argument.  Accordingly, a genuine issue of material fact exists on the question of whether Defendants arrested Plaintiff because of his disability, and Defendants' Motion for Summary Judgment must be DENIED as to Plaintiffs' claim that Defendants arrested Charles Lewis because of his disability.

J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *319-20 (quoting Lewis v. Truitt, 960 F. Supp. at 178-79)(citation omitted).

Turning to the probable-cause standard, the Court concluded that standard is, "on balance, . . . the appropriate standard for ADA wrongful arrest claims."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *395.  The Court reasoned as follows:

> The Court begins with the statute's language: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Under either the excluded-from-a-benefit language or the subjected-to-discrimination language, the proper standard for the wrongful-arrest theory is probable cause.  The "service" of which a citizen enjoys a "benefit" is "the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law."

Schorr v. Borough of Lemoyne, 243 F. Supp. 2d at 235.  To say that an officer has lawfully exercised an arrest power is to say that the officer will exercise that power only when he has probable cause to arrest the citizen; the "benefit" that a citizen derives from the appropriate use of force in the arrest context is that police will arrest the citizen based only on probable cause to believe that the citizen committed a criminal offense.  Under the subjected-to-discrimination theory, the logic is even clearer.  The baseline against which "discrimination" is measured is the right that all citizens enjoy: the right to be arrested only based on probable cause.

. . . .

To be clear, this standard leaves the ADA's wrongful arrest claim with meaningful work to do.  Constitutional litigation against individuals imposes barriers to recovering damages and achieving systemic change that claims under the Title II of the ADA against public entities do not.  In other words, the ADA creates different sorts of remedies than might be available in a constitutional case.

J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *319-20.  The Court concluded

that "[t]his approach accords with persuasive case law."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014

U.S. Dist. LEXIS 94132, at *397.  For example, the Court noted that, in Bates ex rel Johns v.

Chesterfield County, Va., 216 F. 3d 367 (4th Cir. 2000)(Wilkinson, C.J.) Chief Judge J. Harvie

Wilkinson of the United States Court of Appeals for the Fourth Circuit rejected an ADA wrongful-

arrest claim, explaining:

Bates . . . contends that the defendants violated the Americans with Disabilities Act.  See 42 U.S.C. §§ 12132, 12134 (1994).  Section 12132 provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from  participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132.  Bates alleges that his "unjustified detainment and abuse" constituted discrimination against him by reason of his disability.  Specifically, Bates contends that the officers should have been aware of his autism throughout the September 28 incident and should have taken this condition into account when interacting with him. Bates argues that if they had, he would not have been detained or arrested and the ensuing scuffle would not have occurred.

We need not undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances.  For in evaluating the validity of an investigatory stop, a court must consider "'the totality of the circumstances-- the whole picture.'"  Sokolow, 490 U.S. at 8 . . . (quoting United States v. Cortez, 449 U.S. 411, 417  . . . (1981)).  And in examining a claim

of excessive force, a court must ask whether the officers' conduct was " 'objectively reasonable' in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397 . . . . Just like any other relevant personal characteristic -- height, strength, aggressiveness -- a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus.

Here, we have concluded that under all the circumstances the officers' actions were objectively reasonable.  Officer Genova had a reasonable, articulable suspicion that criminal activity was afoot when he conducted his initial investigatory stop.  See Terry, 392 U.S. at 30-31 . . . .  The officers' use of force against Bates was also objectively reasonable -- both the force used before the officers were aware or should have been aware of Bates' autism and the force used after they were notified of the disability.  See Graham, 490 U.S. at 396-99 . . . . And Bates was not arrested because of his disability. Rather, he was arrested because there was probable cause to believe that he assaulted a police officer. Thus the stop, the use of force, and the arrest of Bates were not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct.  Such reasonable police behavior is not discrimination.  As a result, there has been no ADA violation.

J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397-400 (quoting Bates ex rel

Johns v. Chesterfield Cnty., Va., 216 F.3d at 373).  See Bircoll v. Miami-Dade Cnty., 410 F. Supp.

2d 1280, 1285 (S.D. Fl. 2006)("To have a cause of action for discrimination under the ADA, there

must be a causal link between a plaintiff's disability and the wrongful arrest; i.e., no other probable

cause for the arrest exists."); Sperry v. Maes, 2013 U.S. Dist. LEXIS 96328, at *6 (granting

summary judgment on a false-arrest claim because a plaintiff had not presented facts that would

allow a reasonable juror to find that police officers "denied him the Town's services, programs, or

activities, or discriminated against him because of his mental illness. Rather, the record clearly

shows that Defendants investigated his conduct and arrested him because there was  probable cause

to believe that he had committed debit card fraud."); Patrice v. Murphy, 43 F. Supp. 2d at 1161

("[P]laintiff was arrested because she probable cause existed, as discussed more fully below, not

because she is disabled.  Absent a causal link between plaintiff's disability and the injury of which

she complains (her arrest), there can be no claim under § 12132.").

The Court concluded by noting the probable-cause standard's "important practical benefits":

First, police officers know and understand -- or, at least, should know and understand -- the probable cause standard. A different, heightened standard would significantly burden law enforcement vis-à-vis the disabled. Second, a heightened standard would afford disabled individuals a greater protection against the unlawful exertion of arrest power than nondisabled individuals enjoy -- and the ADA is an antidiscrimination statute intended "to level the playing field," Murphy v. United Parcel Service, Inc., 946 F Supp. 872, 877 (D. Kan. 1996)(Crow, J.), and not to create rights that other citizens do not enjoy. Third, courts are familiar with the probable cause standard, which makes the standard relatively administrable. Accordingly, the Court concludes that if a police officer has probable cause to arrest a disabled person, the disabled person does not have an ADA claim against the police officer.

J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *401.

## 2.   **Reasonable Accommodation During Arrest**.

"The essence of [the reasonable accommodation during arrest] theory is that once the police have a situation under control, the police have a duty to accommodate a disability." Glover v. City of Wilmington, 96 F. Supp. 2d at 429. The seminal case in this area is the decision of the United States Court of Appeals for the Eighth Circuit in Gorman v. Bartch. In that case, a wheelchair-bound man, Gorman, tried to enter a bar's dance floor; a bar employee denied him access to the dance floor, pulled his wheelchair up the steps down to the dance floor, and evicted him from the bar. See 152 F.3d at 909. The wheelchair-bound man told two nearby police officers what happened; he argued with them, and "they eventually arrested him for trespassing and called for transportation to take him to the police station." Gorman v. Bartch, 152 F. 3d at 909.

In response to the call officer Neil Becker arrived with a patrol wagon that was not equipped with a wheelchair lift or wheelchair restraints. Gorman told the police that the van was not properly equipped for him to ride in it, and that due to his use of a urine bag it would be necessary for him to go to the bathroom before he was transported. The officers lifted Gorman from his chair and placed him on a bench inside the van. Gorman states that they complied with his instructions on how to lift him from his chair, but not with his requests that he be allowed to go to the bathroom prior to transport or that they place the seat cushion from his wheelchair underneath him to help support his legs. Because of his paraplegia Gorman was not independently able to maintain himself upright on the bench, and the police tied him with his belt to a mesh wall behind the bench and also fastened a seatbelt around him. During the drive to the station the belts came loose, and Gorman fell to the

floor.  The fall injured his shoulders and back severely enough to require surgery and also broke his urine bag, leaving him soaked in his own urine.

152 F.2d at 909.  The Eighth Circuit held that Gorman has a good a Title II claim, explaining:

> Our task in considering whether Gorman's allegations come under the ambit of the federal statutes has been made easier by the Supreme Court's unanimous decision on June 15 in Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 . . . (1998).  In applying Title II of the ADA to state prisons and prison services, Justice Scalia emphasized the broad language used by Congress and its choice not to include exceptions.  Id.  . . . 118 S. Ct. at 1954.  State prisons "fall squarely within the statutory definition of 'public entity'" since § 12131(1)(B) defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  Id.  . . . 118 S. Ct. at 1954-55.  The Court categorically rejected the argument that the statutory prohibition against excluding a qualified individual with a disability from participating in or receiving the "benefits of the services, programs, or activities of a public entity" does not apply to prison services because they do not fit the common understanding of "benefits" or "services," for "[t]he text of the ADA provides no basis for distinguishing these programs, services, and activities."  Id. . . . 118 S. Ct. at 1955.

> Application of Yeskey to the claims in this case shows that they also fit under the ADA.  A local police department falls "squarely within the statutory definition of 'public entity,'" id. . . . 118 S. Ct. at 1954, just like a state prison. The fact that Gorman may not have "volunteered" to be arrested does not mean he was not eligible to receive transportation service to the police station. Covered programs or services do not need to be voluntary, for "the words [of the statute] do not connote voluntariness." Id.  . . . 118 S. Ct. at 1955.  A qualified individual may participate in a service on either a voluntary or a mandatory basis, as illustrated by Justice Scalia's example of a drug addict required to participate in a treatment program.  Id. Transportation of an arrestee to the station house is thus a service of the police within the meaning of the ADA. The fact that the statute can be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."  Id.  . . . 118 S.Ct. at 1956 (internal citations omitted).  It was therefore error [for the district court] to conclude that Gorman was not a "qualified individual with a disability" who "meets the essential eligibility requirements for the receipt of services."  42 U.S.C. § 12131.

> The stated purpose of the ADA also demonstrates its applicability to transportation of arrestees.  In the statement of findings and purpose at the beginning of the statute, Congress noted that "discrimination against individuals with disabilities persists in such critical areas as . . . transportation . . . institutionalization ... and access to public services" and that disabled individuals face the discriminatory effects of "failure to make modifications to existing facilities and practices." 42 U.S.C. 12101(a). Congress enacted the ADA to "provide a clear and comprehensive national mandate

for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).

The regulations promulgated to guide implementation of the statute are also instructive. The Department of Justice specified that the statutory term "program" includes "the operations of the agency or organizational unit of government receiving or substantially benefitting from the Federal assistance awarded, e.g., a police department or department of corrections." 28 C.F.R. § 42.540. The regulations also indicate that "benefit" includes "provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct)." Id. The commentary also made clear that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. § 35, App. A, Subpart B.

Gorman'' allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of both Title II of the ADA and § 504 of the Rehabilitation Act. The defendants are representatives of the Kansas City police establishment, a department of local government and a public entity. Arrestee transportation is a program or service of the department as shown by record evidence that vehicles are dispatched by the department to transport arrestees. The statutes must be interpreted broadly to include the ordinary operations of a public entity in order to carry out the purpose of prohibiting discrimination. Innovative Health Systems v. City of White Plains, 117 F.3d 37, 44-45 ([2d] Cir. 1997). The "benefit" Gorman sought in this case was to be handled and transported in a safe and appropriate manner consistent with his disability. See 28 C.F.R. § 35.130(b)(1) (public entity may not provide services in a manner denying disabled individuals equal benefit of the service). His allegations are different from cases in which plaintiffs sought unique benefits or services. See[,] e.g., Aswegan[ v. Bruhl, 113 F.3d 109, 110 (8th Cir. 1997)]; Lue v. Moore, 43 F.3d 1203, 1206 (8th Cir. 1994)(Rehabilitation Act did not require creation of new prison vocational training program).

Gorman v. Bartch, 152 F.3d at 912-13 (footnote omitted).

### 3.    The Unclear Status of Failure-to-Train Claims.

Whether a failure-to-train claim exists under Title II remains a disputed issue. Gohier v. Enright referred to the concept in passing, but there is little authority on the point. Those cases that discuss the theory typically pass on deciding whether it exists, disposing of the dispute on other bases. See, e.g., Thao v. City of St. Paul, 481 F.3d 565, 567-68 (8th Cir. 2007)(Bright, J.)(declining to decide the issue, because the Plaintiffs "failed to demonstrate that more 'adequate' training to

accommodate the mentally ill would have required a different response"); Buchanan v. Maine, 469

F.3d 158, 177 (1st Cir. 2006)(Lynch, J.)("An argument that police training, which was provided, was

insufficient does not present a viable claim that [the plaintiff] was 'denied the benefits of

services . . . of a public entity" by reason of his mental illness, as required under 42 U.S.C. §

12132.").

It seems reasonably clear, however, that in the absence of proof of an underlying violation of

ADA, a failure-to-train claim would also fail:

> Because we conclude that any duty of reasonable accommodation was met in these
> circumstances, we do not reach the question of whether the ADA supports a claim
> for failure to train. While plaintiff attempts to pose training in dealing with those
> with mental health problems as an "accommodation," it is well-settled that the failure
> to train must have caused some violation of law for an action against a municipality
> to lie.

Waller ex rel. Estate of Hunt v. Danville, 556 F.3d at 177 n.3.  See also Bates ex rel. Johns v.

Chesterfield Cnty., 216 F. 3d at 373 ("As the officers did not discriminate against Bates by reason of

his disability, Bates' additional ADA claim that the County failed to adequately train its officers also

fails.").

## LAW REGARDING RES JUDICATA

"Under res judicata . . . a final judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have been raised in the prior action." Wilkes

v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d 501, 503-04 (10th Cir. 2002).  The

general rule is that "[t]he appealability of a judgment . . . does not hinder its preclusive effect."

MACTEC, Inc. v. Gorelick, 427 F.3d 821, 832 (10th Cir. 2005)(citing 18A Wright & Miller § 4433,

at 78-85 (2d ed. 2002)).  Accord Leo v. Garmin Intern., Inc., 464 F. App'x 737, 740 (10th Cir. 2012)

(unpublished)("[I]t does not matter that [the plaintiff's] first appeal had not been resolved at the time

[he] filed his second suit because under the federal law of claim preclusion, the district court's order

was final for res judicata purposes."). Courts occasionally refer to the two different effects of judgments under the doctrine of res judicata with various and sometimes conflicting terminology. See 18 Wright & Miller § 4402, at 7 ("The effects of former adjudication have been discussed and determined in varying and occasionally conflicting terminology."). "[T]he broad 'res judicata' phrase refers to the distinctive effects of a judgment separately characterized as 'claim preclusion' and 'issue preclusion.'" 18 Wright & Miller § 4402, at 7. The United States Court of Appeals for the Fifth Circuit has presented a summary that explains the two doctrines:

> The rules of res judicata, as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication. The first such doctrine is "claim preclusion," or true res judicata. It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." When the plaintiff obtains a judgment in his favor, his claim "merges" in the judgment; he may seek no further relief on that claim in a separate action. Conversely, when a judgment is rendered for a defendant, the plaintiff's claim is extinguished; the judgment then acts as a "bar." Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial. The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.
>
> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims. In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties. It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535-36 (5th Cir. 1978)(citations omitted). The following principles apply in federal-question cases -- and are generally consistent with state-law res judicata rules -- but "[f]or judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court

sits." Taylor v. Sturgell, 553 U.S. 880, 891 n.4 (2008)(citing Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 (2001)).

### 1.    **Claim Preclusion a/k/a Res Judicata.**

"The doctrine of res judicata, or claim preclusion, 'bars a second suit involving the same parties or their privies based on the same cause of action.'" Roybal v. City of Albuquerque, 2009 U.S. Dist. LEXIS 45663, at *5 (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)). "Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits." MACTEC, Inc. v. Gorelick, 427 F.3d at 831. The Tenth Circuit has adopted the "transactional" approach from § 24 of the Restatement (Second) of Judgments to determine what constitutes a "cause of action" for claim preclusion. Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504. Under this approach, a cause of action includes "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504 (quoting Nwosun v. Gen. Mills Rest., Inc., 124 F.3d 1255, 1257 (10th Cir. 1997)). Claim preclusion does not, however, "extend from criminal prosecutions to civil actions." 18B Wright & Miller § 4474, at 420.

The Supreme Court, in Taylor v. Sturgell, clarified when preclusion may appropriately be applied to those who were not actual parties in the earlier litigation. The Supreme Court stated: "'It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" 553 U.S. at 884 (quoting Hansberry v. Lee, 311 U.S. 32, 40 (1940)). The Supreme Court eliminated the broad doctrine of virtual representation, which allowed preclusion on the grounds of a sufficiently close relationship and which had prevailed in

some federal circuits.  See Taylor v. Sturgell, 553 U.S. at 884, 890, 903-04.  Instead, the Supreme

Court approved six exceptions to the general rule against non-party preclusion: (i) when the non-

party "agrees to be bound by the determination of issues in an action between others," 553 U.S. at

893 (quoting Restatement (Second) of Judgments § 40)(internal quotation marks omitted); (ii) based

on pre-existing substantive legal relationships that "include, but are not limited to, preceding and

succeeding owners of property, bailee and bailor, and assignee and assignor," 553 U.S. at 894

(citation omitted)(internal quotation marks omitted); (iii) when the non-party was "adequately

represented by someone with the same interests who" was a party in the prior lawsuit, 553 U.S. at

894 (citation omitted)(internal quotation marks omitted); (iv) when the non-party assumed control

over the earlier litigation, see 553 U.S. at 895; (v) when the non-party is suing on behalf of the party

to the earlier litigation, see 553 U.S. at 895; and (vi) where a "a special statutory scheme" forecloses

successive litigation, provided the scheme is consistent with due process, 553 U.S. at 895.  The

Supreme Court did not eliminate all aspects of virtual representation -- the situations other courts

labeled virtual representation were too diverse and could be justified on traditional grounds.  Instead,

the Supreme Court declared that "[t]he preclusive effects of a judgment in a federal-question case

decided by a federal court should . . . be determined according to the established grounds for

nonparty preclusion described in"  Taylor v. Sturgell, 553 U.S. at 904.

### 2.    Issue Preclusion a/k/a Collateral Estoppel.

Where the causes of action are not identical, the second aspect of the doctrine of res judicata,

termed "collateral estoppel" or "issue preclusion," may still preclude parties from relitigating issues

in a second, not identical cause of action, where the particular issues were litigated in a prior case.

See In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009)("The doctrine of issue preclusion prevents a

party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another

lawsuit."). The Tenth Circuit has stated: "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." In re Corey, 583 F.3d at 1251 (quoting Arizona v. California, 530 U.S. 392, 414 (2000); Restatement (Second) of Judgments § 27 cmt. e)(alterations and internal quotation marks omitted). See Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). The Tenth Circuit's test for issue preclusion under res judicata consists of four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003)(quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002)).

"It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. 558, 568 (1951). See Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982)("A prior conviction will estop a party from contesting in a later civil suit any element necessarily established in the criminal trial."). The Tenth Circuit has stated that whether a defendant is estopped from relitigating an issue after a criminal trial "is whether the question was 'distinctly put in issue and directly determined' in the criminal prosecution." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d 313, 316 (10th Cir. 1970)(quoting Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. at 569). Thus, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which

were essential to the verdict must be regarded as having been determined by the judgment." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 (quoting Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. at 569)(internal quotation marks omitted).

> With respect to issues determined in a criminal prosecution: (1) A judgment in favor of the prosecuting authority is preclusive in favor of the government: (a) In a subsequent civil action between the government and the defendant in the criminal prosecution, as stated in § 27 with the exceptions stated in § 28.

Restatement (Second) of Judgments § 85.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

### 1.    Supplemental Jurisdiction.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[26] Federal courts may

---

[26]The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress

exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, 2011 WL 6013547, at *5 (D.N.M. 2011)(Browning, J.)(citing 16 Moore's Federal Practice, § 106.04[5] (Matthew Bender 3d ed.)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with

---

enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine."  Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.    District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726. Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of

28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News

Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has indeed altered

Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute

plainly allows the district court to reject jurisdiction over supplemental claims only in the four

instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557

(9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it

is clear that Congress intended the exercise of discretion to be triggered by the court's identification

of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other

grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v.

Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in

the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v.

Lujan, 2009 WL 1324119, at *8 (D.N.M. 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the

district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining

jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other district

court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v.

Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of

discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the

existence of one of the four conditions enumerated.").

    The Tenth Circuit has held that district courts should presume to decline jurisdiction over

state claims when federal claims no longer remain: "When all federal claims have been dismissed,

the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."

Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel.

Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).   The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, 2009 U.S. Dist. LEXIS 101917, at *4 ("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## NEW MEXICO LAW REGARDING FALSE ARREST AND FALSE IMPRISONMENT

"Under New Mexico law, 'false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'"  Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d 212 (quoting NMSA § 30-4-3).  False arrest or unlawful detention occurs when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate."  Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d 212 (stating that "[u]nlawful detention has similar requirements" to false imprisonment).  While the Supreme Court of New Mexico appears to recognize them as separate torts, the Court of Appeals of New Mexico more recently has found that "[a] false arrest is merely one way of committing false imprisonment."  Santillo v. N.M. Dep't of Pub. Safety, 2007-

NMCA-159, ¶ 12, 173 P.3d 6 (citing 32 Am. Jur. 2d False Imprisonment § 3 (2007)).  See Wallace v. Kato, 549 U.S. 384, 388-89 (2007)("False arrest and false imprisonment overlap; the former is a species of the latter."); Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002)("The torts of false arrest and false imprisonment are similar."); D. Dobbs, The Law of Torts § 36, at 67 (2000)("False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest.").

New Mexico state courts have not stated when a plaintiff's causes of action for false arrest and for false imprisonment accrue.  These courts, however, often look to the law as stated in the RESTATEMENT (SECOND) OF TORTS.  See Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189 ("It has long been the policy of our courts to follow in the footsteps of the RESTATEMENT OF TORTS, 2d.").  In Schmitz v. Smentowski, 1990-NMSC-002, 785 P.2d 726, the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the RESTATEMENT OF TORTS to assist our development of new tort areas."  1990-NMSC-002, ¶ 49, 785 P.2d 726.  The Supreme Court of New Mexico explained:

> Accordingly, New Mexico has recognized as tortious inducing a breach of contract, adopting the view promulgated in RESTATEMENT OF TORTS § 766 (1939).  Wolf v. Perry, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959)(requiring that "one who, without justification or privilege to do so, induces a third person not to perform a contract with another, is liable to the other for the harm caused thereby"); see also Williams v. Ashcraft, 72 N.M. 120, 381 P.2d 55 (1963)(recognizing the tort of wrongful interference with another's business relations).  We have adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B) (1977).  M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 452-54, 612 P.2d 241, 244-46 (Ct. App. 1980)(one who, with "bad motive," intentionally interferes with another's prospective contractual relations, is subject to liability); Anderson v. Dairyland Ins. Co., 97 N.M. 155, 158-59, 637 P.2d 837, 840-41 (1981).  These torts reflect the underlying theory of prima facie tort as applied to contractual relations -- the underlying malicious motive of a defendant's actions, done without justification, makes an otherwise lawful act, competition, tortious.

New Mexico has also recognized the tort of intentional infliction of emotional distress, relying on Restatement (Second) of Torts § 46 (1965), Mantz v. Follingstad, 84 N.M. 473, 479-80, 505 P.2d 68, 74-75 (Ct. App. 1972); Ramirez v. Armstrong, 100 N.M. 538, 673 P.2d 822 (1983), and we have recognized that the intentional and wrongful deprivation of the right to vote or hold public office creates tort liability. Valdez v. Gonzalez, 50 N.M. 281, 176 P.2d 173 (1946).

Schmitz v. Smentowski, 1990-NMSC-002, ¶¶ 50-51, 785 P.2d 726.  See Baldonado v. El Paso Natural Gas Co., 2008-NMSC-005, 176 P.3d 277 (adopting the elements of intentional infliction of emotional distress from RESTATEMENT (SECOND) OF TORTS § 46); Berlangieri v. Running Elk Corp., 2003-NMSC-024, ¶ 18, 76 P.3d 1098 ("The rule [for acceptance of risk] followed by the courts of this state thus far tracks the rule followed in a majority of other courts, as well as the RESTATEMENT (SECOND) OF TORTS § 496B (1965).").  The Supreme Court of New Mexico, however, has also stated that "the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court."  Gabaldon v. Erisa Montg. Co., 1999-NMSC-039, ¶ 27, 990 P.2d 197.  See Blake v. Public Serv. Co, 2004-NMCA-002, 82 P.3d 960 (noting that New Mexico courts have not adopted RESTATEMENT (SECOND) OF TORTS § 324A, Liability to Third Person for Negligent Performance of Undertaking, declining to decide whether to do so).

## NEW MEXICO LAW REGARDING MALICIOUS ABUSE OF PROCESS

New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process.  See DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 17, 953 P.2d 277, overruled by Durham v. Guest, 2009-NMSC-007, 204 P.3d 19. "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Richardson v. Rutherford, 1990-NMSC-015, ¶ 21, 787 P.2d 414.  The Supreme Court of New Mexico has held that

an abuse of process arises when there has been a perversion of the court processes to
accomplish some end which the process was not intended by law to accomplish, or
which compels the party against whom it has been used to perform some collateral
act which he legally and regularly would not be compelled to do.

Richardson v. Rutherford, 1990-NMSC-015, ¶ 18, 787 P.2d 414.

The Supreme Court of New Mexico recently revised the necessary elements of the tort of
malicious abuse of process.  In Durham v. Guest, the Supreme Court of New Mexico held that: (i) an
arbitration proceeding is a judicial proceeding for the purposes of a claim for malicious abuse of
process, see 2009-NMSC-007, ¶ 35, 204 P.3d 19; and (ii) that the requirement that the defendant
initiate judicial proceedings against the plaintiff -- which had previously been an essential element to
a malicious-abuse-of-process claim -- was no longer an element, see 2009-NMSC-007, ¶ 28, 204
P.3d 19.  The tort of malicious abuse of process under New Mexico law now has only three
elements: (i) "the use of process in a judicial proceeding that would be improper in the regular
prosecution or defense of a claim or charge;" (ii) "a primary motive in the use of process to
accomplish an illegitimate end;" and (iii) damages.  Durham v. Guest, 2009-NMSC-007, ¶ 29, 204
P.3d 19.

In elaborating upon the first element, the Supreme Court of New Mexico commented:

An improper use of process may be shown by (1) filing a complaint without probable
cause, or (2) an irregularity or impropriety suggesting extortion, delay, or
harassment, or other conduct formerly actionable under the tort of abuse of process.
A use of process is deemed to be irregular or improper if it (1) involves a procedural
irregularity or a misuse of procedural devices such as discovery, subpoenas, and
attachments, or (2) indicates the wrongful use of proceedings, such as an extortion
attempt.  Finally, we emphasize that the tort of malicious abuse of process should be
construed narrowly in order to protect the right of access to the courts.

2009-NMSC-007, ¶ 29, 204 P.3d 19.  About the general policies underlying the malicious-abuse-of-
process tort, the Supreme Court said:

When the judicial process is used for an illegitimate purpose such as harassment,
extortion, or delay, the party that is subject to the abuse suffers harm, as does the

> judicial system in general.  Thus, the malicious abuse of process tort makes the
> process abuser liable to the other party for the harm caused by the abuse of process.

2009-NMSC-007, ¶ 31, 204 P.3d 19.  The tort of malicious abuse of process is construed narrowly to

protect the right of access to the courts.  See DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001,

¶ 19, 953 P.2d 277.  "[T]he filing of a proper complaint with probable cause, and without any overt

misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is

the result of a malicious motive."  DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 20, 953

P.2d 277.  See Richardson v. Rutherford, 1990-NMSC-015, ¶ 23, 787 P.2d 414 ("There is no

liability where the defendant has done nothing more than carry out the process to its authorized

conclusion, even though with bad intentions . . . ." (citation omitted)).  "[A] malicious-abuse-of-

process plaintiff attempting to show a lack of probable cause must demonstrate, by the applicable

standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations

of fact or law of the underlying claim."  DeVaney v. Thriftway Mktg. Corp., 1998-NMSC-001, ¶ 27,

953 P.2d 277.  If an officer had probable cause to obtain the warrant for the plaintiff's arrest, then he

acted with authority when he arrested her, and he cannot be held liable for malicious abuse of

process based on a lack of probable cause, but can still be held liable under a "procedural

impropriety" theory.  Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 26, 173 P.3d 6

(noting that "the procedural impropriety theory, unlike the lack of probable cause theory, does not

stand or fall on the merits of the underlying claims," and that "even in meritorious cases the legal

process may be abused").

## ANALYSIS

The Court's analysis proceeds as follows.  First, the Court dismisses as moot Atencio's

assertion of qualified immunity, because Trujillo asserts his ADA Title II claim solely against Rio

Arriba County and not against Atencio.  Second, construing all evidence in the light most favorable

to Trujillo, the Court concludes, pursuant to rule 56(a), that there is no genuine dispute as to any material fact and that the Defendants are entitled to judgment as a matter of law on Trujillo's ADA Title II claim.   The Court therefore grants the MSJ with respect to that claim.   Finally, having dismissed the claim which originally invoked the Court's federal question jurisdiction, the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Trujillo's remaining state law claims and remands the case to state court for further proceedings.   Accordingly, the Court grants the MSJ only in part.

## I.      THE COURT DISMISSES AS MOOT ATENCIO'S ASSERTION OF QUALIFIED IMMUNITY WITH RESPECT TO TRUJILLO'S ADA TITLE II CLAIM.

Atencio originally moved for qualified immunity on Trujillo's ADA Title II claim.   See MSJ at 9.   It is well-established that Title II "does not provide for individual capacity suits against state officials."   Braverman v. New Mexico, 2011 U.S. Dist. LEXIS 138808, at *22.   "Only public entities are subject to Title II[.]"   City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. at 1773 (citing Pa. Dep't of Corrs. v. Yeskey, 524 U.S. at 208).   Thus, because Title II does not provide for individual capacity suits, Trujillo does not need qualified immunity.   The Court, moreover, need not revisit the issue whether qualified immunity is available in this context, because Trujillo asserts his Title II claim against only Rio Arriba County.   See MSJ Response at 17 (citing Complaint ¶¶ 125-37, at 10-12).   Atencio has accordingly withdrawn his assertion of qualified immunity.   See MSJ Reply at 1. The Court, therefore, dismisses as moot Atencio's assertion of qualified immunity.

## II.     THE COURT GRANTS SUMMARY JUDGMENT AS TO TRUJILLO'S ADA TITLE II CLAIM, BECAUSE TRUJILLO WAS NOT DISCRIMINATED AGAINST BY REASON OF HIS DISABILITY.

The Defendants move for summary judgment on Trujillo's ADA Title II claim, contending that Trujillo's rights under the ADA were not violated during his arrest or subsequent detention.   See MSJ at 10-19.   The Defendants advance two primary arguments: (i) that Trujillo "was arrested based

on the probable cause that he was intoxicated" and not on a misperception of Trujillo's disability as

intoxication, MSJ at 11; and (ii) that Rio Arriba County had no knowledge of Trujillo's need for an

accommodation during his field sobriety tests, transportation, or detention, see MSJ at 18.  Trujillo

counters that Atencio improperly used observations of his disability to provide probable cause and

that, absent such observations, "a reasonable jury could find that Atencio had insufficient probable

cause."  MSJ Response at 14.  Trujillo also argues that he "requested accommodation multiple times

and informed Defendants of his disabilities multiple times, to no avail."  MSJ Response at 16.  Thus,

Trujillo argues, "taking the facts in the light most favorable to the non-moving party, a reasonable

jury could find Defendant Rio Arriba County violated John Trujillo's rights under Title II of the

Americans with Disabilities Act . . . ."  MSJ Response at 1.

       To establish a claim under the ADA's Title II, Trujillo must demonstrate that: (i) he is a

qualified individual with a disability; (ii) a public entity discriminated against him; and (iii) that

discrimination was by reason of his disability.  See Robertson v. Las Animas Cnty. Sheriff's Dep't,

500 F.3d at 1193; Gohier v. Enright, 186 F.3d at 1219.  The first element requires evidence of "a

physical or mental impairment that substantially limits one or more major life activities of [an]

individual."  42 U.S.C. § 12102(1)(A).  See Doebele v. Sprint/United Mgt. Co., 342 F.3d 1117, 1129

(10th Cir. 2003)("[A] plaintiff must show that an impairment substantially limits at least one major

life activity.")(citation omitted).  "Major life activities" include those "activities that are of central

importance to daily life," Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002),

such as "walking, standing, lifting," 42 U.S.C. § 12102(2)(A).  That Trujillo has a qualifying

impairment under this definition is uncontested.  The Defendants concede that Trujillo "is disabled

due to degenerative joint disease, kidney disease, diabetes, and nephropathy."  MSJ ¶ 28, at 6.

Trujillo agrees with this characterization of his disability.  See MSJ Response ¶ 27, at 13; Complaint

¶ 9, at 2.  Trujillo's disability, moreover, limits a major life activity, namely, joint problems in his knees make it difficult to walk without the assistance of a cane.  <u>See</u> MSJ Response at 3 (citing Trujillo Depo. at 51:19-20 (Trujillo)); Complaint ¶ 38, at 4; <u>id.</u> ¶¶ 64-73, at 6.[27]  Thus, viewing the evidence in the light most favorable to Trujillo, the Court concludes that Trujillo has an impairment affecting a major life activity within the ADA's meaning.  <u>See</u> <u>Bristol v. Bd. of County Comm'rs</u>, 281 F.3d 1148, 1157 (10th Cir. 2002)(stating that whether the plaintiff has a qualifying impairment affecting a major life activity is a question of law for the court to decide), <u>rev'd in part on other grounds</u>, 312 F.3d 1213 (10th Cir. 2002)(en banc).  Further, a reasonable jury could find that Trujillo's impairment substantially limited his ability to walk on the night of his arrest.  <u>See</u> <u>Bristol v. Bd. of County Comm'rs</u>, 281 F.3d at 1157 (stating that whether impairment substantially limits a major life activity is a factual question for the jury).

    Whether Trujillo was discriminated against by reason of this disability is more complex.  As discussed <u>supra</u>, the Tenth Circuit recognizes that Title II of the ADA applies to arrests, <u>see</u> <u>Gohier v. Enright</u>, 186 F.3d at 1221 (stating that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law"), but has repeatedly eluded defining the contours of that application, <u>see</u> 186 F.3d at 1221 ("It remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of *Lewis* and *Jackson* and the reasonable-accommodation-during-arrest

---

[27]The Defendants' Statement of Undisputed Material Facts, <u>see</u> MSJ ¶¶ 1-29, at 4-7, does not assert that Trujillo's degenerative joint disease makes it difficult for him to walk without the assistance of a cane.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, <u>see</u> MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, <u>see</u> D.N.M.LR-Civ. 56.1(b) ("The response may set forth additional facts . . . which the non-movant contends are material to the resolution of the motion. . . . All material facts set forth in the Response will be deemed undisputed unless specifically controverted [by the Reply].").  Trujillo's general discussion of the facts in his Response does, however, assert that Trujillo was unable to "perform the walk and turn" test "without his cane."  <u>See</u> MSJ Response at 3 (citing Trujillo Depo. at 51:19-20 (Trujillo)).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

theory of *Gorman*."); J.H. v. Bernalillo Cnty., 806 F.3d at 1260 ("declin[ing] to decide" the viability of the wrongful-arrest theory and "assum[ing] -- without deciding -- that accommodations may be necessary when disabled individuals are arrested")(citing Gohier v. Enright, 186 F.3d at 1221). Nevertheless, it is clear that disability discrimination claims stemming from arrests may properly be asserted pursuant to Title II in some form.  See Gohier v. Enright, 186 F.3d at 1221.  Title II's plain language supports this construction.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any [public] entity."  42 U.S.C. § 12132.  Arrests logically fall within the catchall anti-discriminatory clause at the end of this sentence, see Gohier v. Enright, 186 F.3d at 1220 (implicitly reading "be subjected to discrimination by" as encompassing arrests), particularly given the well-established principle that courts should interpret antidiscrimination statutes broadly.  See Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 983 (10th Cir. 2002)("In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end.'")(quoting Wheeler v. Hurdman, 825 F.2d 257, 262 (10th Cir. 1987)).  The question remains, however, precisely which theories of liability Title II encompasses in the context of arrests.

The Court has previously concluded that "it is appropriate to recognize wrongful-arrest and reasonable-accommodation claims under the ADA." J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *390.  Trujillo, relying on the Court's decision in J.H. ex rel. J.P. v. Bernalillo County, grounds his Title II claim on those theories.  See MSJ Response at 14 (citing J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *314).  The Complaint alleges that:

> 131.  Deputy Atencio wrongfully arrested Plaintiff when he misperceived the effects of Plaintiff's disability as criminal activity, namely, intoxication.

> 132.  On the basis of his disability, Defendants discriminated against Plaintiff by arresting Plaintiff for the manifestations of his disability.

133.  Defendants failed to provide adequate accommodations for disabled persons such as Plaintiff while conducting field sobriety tests.

134.  Defendants failed to provide adequate accommodations when they placed Plaintiff in jail and kept him handcuffed for a period of over four hours.

135.  Because of Plaintiff's physical disabilities, the handcuffing of Plaintiff caused more pain and discomfort than would occur to a person without a disability.

136.  Defendants violated Title II of the Americans with Disabilities Act when they discriminated against Plaintiff and when they failed to provide adequate accommodations to Plaintiff.

Complaint ¶¶ 131-36, at 11-12.  The Defendants do not dispute these theories' validity; rather, they assume it.  See MSJ at 9 (noting that "[f]ederal district courts have recognized Title II ADA claims arising from [these] two theories," but arguing that Trujillo cannot succeed on either theory).  The Court, for its part, can think of no sound reason to depart from its reasoning in J.H. ex rel. J.P. v. Bernalillo County and conclude that these theories are invalid.  See 2014 U.S. Dist. LEXIS 94132, at *390.  Indeed, the Tenth Circuit's opinion in J.H. v. Bernalillo County -- on appeal from the Court's decision in J.H. ex rel. J.P. v. Bernalillo County -- does not counsel such a departure.  Although the Tenth Circuit did not expressly adopt the wrongful-arrest or reasonable-accommodation theories, it nonetheless discussed their application to the case without casting doubt on their legitimacy.  See J.H. v. Bernalillo Cnty., 806 F.3d at 1260-62.  Accordingly, the Court concludes -- as it did in J.H. ex rel. J.P. v. Bernalillo County -- that Trujillo's ADA claim should be analyzed under the wrongful-arrest and reasonable-accommodation theories.

### A.   TRUJILLO'S TITLE II CLAIM FAILS UNDER THE WRONGFUL-ARREST THEORY.

An arrest is wrongful under Title II where police arrest someone with a disability "because they misperceive[] the effects of that disability as a criminal activity."  Gohier v. Enright, 186 F.3d at 1221-22 (citations omitted).  The Court's analysis of this theory begins with a threshold inquiry --

under which standard should wrongful-arrest claims be evaluated.  Trujillo cites <u>J.H. ex rel. J.P. v.</u> <u>Bernalillo County</u> for the proposition that wrongful-arrest claims require proof that: "(i) the plaintiff was disabled; (ii) the arresting officers knew or should have known that the plaintiff was disabled; and (iii) the defendant arrested the plaintiff because of legal conduct related to the plaintiff's disability."  MSJ Response at 14 (quoting <u>J.H. ex rel. J.P. v. Bernalillo Cnty.</u>, 2014 U.S. Dist. LEXIS 94132, at *394-95)(citation omitted).  The Defendants counter that whether an arrest is wrongful depends on the absence or existence of supporting probable cause.  <u>See</u> MSJ at 9 (citing <u>J.H. v.</u> <u>Bernalillo Cnty.</u>, 806 F.3d at 1261).

Trujillo is correct that the Court referenced and even applied the above three-part test in <u>J.H.</u> <u>ex rel. J.P. v. Bernalillo County</u>.  <u>See</u> 2014 U.S. Dist. LEXIS 94132, at *395-415.  Trujillo omits, however, the Court's conclusion "that, on balance, the probable-cause standard is the appropriate standard for ADA wrongful arrest claims."  2014 U.S. Dist. LEXIS 94132, at *395.  That is, "if probable cause to arrest is present, a plaintiff has no ADA claim."  2014 U.S. Dist. LEXIS 94132, at *395 (citing <u>Patrice v. Murphy</u>, 43 F. Supp. 2d at 1161).  The Court's conclusion favoring the probable-cause standard was based on several factors.  The Court reasoned that the ADA's language prohibiting "discrimination" implies a "right that all citizens enjoy: the right to be arrested only based on probable cause."  <u>J.H. ex rel. J.P. v. Bernalillo Cnty.</u>, 2014 U.S. Dist. LEXIS 94132, at *396-97.  In essence, "discrimination" under Title II requires a "causal link" between a plaintiff's disability and the wrongful arrest, that is, that no probable cause for the arrest exists.  2014 U.S. Dist. LEXIS 94132, at *395 (quoting <u>Patrice v. Murphy</u>, 43 F. Supp. 2d at 1161).  The Court also noted that "the probable-cause standard has important practical benefits," for example, that police officers and courts are familiar with the standard, which makes it "relatively administrable."  <u>J.H. ex rel. J.P.</u> <u>v. Bernalillo Cnty.</u>, 2014 U.S. Dist. LEXIS 94132, at *401.

The Court's conclusion favoring the probable-cause test finds support in the Tenth Circuit's opinion in J.H. v. Bernalillo County, which affirmed the Court's grant of summary judgment on the plaintiff's ADA wrongful arrest claim in J.H. ex rel. J.P. v. Bernalillo County.  See J.H. v. Bernalillo County, 806 F. 3d at 1260.  In J.H. v. Bernalillo County, the Tenth Circuit affirmed summary judgment, because "Deputy Sharkey could make the arrest based on probable cause."  J.H. v. Bernalillo Cnty., 806 F.3d at 1260.  Thus, although the Court had analyzed the plaintiff's wrongful-arrest claim under both the probable-cause standard and the three-part test articulated above, see J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *402-15, the Tenth Circuit explicitly endorsed only the Court's probable-cause theory analysis.  In light of this analysis and the reasons that the Court outlined in J.H. ex rel. J.P. v. Bernalillo County, the Court maintains that the probable-cause standard is "the appropriate standard for ADA wrongful arrest claims."  2014 U.S. Dist. LEXIS 94132, at *395.  Trujillo proffers no reason why the Court should change course and endorse the three-part test instead.

Having clarified the appropriate test for wrongful-arrest claims under Title II, the Court's analysis is fairly straightforward.  "Probable cause to arrest exists where, 'under the totality of the circumstances,' a 'reasonable person' would believe that an offense has been . . . committed' by 'the person arrested.'"  United States v. Martin, 613 F.3d 1295, 1302 (10th Cir. 2010)(quoting United States v. Munoz-Nava, 524 F.3d 1137, 1144 (10th Cir. 2008)).  The Tenth Circuit has stated that "[t]he probable cause inquiry is an objective one" and that an arrest is not invalid "'simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as 'the circumstances, viewed objectively, justify' the arrest.'"  Morris v. Noe, 672 F.3d 1185, 1193 (10th Cir. 2012)(quoting Howards v. McLaughlin, 634 F.3d 1131, 1142 (10th Cir. 2011)(quoting Devenpeck v. Alford, 543 U.S. 146, 153 (2004))).  Probable-cause determinations,

moreover, need be based only on "reasonably trustworthy information" that supports a reasonable belief that a suspect committed an offense.  Beck v. Ohio, 379 U.S. at 91 (citing Brinegar v. United States, 338 U.S. at 175-76).  As the Supreme Court has stated, probable cause requires only a "fair probability on which reasonable and prudent people, not legal technicians, act."  Florida v. Harris, 133 S. Ct. at 1055.

The Court previously has noted that application of the probable-cause standard to wrongful-arrest claims asserted under the ADA does not "render the disability irrelevant."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397.  This is because "[t]he probable cause inquiry depends on 'facts known to the arresting officer at the time of the arrest.'"  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397 (quoting Buck v. City of Albuquerque, 549 F.3d 1269, 1281 (10th Cir. 2008)).  Consequently, if "facts known to the officer include information about an individual's disability -- and particularly if the information known to the officer about an individual's disability would exculpate the defendant -- those facts inform the probable cause calculus."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397.

Taking these principles into account, the Court concludes that Atencio did not wrongfully arrest Trujillo based on a misperception of Trujillo's disability as evidence of criminal activity.  See Gohier v. Enright, 186 F.3d at 1221-22.  Instead, construing all evidence in the light most favorable to Trujillo, see Hunt v. Cromartie, 526 U.S. at 550-55, the Court concludes that Atencio arrested Trujillo based on probable cause that Trujillo was driving while intoxicated.  The Court has found the following facts -- all relevant to the probable-cause determination -- undisputed: (i) Trujillo's admission to drinking two beers within the past few hours; (ii) Trujillo's exhibition of the "six clues" of horizontal gaze nystagmus and failure of the HGN test, which correlates with indicia of intoxication; (iii) Trujillo's failure of the finger dexterity test with his right hand; (iv) Trujillo's odor

of alcohol; (v) Trujillo's bloodshot eyes; and (vi) Trujillo's slurred speech.  The Court concludes that, considered "under the totality of the circumstances," United States v. Martin, 613 F.3d at 1302, these facts would lead a reasonable person to believe that Trujillo was driving while intoxicated.

Trujillo argues, and the Defendants concede, that Trujillo's admission to drinking two beers did not, by itself, supply probable cause.  See Tr. at 13:25-14:2 (Salvato); id. at 10:12-15 (Kennedy). The Court agrees that Trujillo's admission alone would not be sufficient to provide probable cause. Trujillo's admission is a significant factor in the probable-cause analysis, however.  The Tenth Circuit has stated that a suspect's admission to drinking "one beer three hours ago" provides an officer with "the reasonable suspicion necessary to conduct [] field sobriety tests . . . ." Vondrak v. City of Las Cruces, 535 F.3d at 1207 (citing United States v. Slater, 411 F.3d 1003, 1004, 1006 (8th Cir. 2005)).  This principle is especially true in New Mexico, where "driving while impaired to the slightest degree" is unlawful.  Vondrak v. City of Las Cruces, 535 F.3d at 1207 (citing NMSA § 66-8-102(A)).  Thus, Trujillo's admission to drinking two beers within the last few hours supplied Atencio with reasonable suspicion to proceed to conduct field sobriety tests.  Atencio then developed probable cause to arrest Trujillo while conducting those tests.

The Defendants assert that, in the totality of the circumstances, Trujillo's failure of the HGN test was "very critical[]" to Atencio's probable-cause determination. Tr. at 14:3-8 (Salvato).  As the Court explained earlier, supra note 5, "[t]here is a well-recognized . . . causal connection between the ingestion of alcohol and the detectable presence of exaggerated horizontal gaze nystagmus in a person's eyes."  United States v. Horn, 185 F. Supp. 2d at 533.  In light of this causal connection, federal courts have recognized that HGN test results "may be considered to determine whether probable cause exists to charge a driver with driving while intoxicated . . . ."  United States v. Horn, 185 F. Supp. 2d at 532-33.  See Sherbrooke v. City of Pelican Rapids, 577 F.3d at 988 (holding that

the defendant's failure of the HGN test, along with other indicia of impairment, was "sufficient to create probable cause to arrest him for driving while impaired").  Indeed, investigating officers are trained on the mechanics of HGN testing based the notion that nystagmus correlates with intoxication.  See, e.g., NHTSA Manual Session 8, at 32-45.  Officers are specifically trained to look for six "clues" in the suspect's eyes, United States v. Horn, 185 F. Supp. 2d at 537, and they learn that exhibition of four or more of these clues makes it "likely that the subject's BAC is at or above 0.08," see NHTSA Manual Session 8, at 32-45.  Here, it is undisputed that Trujillo exhibited all six nystagmus clues, thereby failing the test and making it likely, according to the NHTSA Manual, that his BAC exceeded the legal limit.  Even resolving all reasonable inferences in Trujillo's favor, see Hunt v. Cromartie, 526 U.S. at 550-55, his failure of the test provided Atencio with at least a "fair probability," Florida v. Harris, 133 S. Ct. at 1055, that he was driving while intoxicated.  Accordingly, the Court concludes that Trujillo's failure of the HGN test contributed to Atencio's probable-cause determination.

Trujillo advances a number of objections to the HGN test supplying probable cause; none are persuasive.  Trujillo's main objection is that there is no evidence that the HGN test is scientifically reliable.  See MSJ Response ¶ 9, at 10-11.  The Court has already dealt with this argument, supra note 5.  Suffice it to say, for purposes of probable cause, it is sufficient that the HGN test is at least a "reasonably trustworthy," Beck v. Ohio, 379 U.S. at 91, method of assessing intoxication.  The test need not, in other words, predict intoxication with a particularly high degree of accuracy for officers to rely on it to determine probable cause.  See Beck v. Ohio, 379 U.S. at 91 (noting that probable-cause determinations turn on "practical, nontechnical" considerations)(internal quotation marks and citation omitted); Illinois v. Gates, 462 U.S. at 235 ("Finely tuned standards . . . have no place in the [probable-cause] decision.").  Trujillo presses a related argument that the HGN test is not a reliable

indicator of intoxication, because the test's clues can be "caused by things other than alcohol" and because "[s]ome people naturally have nystagmus." Tr. at 17:5-8 (Kennedy). These facts are true, but they do not negate the value of HGN test results, especially in the total mix of evidence and the circumstances. That there are potential alternate causalities which manifest in nystagmus does not disprove the correlation between nystagmus and intoxication; it simply posits that there are more correlations. Even accounting for such alternative causes, a suspect's exhibition of nystagmus' six clues still provides a "fair probability," Florida v. Harris, 133 S. Ct. at 1055, that the suspect is intoxicated, see NHTSA Manual Session 8, at 32-45, especially where, as here, the officer has no reason to suspect any alternate cause at play. Trujillo also advances that "HGN is not admissible in court in criminal cases." Tr. at 7:2-7 (Kennedy). The Court has already explained that, even if HGN test results are inadmissible in state court, they are admissible in federal court as long as the witness is qualified to testify about the results. See discussion, supra note 5. Also, as the Court explained supra note 5, the test's admissibility is irrelevant, because officers are entitled to rely on otherwise inadmissible evidence when determining probable cause. See United States v. Sanchez, 725 F.3d at 1247 (citing Franks v. Delaware, 438 U.S. at 165). Finally, Trujillo attempts to diminish the HGN test result's significance by asserting that he "performed well on an alphabet recitation test." MSJ Response at 19. This argument, too, is irrelevant. A suspect need not fail every field sobriety test for an officer to develop probable cause. See Sherbrooke v. City of Pelican Rapids, 577 F.3d at 988 (upholding an officer's probable-cause determination where the defendant failed only the HGN field sobriety test). Probable-cause determinations are based on the totality of the circumstances, see United States v. Martin, 613 F.3d at 1302, and not on rigid litmus tests.

While the HGN test, by itself, is highly significant to the probable-cause determination, the Court concludes that the test supplied probable cause when coupled with Atencio's observations of

other indicia of intoxication.  As noted above, it is undisputed that Trujillo admitted to drinking two beers and that he had an odor of alcohol, bloodshot eyes, and slurred speech.  The Supreme Court, the Tenth Circuit, and other Courts of Appeals have upheld probable-cause determinations on similar facts.  The Supreme Court, for example, has found that "there was plainly probable cause" to arrest a driver who smelled of alcohol and had bloodshot watery eyes.  Schmerber v. California, 384 U.S. 757, 768-69 (1966).  The Tenth Circuit has found probable cause where a driver admitted to drinking "a couple of beers" before the stop, performed poorly on the field sobriety tests, and had bloodshot eyes and an odor of alcohol.  United States v. Chavez, 660 F.3d at 1224-25.  See Wilder v. Turner, 490 F.3d 810, 815 (10th Cir. 2007)(finding probable cause where the officer "observed . . . a moderate odor of alcohol, pinkish and watery eyes, a flushed face, unusually slow and deliberate speech, and slow hand movements," and the driver "refused to participate in a field sobriety test").  The Eighth Circuit has similarly found probable cause where an officer smelled an odor of alcohol, the driver admitted to consuming four alcoholic drinks before driving, and the driver failed the HGN test.  Sherbrooke v. City of Pelican Rapids, 577 F.3d at 987-88.  All of these cases are apposite and support the proposition that Atencio had probable cause to arrest Trujillo based on Trujillo's admission to drinking two beers, Trujillo's odor of alcohol, bloodshot eyes, and slurred speech, and Trujillo's failure of the HGN test.

The results of Trujillo's toxicology report buttress this conclusion.  The Court has concluded that it is undisputed that Trujillo's blood test revealed that he had diazepam in his system, that diazepam is a CNS depressant with the same impairing effects as alcohol, and that diazepam can exaggerate the effects of alcohol.  See discussion, supra note 16.  Trujillo objects that this evidence is irrelevant, because "Atencio cannot assert after discovered evidence to support a finding of probable cause."  MSJ Response at 18 (citing Maryland v. Garrison, 480 U.S. at 85).  It is indeed

true that "[t]he probable cause inquiry depends on facts known to the arresting officer at the time of the arrest." J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397 (internal quotation marks and citation omitted). As the Court explained earlier, supra note 14, however, Atencio based his probable-cause determination only on facts known to him at the time of Trujillo's arrest -- Trujillo's smell of alcohol, bloodshot eyes, slurred speech, and his observable eye gaze nystagmus. Evidence of Trujillo's diazepam use and of diazepam's effects is offered only to explain the facts upon which Atencio relied, i.e., it illustrates that Atencio did not simply imagine Trujillo's apparent signs of intoxication, because Trujillo's diazepam use caused him to manifest indicia that resembled alcoholic impairment. Trujillo's blood test is not, therefore, "after discovered evidence" offered to establish probable cause, as Trujillo asserts. MSJ Response at 18.

Lest the Court's probable-cause analysis "render the disability irrelevant," J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397, the Court notes that Atencio was aware of aspects of Trujillo's disability when he made his probable-cause determination. As noted above, if an arresting officer has information about a suspect's disability, such information must "inform the probable cause calculus," especially if the information "would exculpate the defendant." J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397. Here, Trujillo requested to retrieve his cane and told Atencio that he had balance issues because of his disability. See MSJ Response at 3 (citing Trujillo Depo. at 46:4-10, 48:14-22 (Trujillo, Sullivan)).[28] After informing Atencio of his

---

[28]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Trujillo requested to retrieve his cane or told Atencio that he had balance issues because of his disability. In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b). Trujillo's general discussion of the facts in his Response asserts, however, that "Trujillo asked Atencio if he could retrieve his cane," and that he wouldn't be able to perform the walk and turn test, because he did not "have that degree of balance." MSJ Response at 3 (citing Trujillo Depo. at 46:4-10, 48:14-22 (Trujillo, Sullivan)). Moreover, the parties' subsequent briefings

balance issues, Trujillo was unable to perform the walk and turn test.  See MSJ Response at 3 (citing Trujillo Depo. at 51:19-22 (Trujillo).[29]  Trujillo also failed the finger dexterity test with his right hand, see MSJ ¶ 13, at 5, because his right thumb was, plainly, missing, see MSJ ¶ 11, at 5; MSJ Response ¶ 10, at 11.  In an attempt to explain these results, Trujillo pointed to his handicap placard and offered to show Atencio proof of his disability.  See MSJ Response at 3 (citing Trujillo Depo. at 53:16-23 (Sullivan, Trujillo)).[30]  Taking these facts in the light most favorable to Trujillo, the Court concludes that Atencio was aware that Trujillo was at least somewhat disabled when he made his probable-cause determination.

Awareness of a disability does not, however, necessarily vitiate probable cause under Title II -- it just "inform[s] the probable cause calculus."  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *397.  Here, had Atencio arrested Trujillo based only on Trujillo's failure of the

---

and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

[29]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Trujillo was unable to perform the walk and test turn test.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b).  Trujillo's general discussion of the facts in his Response asserts, however, that Trujillo "could not perform" the walk and turn test, and that Atencio "terminated that test for Plaintiff's safety."  Trujillo Depo. at 51:19-22 (Trujillo).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

[30]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Trujillo pointed to his handicap placard and offered to show Atencio proof of his disability.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b).  Trujillo's general discussion of the facts in his Response asserts, however, that he said "there is a handicap sticker right there on the dash" and that he "told Atencio multiple times of his disability and his ability to show proof."  MSJ Response at 3 (citing Trujillo Depo. at 53:19-23 (Sullivan, Trujillo)).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

walk and turn test and the finger dexterity test, the arrest may have been wrongful under Title II, because Atencio "misperceived the effects of [Trujillo's] disability as a criminal activity." Gohier v. Enright, 186 F.3d at 1221-22 (citations omitted).  "[D]iscrimination" under Title II, however, requires a "causal link" between an arrestee's disability and the individual's arrest, i.e., that no other probable cause for the arrest exists.  J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *395 (quoting Patrice v. Murphy, 43 F. Supp. 2d at 1161).  See Morris v. Noe, 672 F.3d at 1193 ("[A]n arrest is lawful as long as probable cause exists for *some* offense.")(emphasis in original).  Here, Atencio had probable cause to arrest Trujillo based on numerous other factors: Trujillo's smell of alcohol, bloodshot eyes, slurred speech, his admission to drinking two beers, and his failure of the HGN test.  There is no evidence that Trujillo's disability affected these observations, unlike the walk and turn test and the finger dexterity test.  The disability in Trujillo's joints and his missing thumb did not affect his eye gaze nystagmus, for example, nor is there any evidence that his nystagmus was caused by his diabetes.  Moreover, the existence of these additional factors illustrates that the walk and turn test and the finger dexterity test were not necessary for Atencio to develop probable-cause.  See MSJ at 12 (arguing that these tests were "not necessary for probable cause," because Atencio "had more than enough facts" from his other observations).  As noted above, probable cause is based on the totality of the circumstances, see United States v. Martin, 613 F.3d at 1302, and may be found where a suspect fails a single field sobriety test, see Sherbrooke v. City of Pelican Rapids, 577 F.3d at 988.  Even disregarding Trujillo's failure of the tests that his disability affected, therefore, Atencio still had probable cause based on these other factors.

In short, the Court concludes that Atencio did not arrest Trujillo "by reason of a disability," J.H. v. Bernalillo Cnty., 806 F.3d at 1260 (citing Gohier v. Enright, 186 F.3d at 1221)(internal

quotation marks omitted), because the arrest was based on probable cause that Trujillo was driving while intoxicated.  Accordingly, the Court concludes that, pursuant to rule 56(a), the Defendants are entitled to judgment as a matter of law on Trujillo's wrongful-arrest claim.

> **B.      TRUJILLO'S TITLE II CLAIM FAILS UNDER THE REASONABLE-ACCOMMODATION-DURING-ARREST THEORY.**

Title II of the ADA "forbids not only discrimination but also failure to make reasonable accommodations for a disability."  J.H. v. Bernalillo Cnty., 806 F.3d at 1261 (citing 42 U.S.C. § 12112(b)(5)(A)).  An arresting officer fails to make reasonable accommodations when the officer "properly investigated and arrested a person with a disability for a crime unrelated to that disability," yet "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  Gohier v. Enright, 186 F.3d at 1220.  A claim for failure to make reasonable accommodations during arrest fits within Title II's "subjected to discrimination" language.  42 U.S.C. § 12132.  The Tenth Circuit has assumed, "[f]or the sake of argument," that "accommodations may be necessary when disabled individuals are arrested."  J.H. v. Bernalillo Cnty., 806 F.3d at 1261.  For its part, the Court has held that accommodations are necessary in the context of arrests.  See J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *402 (concluding that, "in an appropriate case, the Court would apply the reasonable-accommodation-during-arrest theory").  Thus, the Court will analyze Trujillo's ADA claim under the reasonable-accommodation-during arrest theory.

For a public entity to be required to provide a disabled individual with an accommodation under the ADA, the entity must "first understand that an individual requires such modification *because* he is disabled."  Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196 (emphasis in original).  The Court has previously explained that the ADA's protections require such knowledge, because "a disabled arrestee . . . should not be able to keep his disability secret and sue

later for a failure to accommodate." J.H. ex rel. J.P. v. Bernalillo Cnty., 2014 U.S. Dist. LEXIS 94132, at *422 (citing Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196). Thus, the threshold question for reasonable-accommodation-during-arrest claims is whether the public entity has "knowledge of the individual's disability . . . ." Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196. Such knowledge can arise "either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability." Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196.

The Court has already concluded that Atencio -- and thus Rio Arriba County -- was aware of Trujillo's disability, because aspects of his disability were obvious and because Trujillo told Atencio that he was disabled. See Analysis, supra Part II.A. Before his arrest, Trujillo requested to retrieve his cane, informed Atencio of his balance issues, was unable to perform the walk and turn test because he had trouble standing and balancing, failed the finger dexterity test with his right hand because his thumb was missing, and tried to present Atencio with proof of his disability. These facts, taken in the light most favorable to Trujillo, demonstrate that Atencio knew Trujillo was to some extent disabled. This conclusion is not to say that Atencio had knowledge of Trujillo's specific disabilities, namely, his "degenerative joint disease, kidney disease, diabetes, and nephropathy," MSJ ¶ 28, at 6; there is no evidence that would impute such specific knowledge to Atencio, particularly when Trujillo asserts that he told Atencio only that he had joint and balance issues and that he was physically disabled in a general sense, see MSJ Response at 15 ("Plaintiff repeatedly told Atencio he was disabled."); Complaint ¶ 44, at 4 (alleging that Trujillo told Atencio he had "physical disabilities"). Thus, although the Court concludes that Atencio was aware that Trujillo was disabled, the Court notes that he was only aware of Trujillo's mobility impairment in a general sense.

In addition to knowledge of an individual's disability, the ADA requires accommodations only if a public entity has knowledge that the "individual requires an accommodation of some kind to participate in or receive the benefits of its services." Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197. In J.H. ex rel. J.P. v. Bernalillo County, the Court noted the importance of this requirement, explaining that the "alternative would effectively impose a strict-liability regime on police officers who, as far as they knew, were doing nothing more than securing a suspect as usual." 2014 U.S. Dist. LEXIS 94132, at *423. Knowledge of an individual's need for an accommodation may arise in two ways: "[E]ither because that need is obvious or because the individual requests an accommodation." Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197 (citations omitted). Here, Trujillo contends that he required accommodations to receive the "benefits . . . of the Department of Public Safety," including: (i) "encounters with officers properly trained to deal with citizens who suffer from service-related disabilities;" and (ii) "being treated with dignity by the government entity sworn to protect its community's citizens." Complaint ¶ 130, at 11. The Court will address the obviousness of Trujillo's need for such accommodations and then turn to Trujillo's requests for accommodations.

Whether an individual's need for an accommodation is obvious depends on a public entity's "knowledge of the individual's disability and his need for, or attempt to participate in or receive the benefits of, a certain service." Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197. Thus, here, the obviousness of Trujillo's need for accommodations depends on the extent to which Atencio -- and thus Rio Arriba County -- subjectively understood the effects of Trujillo's impairment on his ability to perform field sobriety tests and on his needs after his arrest. As discussed above, Atencio had only a general sense of Trujillo's disability, i.e., he knew that Trujillo was mobility-impaired, but he was not aware of that disability's specific attributes. The Court concludes that, to

the extent Atencio understood Trujillo's disability in this general sense, he provided reasonable accommodations when the need was obvious.  When Trujillo struggled to retain his balance and almost fell during the walk and turn test, "Atencio terminated that test for Plaintiff's safety."  MSJ Response at 3 (citing Trujillo Depo. at 51:20-22 (Trujillo)).[31]  When Trujillo struggled with the finger dexterity test with his right hand, Atencio administered an alphabet test, see MSJ Response at 6 (citing Atencio Depo. at 75:23-25 (Atencio)),[32] an accommodation which Trujillo admits was reasonable because it required no mobility, see Tr. at 6:15-21 (Kennedy).  When Atencio arrested Trujillo, he handcuffed him "with his hands in the front of his body" as a "courtesy" to Trujillo and for Trujillo's "comfort," MSJ ¶ 17, at 5, an accommodation which Trujillo "appreciate[d]" because of his joint issues, MSJ ¶ 18, at 5.  See Trujillo Depo. at 52:1-5 ("I'm grateful that because of . . . issues with, you know, arthritis in my shoulders and such that they fortunately cuff[ed] me in front.").  Taking into account Atencio's limited, nonspecific knowledge of Trujillo's disability, these accommodations sufficiently addressed Trujillo's obvious manifestations of mobility impairment.

---

[31]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Atencio terminated the walk and turn test for Trujillo's safety.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b).  Trujillo's general discussion of the facts in his Response asserts, however, that "Atencio terminated that test for Plaintiff's safety."  MSJ Response at 3 (citing Trujillo Depo. at 51:20-22 (Trujillo)).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

[32]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Atencio administered an alphabet test.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b).  Trujillo's general discussion of the facts in his Response asserts, however, that "Trujillo did very well on an alphabet test."  MSJ Response at 6 (citing Atencio Depo. at 75:23-25 (Atencio)).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

Trujillo objects, however, that Atencio should not have administered the walk and turn test or the finger dexterity test in the first place -- that, essentially, it was obvious from the start that Trujillo required an exemption from all mobility-dependent field sobriety tests.  See MSJ Response at 1, 3, 5; Tr. at 12:13-24 (Kennedy); Complaint ¶¶ 64-73, at 6.  In support of this contention, Trujillo argues that "the observations Atencio made of Trujillo stumbling to get out of his car and leaning on his car revealed that John Trujillo was disabled," MSJ Response at 1; that his missing right thumb revealed that he could not perform the finger dexterity test, see MSJ Response at 3; Tr. at 12:21-24 (Kennedy); and that "a handicapped placard sign was visibly placed on the rear view mirror, in plain sight of an officer approaching a vehicle," MSJ Response at 15.

The Court disagrees that these facts made it obvious that mobility-dependent field sobriety tests were presumptively inappropriate.  When Atencio first observed Trujillo stumble and lean on his car, he already had "reasonable suspicion to conduct [] field sobriety tests" based on Trujillo's admission to drinking two beers.  Vondrak v. City of Las Cruces, 535 F.3d at 1207 (citation omitted).  Trujillo's apparent clumsiness only bolstered Atencio's initial suspicion that Trujillo was intoxicated and that field sobriety tests were necessary.  Atencio did not, however, simply launch into conducting those tests; instead, he had Trujillo "perform a preliminary walk" to determine whether Trujillo was capable of performing the full walk and turn test.  MSJ Response at 3 (citing Trujillo Depo. at 48:23-49:1 (Trujillo)).[33]  Atencio determined that Trujillo performed adequately on the preliminary walk, and began to administer the walk-and-turn test, see MSJ Response at 5 (citing

---

[33]The Defendants' Statement of Undisputed Material Facts, see MSJ ¶¶ 1-29, at 4-7, does not assert that Atencio had Trujillo perform a preliminary walk.  In his Response, Trujillo does not set forth this fact as an additional undisputed fact, see MSJ Response at 1-20, thereby giving the Defendants an opportunity to respond to it, see D.N.M.LR-Civ. 56.1(b).  Trujillo's general discussion of the facts in his Response asserts, however, that "Atencio . . . told [Trujillo] to perform a preliminary walk."  MSJ Response at 3 (citing Trujillo Depo. at 48:23-49:1 (Trujillo)).  Moreover, the parties' subsequent briefings and arguments at the hearing assume without disputing this fact's accuracy.  Accordingly, the Court will rely upon this fact in its analysis.

Atencio Depo. 77:17-78:2 (Atencio, Kennedy)), but terminated that test when Trujillo nearly fell, see MSJ Response at 3 (citing Trujillo Depo. at 51:20-22 (Trujillo)).  Trujillo argues that the test should never have even been administered, because he told Atencio that his balance issues were attributable to his mobility impairment.  See MSJ Response at 3 (citing Trujillo Depo. at 48:14-49:1 (Trujillo)). Trujillo's explanation for his apparent manifestation of intoxication does not prove that his need for an accommodation was obvious, however, because officers are generally not required to accept an arrestee's innocent explanation for their conduct.  See Munday v. Johnson, 257 Fed. App'x. at 134. Indeed, Atencio asserts that DUI suspects frequently attribute their apparent signs of intoxication to a disability, and that he regularly administers a preliminary walk to "evaluate the veracity of their allegation."  MSJ Response at 4 (citing Atencio Depo. at 33:4-34:25 (Kennedy, Atencio)).  Here, Atencio investigated Trujillo's asserted disability and initially concluded that Trujillo could perform the walk-and-turn test; Atencio then terminated the test when Trujillo's disability began to obviously inhibit his mobility.  Thus, although Trujillo's initial clumsiness did not make it "obvious" that he required an accommodation for the walk and turn test, Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197, Atencio provided an accommodation when that need later became obvious.

With respect to the finger dexterity test, Trujillo's assertion that he obviously required an accommodation from the test, see MSJ Response at 3, is a red herring.  First, Trujillo performed the test with both hands and not only his right hand.  See MSJ ¶ 12, at 5 (citing Trujillo Depo. at 49:5-16 (Sullivan, Trujillo)).  Trujillo has not alleged that he was incapable of performing the test with his left hand; to the contrary, he contends that he successfully performed the test with that hand.  See MSJ Response ¶ 12, at 11 (citing Trujillo Depo. at 50:1-22 (Sullivan, Trujillo)).  Accordingly, because Trujillo was able to perform the test with at least one hand, there is no sound reason why the test should not have been administered at all.  Second, Trujillo did, in fact, perform the finger

dexterity test with his right hand in an accommodated fashion.  See Trujillo Depo. at 50:2-18 (Sullivan, Trujillo).  In his deposition, Trujillo stated that he performed the test with his right hand by touching his fingers to the base of his thumb -- and not his thumb's "stub" -- in the order that Atencio instructed.  Trujillo Depo. at 50:4-15 (Sullivan, Trujillo).  Trujillo contended that he was thereby "able to perform [Atencio's] task."  Trujillo Depo. at 50:14-18 (Sullivan, Trujillo).  Thus, Trujillo was not wholly incapable of performing the finger dexterity test with his right hand.  Third, and finally, Trujillo admits that, when he struggled with the finger dexterity test, Atencio reasonably accommodated his impairment by administering an alphabet test.  See MSJ Response at 6 (citing Atencio Depo. at 75:23-25 (Atencio); Tr. at 6:15-21 (Kennedy).  Accordingly, Atencio responded to Trujillo's obvious manifestations of mobility impairment by switching to an alternative test that did not require mobility.

Trujillo's final assertion that his handicap placard evinced an obvious need for disability accommodations, see MSJ Response at 15, is likewise unavailing.  Even if Atencio saw the placard, it would not have alerted him to Trujillo's specific impairments and, thus, to his specific needs with respect to accommodations.  Put another way, that Trujillo had a disability placard did not make it obvious that he could not perform mobility-dependent field sobriety tests, because the placard could have suggested any number of impairments.  See Complaint ¶¶ 43-44, at 4 (asserting that Trujillo tried to present his disability placard to prove unspecified "physical limitations").  The placard put Atencio on notice that Trujillo had some disability, however, and Atencio's ensuing investigation into Trujillo's disability via the preliminary walk and walk and turn test helped him to ascertain the disability's legitimacy.  See MSJ Response at 4 (citing Atencio Depo. at 33:4-34:25 (Kennedy, Atencio)).

All the above notwithstanding, Trujillo asserts that Atencio had knowledge that he required an accommodation, because he "requested his walking cane multiple times to assist him in standing and maintaining his balance." MSJ Response at 16.  See Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1197 (stating that knowledge of an individual's need for an accommodation may arise "because the individual requests an accommodation")(citations omitted).  Trujillo's Complaint indeed asserted that he made multiple requests to use his cane.  See Complaint ¶ 38, at 4 (alleging that, when he stepped out of his car, Trujillo "asked Deputy Atencio if he could retrieve his walking cane from the trunk"); id. ¶ 42, at 4 (alleging that, when he moved away from his car and began to lose his footing, Trujillo "again asked if he could retrieve his walking cane from his car"); id. ¶ 68, at 6 (arguably implying that Trujillo requested to retrieve his cane during the walk-and-turn test by alleging that "Atencio refused to allow Plaintiff to retrieve his walking cane").  Trujillo's MSJ Response, however, isolates only one such request and not "multiple" requests as he posits.  Namely, in his general discussion of the case's facts, Trujillo asserts that, when Atencio directed him to exit his vehicle, "Trujillo asked Atencio if he could retrieve his cane."  MSJ Response at 3 (citing Trujillo Depo. at 46:4-10 (Trujillo, Sullivan)).  Trujillo arguably implies that he made one additional request -- that, when Atencio directed him to perform the walk-and-turn test, he "knew he could not perform this task, without his cane, due to his diagnosis of neuropathy."  MSJ Response at 3 (citing Trujillo Depo. at 51:19-22 (Trujillo)).  The record does not suggest -- either explicitly or implicitly -- that a request was made during the walk-and-turn test, however.  In his deposition, upon which the MSJ Response relies, Trujillo stated that, "because of the neuropathy [the walk-and-turn test] was just impossible."  Trujillo Depo. at 51:19-20 (Trujillo).  Even resolving all reasonable inferences from this statement in Trujillo's favor, see Hunt v. Cromartie, 526 U.S. at 550-55, it amounts to only an expression of the reason that Trujillo was unable to perform the walk-and-turn test; it does not

support the proposition that Trujillo expressly requested to use his cane during that test.  As a result, the MSJ Response does not articulate "multiple" requests, MSJ Response at 16, by Trujillo to use his cane.  The Court concludes that the MSJ Response represents Trujillo's current version of the facts, because it relies on a more developed record than was in existence at the time the Complaint was filed.  Accordingly, although the Complaint alleged multiple requests by Trujillo to use his cane, the Court concludes that Trujillo made only one such request when he exited his vehicle.

Trujillo's single request to use his cane, made at the outset of his encounter with Atencio, is insufficient to support his reasonable-accommodation-during-arrest claim.  The Court has already explained that Atencio was entitled to act on his reasonable suspicion that Trujillo was intoxicated and proceed to conduct field sobriety tests, see Vondrak v. City of Las Cruces, 535 F.3d at 1207 (citation omitted), and that Atencio first administered a "preliminary walk" to ascertain whether Trujillo could perform the full walk-and-turn test, MSJ Response at 3 (citing Trujillo Depo. at 48:23-49:1 (Trujillo)).  Trujillo's performance on the preliminary walk suggested that he was capable of performing the walk-and-turn test without the assistance of a cane.  See MSJ Response at 5 (citing Atencio Depo. 77:17-78:2 (Atencio, Kennedy)).  Indeed, when Atencio told Trujillo "you can walk well enough to do this" based on Trujillo's performance of the preliminary walk, Trujillo responded "[o]kay" and did not reiterate his request for his cane.  Trujillo Depo. at 48:23-49:1 (Trujillo).  When Trujillo subsequently struggled to retain his balance during the full walk-and-turn test, Atencio terminated that test for Trujillo's safety.  See MSJ Response at 3 (citing Trujillo Depo. at 51:20-22 (Trujillo)).  Thus, after investigating and ascertaining the veracity of Trujillo's mobility impairment, Atencio accommodated that impairment by terminating the field sobriety test which Trujillo's impairment affected.  Had Atencio skipped the preliminary walk and moved directly to the walk-and-turn test, the Court might reach the opposite conclusion.  It was not unreasonable, however, for

Atencio to initially deny Trujillo the use of his cane to investigate Trujillo's disability, nor was it unreasonable for Atencio to proceed to the walk-and-turn test when Trujillo performed adequately on the preliminary walk.  Atencio acted on a reasonable belief, based on his initial investigation, that Trujillo could perform the walk-and-turn test without his cane, and changed course when Trujillo's mobility impairment visibly affected his ability to walk

Even assuming Trujillo also requested to use his cane during the walk-and-turn test, such a request is not a "reasonable accommodation" under the ADA.  J.H. v. Bernalillo Cnty., 806 F.3d at 1261 (citing 42 U.S.C. § 12112(b)(5)(A)).  A requested accommodation is not reasonable if it would "'fundamentally alter the nature of the service, program, or activity,' 28 C.F.R. § 35.130(b)(7), or 'impose an undue hardship on the operation of [the] program,' 28 C.F.R. § 41.53."  Henrietta D. v. Bloomberg, 331 F.3d 261, 281 (2d Cir. 2003)(brackets in original).  Here, facilitating the use of a cane during the walk-and-turn test would "fundamentally alter the nature of the" test.  28 C.F.R. § 35.130(b)(7).  The walk-and-turn test, like the HGN test, is "designed to test a suspect's physical coordination."  Pa. v. Muniz, 496 U.S. 582, 608 (1990).  Allowing a suspect to use a cane during the test would effectively eliminate the test's usefulness, because it would allow the suspect to conceal visible signs of intoxication by artificially stabilizing their unsteady gait with the cane.  Allowing the use of a cane, moreover, would impose an "undue hardship," 28 C.F.R. § 41.53, on police officers conducting field sobriety tests.  If officers were required to simply facilitate a suspect's requested accommodation without investigating the veracity of the suspect's purported disability, they would never be able to conduct a meaningful inquiry into whether the suspect was intoxicated, because the suspect could claim an exemption from all tests by means of an unverified disability.  Further, here, Trujillo's alleged request to use a cane during the walk-and-turn test was not an accommodation

request at all; rather, it was a request for Atencio to cease his investigation into Trujillo's disability and administer the test in the way that Trujillo preferred.

Finally, it is worth emphasizing that Atencio terminated the only test for which Trujillo's use of a cane arguably would have been relevant.  To say that reasonable accommodations are required for a disability is to imply that the requested accommodations must relate to the service or program that the disabled individual is attempting to access.  See Sch. Bd. Of Nassau Cnty. v. Arline, 480 U.S. 273, 287 n.17 (1987)(stating, in the employment law context, that, "[w]hen a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodations' by the employer would enable the handicapped person to perform those functions"), superseded by statute on other grounds as stated in Shiring v. Runyon, 90 F.3d 827 (3d Cir. 1996).  For example, "if a disabled individual uses a wheelchair, courts might require law enforcement officers to secure the wheelchair when making an arrest." J.H. v. Bernalillo Cnty., 806 F.3d at 1261 (citing Gorman v. Bartch, 152 F.3d at 909-10, 913).  Other examples of reasonable accommodations include providing a paraplegic arrestee with a wheelchair restraint during transport and providing "the means of effective communications to a deaf individual during an [sic] police investigation."  Estate of Saylor v. Regal Cinemas, Inc., 54 F. Supp. 3d 409, 425 (D. Md. 2014)(Nickerson, J.)(citing Gorman v. Bartch, 152 F.3d at 912; Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 339 (4th Cir. 2012)).  Here, Trujillo's request to use his cane related only to his performance of the walk-and-turn test; there is no evidence that Trujillo also required his cane to stand and perform the HGN test or the finger dexterity test.  Accordingly, the propriety of Atencio's denial of Trujillo's request should be measured strictly by the reasonableness of that request as it related to the walk-and-turn test.  The Court has examined Trujillo's request as it related to the walk-and-turn test, and concluded that Atencio reasonably denied the request.

It is undisputed that, other than requesting a cane during his initial encounter with Atencio, Trujillo did not expressly request any additional accommodations.  As the Defendants note, Trujillo "spoke to several officers to arrange to have his friend take his car," but never communicated a need for "special accommodations due to his disability."  MSJ at 18 (citing Trujillo Depo. at 54:2-5 (Sullivan, Trujillo)).  Trujillo, moreover, admitted that "he did not have any other communications with officers at the scene of the DUI stop," MSJ at 18 (citing Trujillo Depo. at 55:11-13 (Sullivan, Trujillo)); that "he did not have any conversations with Defendant Atencio from the traffic stop to the Espanola Hospital," MSJ at 18 (citing Trujillo Depo. at 56:3-5 (Sullivan, Trujillo)); that he "did not ask for any accommodations at the hospital," MSJ at 18 (citing Trujillo Depo. at 56:9-57:22 (Sullivan, Trujillo)); that he "did not have any discussions with Atencio from the Hospital to the Sheriff's department," MSJ at 18 (citing Trujillo Depo. at 60:11-13 (Trujillo)); that, when his handcuffs were removed to sign a document, he "did not ask for any accommodations . . . before he was handcuffed again," MSJ at 18 (relying on Trujillo Depo. at 60:11-17 (Trujillo)); and that, finally, he did not ask either the transport driver or "the female officer who visited him in his cell for any accommodations," MSJ at 18 (citing Trujillo Depo. at 61:12-14; 62:5-17 (Sullivan, Trujillo)).  Trujillo's only answer to this version of events is that "Atencio kept Trujillo cuffed the entire time during the transport, during his time at the hospital, and during his time in a cell."  MSJ Response at 3 (citing Trujillo Depo. at 57:15-25 (Sullivan, Trujillo)).  Trujillo does not assert, however, that he requested any adjustment to his handcuffs, nor has he articulated any such accommodations that, in hindsight, should have been provided.  Moreover, the Court has found it undisputed that Trujillo was handcuffed "with his hands in front of his body" as an accommodation to his disability.  MSJ ¶ 17, at 5.  Absent some articulation of an accommodation request that was denied, the Court concludes that Trujillo's disability was reasonably accommodated.

In short, the Court concludes that, although Atencio had some knowledge of Trujillo's disability, it was not "obvious," Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d at 1196-97, that Trujillo required an accommodation for that disability.  Moreover, the Court concludes that, although Trujillo initially requested to use his cane, Atencio was not required as a matter of law to accommodate that request.  Accordingly, the Court concludes that, pursuant to rule 56(a), the Defendants are entitled to judgment as a matter of law on Trujillo's reasonable-accommodation-during-arrest claim.

## III.   THE COURT DENIES SUMMARY JUDGMENT AS TO TRUJILLO'S REMAINING STATE LAW CLAIMS AND REMANDS THE CASE TO STATE COURT.

Trujillo requests that the Court remand his state law claims to state court in the event it grants summary judgment on his ADA Title II claim.  See MSJ Response at 17.  Trujillo contends that the Supreme Court and the Tenth Circuit have a "preference for remand of state claims when federal claims are dismissed."  MSJ Response at 17 (citing Armijo v. New Mexico, 2009 U.S. Dist. LEXIS 101917, at *4; Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1115).  The Defendants counter that, should the Court dismiss Trujillo's ADA Title II claim based on a finding that probable cause supported Trujillo's arrest, Trujillo's state tort claims fail as a matter of law under the doctrine of res judicata.  See MSJ Reply at 11.  The Defendants, therefore, oppose remand and assert that the Court should resolve all of Trujillo's claims on the merits.  See MSJ Reply at 12.

The Defendants' objection to remand is unavailing.  Res judicata or claim preclusion bars relitigation of claims that were or could have been raised in an earlier action.  See Yapp v. Excel Corp., 186 F. 3d 1222, 1226-27 (10th Cir. 1999).  Res judicata requires: "(1) the same parties or parties in privity; (2) the same subject matter; (3) a final decision in the first action; and (4) the first decision was on the merits."  Francoeur v. U.S. Bank N.A., 643 F. App'x 701, 706 (10th Cir. 2016)(citing Kirby v. Guardian Life Ins. Co. of Am., 2010-NMSC-014, ¶ 61, 231 P.3d 87).  The

Court's grant of summary judgment on Trujillo's ADA claim does not satisfy these requirements. "'Orders granting partial summary judgment or denying summary judgment are generally not final appealable orders under 28 U.S.C. § 1291.'" Anderson v. Seven Falls Co., 633 F. App'x 691, 694 (10th Cir. 2015)(quoting Poolaw v. Marcantel, 565 F.3d 721, 728 (10th Cir. 2009)). Rather, "an order of partial summary judgment is interlocutory in nature." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514 (4th Cir. 2003)(citing 11 Moore's Federal Practice § 56.40[3] (Matthew Bender 3d ed.)). Here, the Court's grant of summary judgment on Trujillo's ADA claim is a partial grant; Trujillo's state law claims -- and thus this litigation -- remain intact. It is true that the Court will enter final judgment concomitantly with this memorandum opinion and order so that Trujillo may appeal the Court's denial of his federal claim, but the case continues; it would be odd to give res judicata effect to an interlocutory order in the same case. Thus, the Court does not presently reach a "final decision" with preclusive effects under the doctrine of res judicata. Francoeur v. U.S. Bank N.A., 643 F. App'x at 706.

It is possible that the Defendants' preclusion argument confuses res judicata with collateral estoppel -- that they intend to argue that the Court's decision that Atencio had probable cause to arrest Trujillo is preclusive as to that issue in future cases. Whichever doctrine applies, however, the Court's decision does not presently have the preclusive effects that the Defendants contend it has. Collateral estoppel or issue preclusion "is the principle that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" Villareal v. Patton, 608 F. App'x 591, 594 (10th Cir. 2015)(quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970)). As with res judicata, collateral estoppel's requirement that the prior action was "finally adjudicated on the merits," Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1207 (10th Cir. 2001), is fatal to the Defendants' argument.

The Court's grant of partial summary judgment on Trujillo's ADA claim is "interlocutory in nature," Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d at 514 (citation omitted), leaving the case intact. Although the Court's probable-cause determination may have preclusive effects under the doctrine of collateral estoppel in a future case, that determination is not preclusive in the same action.  See Villareal v. Patton, 608 F. App'x at 594 (stating that issues determined by a final judgment are given preclusive effect in "any future lawsuit")(emphasis added)(citation omitted).

Having granted summary judgment on the claim which invoked the Court's federal question jurisdiction under 28 U.S.C. § 1331, the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Trujillo's remaining state law claims.  See Merrifield v. Bd. of Cnty. Comm'rs, 654 F.3d 1073, 1086 (10th Cir. 2011)(holding that, in the interest of comity, the district court should have remanded a state law claim after it dismissed the claims over which it had original jurisdiction).  The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides that a district court may "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c). The Supreme Court and the Tenth Circuit have acknowledged and even encouraged such a result.  In United Mine Workers of America v. Gibbs, the Supreme Court stated that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  383 U.S. at 726 (footnote omitted). Thus, the Supreme Court concluded that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  383 U.S. at 726.  The Tenth Circuit has also stated that "district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial . . . ."  Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1115 n.6.  See

Brooks v. Gaenzle, 614 F.3d 1213, 1229-30 (10th Cir. 2010)("[I]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.")(internal quotation marks omitted).

The Court has considered its authority under 28 U.S.C. § 1367(c) and weighed the values of judicial economy, convenience, fairness, and comity.  In this case, the Court believes that fairness to Trujillo and comity suggest that it should remand Trujillo's remaining claims to the state court where he originally filed them.  The Court previously has noted that "New Mexico state courts are more experienced and knowledgeable about the contours of state law.  Also, federal courts should strive to avoid deciding issues of state law when, as here, it is possible to do so."  Armijo v. New Mexico, 2009 U.S. Dist. LEXIS 101917, at *11.  The Court, moreover, recognizes that Trujillo initially filed this case in state court and that it was the Defendants who removed this case on the basis of federal question jurisdiction; remanding this case would return it to the forum that Trujillo selected.  See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981)(noting, in the context of a motion to dismiss on the ground of *forum non conveniens*, the "strong presumption in favor of the plaintiff's choice of forum").  Accordingly, pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over Trujillo's remaining state law claims and remands the case to state court.

**IT IS ORDERED** that: (i) the Defendants' Motion for Qualified Immunity and Summary Judgment, filed June 7, 2016 (Doc. 34), is granted in part and denied in part; (ii) Trujillo's federal claim, asserted pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165, is dismissed with prejudice; and (iii) the remaining state law claims and the case are remanded to the First Judicial District Court, Rio Arriba County, State of New Mexico for further proceedings.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Theresa V. Hacsi
Kennedy, Kennedy & Ives, LLC
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

James P. Sullivan
Sabrina Salvato
Brennan & Sullivan, P.A.
Santa Fe, New Mexico

 *Attorneys for the Defendants*